# EXHIBIT A

**EXECUTION VERSION**

**SERVICING AGREEMENT**

**dated as of May 18, 2017**

**between**

**RESORTS GROUP, INC., a Pennsylvania corporation,**

**and**

**CRE BUSHKILL GROUP, LLC**

# TABLE OF CONTENTS

**Page**

ARTICLE 1. DEFINITIONS ................................................................................... 1

1.1     Definitions ............................................................................................1

1.2     Construction .......................................................................................10

1.3     Headings and Captions; Exhibits and Schedules ...............................11

ARTICLE 2. LOCKBOX ACCOUNT; SWEEPS; DISTRIBUTIONS ................ 11

2.1     Obligor Credit Risk ...........................................................................11

2.2     No Exercise of Collection Rights and Remedies by RGI ...................11

2.3     Obligor Notification ..........................................................................12

2.4     Lockbox Account; Sweeps; Distributions .........................................12

ARTICLE 3. SERVICING .................................................................................... 13

3.1     Appointment of Servicer ....................................................................13

3.2     Servicing Policies and Procedures and Standards .............................13

3.3     Lockbox and Payment Procedures .....................................................15

3.4     Servicing Fee ......................................................................................16

3.5     Payment of Free and Clear Net Timeshare contract Payments to Holder and RGI ....................................................................................17

3.6     Standstill on some Remedies Applicable to the Timeshare Contracts and Fairway Contracts for Deed .......................................................17

3.7     Amendment and Modification of Timeshare Contracts and Fairway Contracts for Deed .............................................................................18

3.8     Back-Up Servicing..............................................................................18

3.9     Maintenance of Errors and Omissions Insurance ..............................18

3.10    Servicer/Resort Default......................................................................18

3.11    Servicer Reporting Requirements ......................................................19

3.12    Annual Officer's Certificate ...............................................................20

3.13    Compliance with Applicable Law ......................................................20

3.14    Servicer Books and Records and Procedures.....................................20

3.15    Servicer Inspections ...........................................................................21

3.16    RGI's Retained Ownership Percentage ....................................................21

ARTICLE 4. INDEMNIFICATION FOR BENEFIT OF RGI ....................................... 22

4.1    RGI Indemnitees ...............................................................................22

4.2    Direct Claims of RGI .........................................................................23

4.3    Third Party Claims Against Servicer ...................................................24

4.4    Adjustment of Indemnification Owed to RGI Indemnitees ........................25

ARTICLE 5. INDEMNIFICATION FOR BENEFIT OF SERVICER ......................... 26

5.1    Servicer Indemnitees.........................................................................26

5.2    Direct Claims of RGI.........................................................................27

5.3    Third Party Claims Against RGI..........................................................28

5.4    Adjustment of Indemnification Owed to Servicer Indemnitees ..................29

ARTICLE 6. MISCELLANEOUS ........................................................................ 30

6.1    Notices ...........................................................................................30

6.2    Amendments and Waivers ..................................................................32

6.3    Expenses ........................................................................................32

6.4    Successors and Assigns......................................................................32

6.5    Governing Law .................................................................................33

6.6    Consent to Jurisdiction......................................................................33

6.7    WAIVER OF JURY TRIAL................................................................33

6.8    Counterparts; Third Party Beneficiaries .............................................34

6.9    Severability ....................................................................................34

6.10   Entire Agreement .............................................................................34

6.11   Miscellaneous .................................................................................34

## SERVICING AGREEMENT

**THIS SERVICING AGREEMENT** (this **"Agreement"**) made as of the 18th day of May, 2017 between **RESORTS GROUP, INC.,** a Pennsylvania corporation (hereinafter referred to as **"RGI"**) and **CRE BUSHKILL GROUP, LLC,** a Delaware limited liability company (f/k/a Bushkill Group Inc., a Delaware corporation) (hereinafter referred to as **"Servicer"**).

## WITNESSETH:

**WHEREAS,** RGI is the owner of certain rights to service, collect and receive collections in respect of certain Timeshare Contracts and Fairway Contracts for Deed (each as such term is defined in <u>Section 1.1</u> hereof) and is the owner of certain Fairway Contracts for Deed;

**WHEREAS**, RGI desires to engage the Servicer to service the Timeshare Contracts and Contracts for Deed under the terms and conditions in this Agreement.

**NOW, THEREFORE,** in consideration of the premises and the mutual covenants and promises herein contained, the parties hereto agree as follows:

## ARTICLE 1.
## DEFINITIONS

**1.1** **Definitions**. Unless defined herein, all terms defined in that certain Participation Agreement (the **"Participation Agreement"**), dated as of May 18, 2017, between RGI and Holder shall have the same meaning when used herein. As used in this Agreement, the following terms have the respective meanings specified below:

"<u>Affiliate</u>" means, with respect to any Person, any other Person (a) directly or indirectly Controlling such first Person, (b) directly or indirectly Controlled by such first Person or (c) under common Control with such first Person.

"<u>Agreement</u>" is defined in the first paragraph hereof.

"<u>Applicable Law</u>" means, with reference to any Person, (a) all laws (including common law), statutes, regulations, ordinances, and treaties, (b) all judgments, decrees, injunctions, writs and orders of any Governmental Authority and (c) the rules, regulations, orders, directives, licenses and permits in respect of clauses (a) and (b) above, in each case, applicable to such Person or its property or in respect of its operations.

"<u>Back-Up Servicer</u>" is defined in <u>Section 3.8</u> hereof.

"<u>Back-Up Servicing Agreement</u>" is defined in <u>Section 3.8</u> hereof.

"BGL" means CRE Bushkill Group, LLC, a Delaware limited liability company, formerly known as Bushkill Group Inc., a Delaware corporation.

"Building" means any residential building that contains accommodations that qualify as Villas and that is located on the property leased or owned by TTL or HRP, as applicable, in Bushkill, Pennsylvania.

"Business Day" means any day except a Saturday, Sunday or any day on which banks are not generally open for business in New York, New York and Philadelphia, Pennsylvania.

"Cash Flow Shortfall Default" is defined in clause (a) of the definition of "Servicer/Resort Default" set forth in this Section 1.1.

"Cerberus Control Group" means Cerberus Capital Management, LP and each of its (a) wholly-owned subsidiaries or (b) other Affiliates, including, without limitation, Purchaser, that are Controlled, directly or indirectly, by Cerberus Capital Management, LP and as to which Cerberus Capital Management, LP and any one or more Affiliates thereof own in the aggregate not less than 20% of the voting equity thereof.

"Closing Date" means May 18, 2017.

"Contract for Deed" means a contract for deed for a purchase of a Fairway Timeshare Interest (as defined in the Purchase Agreement).

"Control" means, when used with respect to a specified Person, the power to direct the management and policies of such Person, directly or indirectly, whether through the ownership of voting securities, by contract or otherwise.

"Damages" means, with respect to any event relating to indemnification hereunder, any and all damage (excluding any special, indirect, incidental, consequential, exemplary, and punitive damage), loss, liability and expense (including reasonable expenses of investigation and attorneys' fees and expenses in connection with any Proceeding) incurred, suffered or relating to the Person being so indemnified.

"Delinquent Timeshare Contract" means a Timeshare Contract or Fairway Contract for Deed as to which, as of the last day of any calendar month falling on and after the Closing Date, any Timeshare Contract Payment which is a scheduled installment payment then due and payable has remained unpaid for more than 180 days from the original due date for such payment.

"Fairway Contract for Deed" means each Contract for Deed in existence as of the date hereof and as listed in Schedule 3 attached to the Participation Agreement, provided that each of such Fairway Contracts for Deed will not be considered a Fairway Contract for Deed if (a) it shall have been declared after the date hereof a Non-Performing Timeshare Contract and for which the applicable Non-Performance Fee has been paid to RGI under Section 5.4(a) of the

2

Participation Agreement, (b) it shall have been declared after the date hereof an Improperly Interfered With Timeshare Contract and for which the applicable consideration has been paid to RGI under Section 5.4(b) of the Participation Agreement, or (c) it shall have been Upgraded, Reloaded, Resold or Refinanced after the date hereof and, with respect thereto, all payments have been made to RGI as contemplated under Section 3.1 of the Participation Agreement.

"Fees" means, with respect to any Timeshare Contract or Fairway Contract for Deed, all fees payable with respect thereto, including, without limitation, all late fees, servicing fees and processing fees (but excluding any fees for returned checks and similar fees owing to any applicable account banks).

"Force Majeure Event" means, with respect to the Buildings and related amenities and Servicer's performance and delivery of its Residential and Vacation Ownership Services, an event involving or in the nature of a strike, lock-out, a war, a civil disturbance, a natural disaster, an act of terrorism, an act of God and any other cause beyond Servicer's and its Affiliates' reasonable control.

"Free and Clear Net Timeshare Contract Payments" means, at any time after the Closing Date and prior to the date on which the Hypothecation Loan shall have been repaid in full and the liens and security interests of the Hypothecation Lender in and to the Lockbox Account shall have been terminated and discharged, the balance at such time of Timeshare Contract Payments (in good collected funds) less the sum of (a) all amounts then required to be deducted (or swept) from such balance of Timeshare Contract Payments and paid to the Hypothecation Lender for application under the Hypothecation Loan and Security Documents, as contemplated in Section 4.1 of the Participation Agreement plus (b) a minimum working operating balance of $20,000.

"Governmental Authority" means any court, government or political subdivision or department thereof, any governmental or regulatory body, board, bureau, arbitrator or alternative dispute resolution body, administrative agency or commission, securities exchange, or other governmental agency or instrumentality of competent jurisdiction.

"Holder" means the holder of a Participation Certificate as reflected in the books and records of RGI.

"Holder's Received Amount" means the aggregate amount received by Holder under the Participation Agreement in respect of Timeshare Contract Payments and Collection Rights and Hypothecation Distribution Advance Proceeds (including, after full repayment of the Hypothecation Loan, the Holder's Ownership Percentage of any Upgrade/Reload/Resold/Refinance Deemed Prepayments to the extent the related Timeshare Contract Payment and Collection Rights have been conveyed by RGI pursuant to Section 3.1(b) of the Participation Agreement).

"HRP" means CRE HRP, LLC a Delaware limited liability company, formerly known as CRE HRP Corp., a Pennsylvania corporation.

3

"Hypothecation Lender Servicing Agreement" means that certain Servicing Agreement dated RGI, April 21, 2017 among RGI, the Hypothecation Lender and the initial Servicer, as servicer, in connection with the Hypothecation Loan.

"Indemnification Cap" means, in the aggregate, an amount not to exceed ten percent (10%) of the Purchase Price (as defined and set forth in the Purchase Agreement).

"Insolvency Event" means the occurrence of any of the following events: (a) a receiver, liquidator, custodian or trustee of the Servicer or of all or any of the property of the Servicer is appointed by court order and such court order remains undismissed or unstayed and in effect for 60 consecutive days; (b) an order for relief is entered with respect to the Servicer or the Servicer is adjudicated a bankrupt or insolvent and such order or adjudication remains undismissed or unstayed and in effect for 60 consecutive days; (c) all or substantially all of the property of the Servicer is sequestered by court order or a petition is filed against the Servicer under any bankruptcy, reorganization, arrangement, insolvency, readjustment of debt, dissolution or liquidation law of any jurisdiction, whether now or hereafter in effect and such order or petition remains undismissed or unstayed and in effect for 60 consecutive days; (d) the Servicer files a petition in voluntary bankruptcy or seeking relief under any provision of any bankruptcy, reorganization, arrangement, insolvency, readjustment of debt, dissolution or liquidation law of any jurisdiction, whether now or hereafter in effect, or shall consent to the filing of any petition against it under any such law; or (e) the Servicer makes an assignment for the benefit of its creditors, or admits in writing its inability, or fails, to pay its debts generally as they become due, or consents to the appointment of a receiver, liquidator or trustee of any one or more of them, or of all or any part of its property.

"Lockbox Account" means that certain bank account held in the name of RGI, titled "RGI Lockbox Account," at PNC Bank, N.A., bearing bank account number 90-0970-4662, which account is used exclusively for the collection of Timeshare Contract Payments.

"Lockbox and Payment Procedures" means, the check, electronic payment and credit card collection and  cash management systems and processes of PNC Bank, N.A. employed by RGI, to receive and collect payments by check, electronic payment and credit cards on the Timeshare Contracts and Fairway Contracts for Deed, as more particularly described on Schedule 3 hereto, and, for so long as the Hypothecation Loan has not been paid in full, used to allow and enable the sweep or transfer of same to the Hypothecation Lender until repayment of the Hypothecation Loan, and following the repayment of the Hypothecation Loan to pay the same to RGI, as contemplated under Section 2.4 hereof.

"Material Servicer/Resort Default" means any Servicer/Resort Default, which has a material adverse effect on the likelihood of payment and/or collectability of the remaining unpaid Timeshare Contract Payments, including but not limited to a Cash Flow Shortfall Default.

"Obligor(s)" means the obligor or obligors under each Timeshare Contract or Fairway Contract for Deed, as applicable.

4

"Opinion of Counsel": A written opinion of counsel (who may, except as otherwise expressly provided, be counsel to or an employee of the Servicer) acceptable in form and substance and from counsel acceptable to RGI.

"Participation Certificate" means a certificate which RGI provides to a Holder substantially in the form attached to the Participation Agreement as Exhibit A.

"Participation Limit" means an amount equal to $15,625,000.

"Parties" means (a) Servicer and its successors and assignees permitted under Section 6.4 hereof and (b) RGI and its successors and assignees permitted under Section 6.4 hereof, with each of the foregoing being referred to herein as a "Party."

"Permitted Modifications" means with respect to any Timeshare Contract or Fairway Contract for Deed, (a) any Timeshare Upgrade, Timeshare Reload, Timeshare Resale Assumption or Refinance, provided that contemporaneously with the effectiveness thereof, Holder shall have paid to RGI RGI's Retained Ownership Percentage of outstanding principal and accrued and unpaid interest for such Timeshare Contract or Fairway Contract for Deed so Upgraded, Reloaded, Resold or Refinanced (except that, prior to full repayment of the Hypothecation Loan, 100% of the outstanding principal, accrued and unpaid interest and Fees for such Timeshare Contract or Fairway Contract for Deed so Upgraded Reloaded, Resold or Refinanced will be paid directly by the Holder to the Hypothecation Lender (pursuant to written direction from Hypothecation Lender) and applied pursuant to the relevant provisions of the Hypothecation Loan and Security Documents) (with respect to any such Timeshare Contract or Fairway Contract for Deed, the full amount thereof deemed to have been prepaid is referred to herein as the "Upgrade/Reload/Resold/Refinance Deemed Prepayment"), (b) any modification effected by Servicer, consistent with the Servicing, Collection and Enforcement Standards, effected prior to such Timeshare Contract or Fairway Contract for Deed being declared a Non-Performing Timeshare Contract, which modification cures any default or deficiency regarding such Timeshare Contract or Fairway Contract for Deed (including, without limitation, its status as a Delinquent Timeshare Contract) that would allow it to have been classified as a Non-Performing Timeshare Contract and (c) any other modifications proposed to RGI by Holder or Servicer in writing and approved by RGI in writing.

"Person" means an individual, corporation, partnership, limited liability company, association, trust or other entity or organization, including a Governmental Authority.

"PMA Liabilities" has the meaning assigned to such term in the Purchase Agreement.

"Proceedings" means any claim, action, arbitration, audit, hearing, investigation, notice of violation, litigation or suit (whether civil, criminal, administrative, investigative or informal) commenced, brought by a Person or Governmental Authority, or conducted or heard by or before, or otherwise involving, any Governmental Authority or arbitrator.

"Projected Portfolio Collection Report" is defined in Section 3.16(a) hereof.

5

"Purchase Agreement" means that certain Unit and Asset Purchase Agreement, dated on or after May 19, 2017, by and between Purchaser and RGI.

"Purchaser" has the meaning assigned to such term in the Purchase Agreement.

"Potential Servicer/Resort Default" means an event which, with the giving of notice or lapse of time (for tolling of grace periods), or both, would constitute a Servicer/Resort Default.

"Reload" is defined in the definition of "Timeshare Reload" in this Section 1.1.

"Resale" is defined in the definition of "Timeshare Resale Assumption" in this Section 1.1.

"Retail Timeshare Contract" means a retail installment contract or contract for sale, as applicable, and disclosure statement for a purchase of a Treetops Timeshare Interest (as defined in the Purchase Agreement).

"Residential and Vacation Ownership Services" means, with respect to each Timeshare Contract and Fairway Contract for Deed, the obligations of Servicer and/or its applicable Affiliates to maintain and operate, or cause to be maintained and operated, the Villas, Buildings and the related roads and amenities, whether owned or leased by Servicer or owned or leased by an Affiliate (including, without limitation, the vacation and resort-related obligations set forth on Schedule 5 attached hereto), in order to provide the residential and vacation services to be provided in accordance with and subject to the terms of such Timeshare Contract and Fairway Contract for Deed, in the Timeshare Documents related thereto and/or requirements of Applicable Law.

"Responsible Officer" means (a) the Chief Financial Officer of Servicer and (b) any other executive officer of Servicer designated, in writing, by Servicer that has supervisory or oversight duties and responsibilities for the performance of Servicer of its undertakings and duties hereunder.

"RGI" is defined in the first paragraph hereof.

"RGI Deductible" is defined in Section 4.4(b) hereof.

"RGI Indemnitees" is defined in Section 4.1 hereof.

"RGI's Retained Ownership Percentage" is defined in Section 3.16 hereof.

"RGI's Swept Timeshare Contract Payments" is defined in Section 2.4(d) hereof.

"Servicer" means initially CRE Bushkill Group, LLC, and any successor servicer appointed hereunder.

"Servicer Indemnitees" is defined in Section 5.1 hereof.

6

"Servicer Material Adverse Effect" means, with respect to any event or circumstance, a material adverse effect on (a) the business, property, licensing, operations, financial condition, prospects, liabilities or capitalization of Servicer or (b) the ability of Servicer to perform its obligations under this Agreement, in each case, which event or circumstance occurred after the date of the Purchase Agreement.

"Servicer/Resort Default" means any one or more of the following:

(a)        (i) Servicer shall fail to perform or observe in any material respects any term, covenant or agreement that is an obligation or duty of Servicer hereunder (other than as referred to in clause (b), (c) or (g) below) and such failure shall remain unremedied for thirty (30) calendar days after the earlier of (1) written notice thereof by RGI or (2) Servicer first obtaining actual knowledge thereof; or (ii) the amount of Timeshare Contract Payments received in good, collected funds by Servicer (including adjustments for any payments that constitute Upgrade/Reload/Resold/Refinance Deemed Prepayments, as provided on Schedule 2 attached hereto) for any full calendar month after the Closing Date is less than the corresponding amount for such month as set forth  on said Schedule 2 (such month is referred to in this clause (ii) as the "deficiency month") and  either

(A)        Timeshare Contract Payments collected by Servicer hereunder for each of the two (2) months immediately preceding such deficiency month were less than the corresponding amounts for such months set forth  on said Schedule 2 or

(B)        Timeshare Contract Payments collected by Servicer hereunder for not less than three (3) other months falling during the preceding twelve- (12-) month period ending with the last day of the then deficiency month were less than the corresponding amounts for such three other months set forth  on said Schedule 2;

in each case, other than because of a Force Majeure Event or an event or circumstance that occurred on or prior to the date of the Purchase Agreement (a Servicer/Resort Default under this subclause (ii) is referred to herein as a "Cash Flow Shortfall Default"); for the avoidance of doubt, the determinations under subclause (A) above shall not commence until the third full calendar month after the Closing Date and the determinations under subclause (B) above shall not commence until the fourth full calendar month after the Closing Date and, for purposes of the 12-month period in subclause (B), such period shall refer, prior to the first anniversary of the Closing Date, to the number of full calendar months from and after the Closing Date to and including any deficiency month;

(b)        Servicer shall fail to make any payment or deposit to be made by it hereunder more than five (5) Business Days after such payment or deposit became due;

(c)        Any information set forth in any daily, monthly or other report, as provided for in Section 3.11 hereof, shall prove to have been false or incorrect in any material respect when provided and such false or incorrect information was not based on any information originally generated by RGI or any Affiliate thereof on or prior to the date of the Purchase Agreement and

DOC ID - 25164159.16

5037022-100403 04/07/2017

remains unremedied for thirty (30) calendar days after the earlier of (1) written notice thereof by RGI or (2) Servicer's first obtaining actual knowledge thereof;

(d)     An Insolvency Event shall have occurred and remain continuing with respect to Servicer and such Insolvency Event was not caused by any action or inaction that was taken or event or circumstance that occurred, in either case, on or prior to the date of the Purchase Agreement;

(e)     There shall exist any event or occurrence that (i) has caused, or would reasonably be expected to cause, a Servicer Material Adverse Effect; or (ii) has, or would reasonably be expected to have, a material adverse effect on the Lockbox and Payment Procedures that was caused by the Servicer and, in the case of clauses (i) and (ii), such event or occurrence occurred after the date of the Purchase Agreement;

(f)     After the date of the Purchase Agreement, the Purchaser and/or one or more members of the Cerberus Control Group shall fail to, directly or indirectly, beneficially own and control, on an aggregate basis, all of the voting equity interests of the initial Servicer; or

(g)     Any uncured material breach by Servicer in its performance of any representation, warranty or covenant under this Agreement, including, without limitation, Section 2.4 hereof and, such material breach remains unremedied for thirty (30) calendar days after the earlier of (1) written notice thereof by RGI or (2) Servicer's first obtaining actual knowledge thereof.

"Servicing, Collection and Enforcement Policies and Procedures" means those servicing, collection and enforcement policies, procedures and practices of Servicer, as described in Schedule 1 attached hereto, as amended or otherwise modified from time to time after the date hereof after written notice to RGI and agreement by RGI, as provided in Section 3.2 herein below.

"Servicing, Collection and Enforcement Standards" is defined in Section 3.2 hereof.

"Servicing Fee" means, with respect to any calendar month (or portion thereof) falling after the Closing Date), a fee equal to the result of the following: A times B times C, where "A" equals $1/12^{th}$, "B" equals 0.7% and, "C" equals the aggregate principal balance of all Timeshare Contracts and Fairway Contracts for Deed as of the last day of such month.

"Servicing Term" means the term commencing as of the date hereof and ending on the Termination Date or, if earlier, as may be mutually agreed upon, in a writing, by Holder, RGI and Servicer.

"Termination Date" means the date on which all Timeshare Contract Payments have been paid or collected indefeasibly in cash, as jointly certified in a writing exchanged among RGI and Holder.  For purposes of determining the "Termination Date," the "Timeshare Contract Payments" of all Retail Timeshare Contracts excluded from the definition of "Timeshare

8

Contract" and Contracts for Deed excluded from the definition of "Fairway Contracts for Deed" shall be excluded from such determination.

"Third Party Claim Against RGI" is defined in Section 5.3(a) hereof.

"Third Party Claim Against Servicer" is defined in Section 4.3(a) hereof.

"Timeshare Contract" means each Retail Timeshare Contract in existence as of the date hereof and as listed in Schedule 1 to the Participation Agreement, provided that each of such Retail Timeshare Contracts will not be considered a Timeshare Contract if (a) it shall have been declared after the date hereof a Non-Performing Timeshare Contract and for which the applicable Non-Performance Fee has been paid to RGI under Section 5.4(a) of the Participation Agreement, (b) it shall have been declared after the date hereof an Improperly Interfered With Timeshare Contract and for which the applicable consideration has been paid to RGI under Section 5.4(b) of the Participation Agreement, or (c) it shall have been Upgraded, Reloaded, Resold or Refinanced after the date hereof and, with respect thereto, all payments have been made to RGI as contemplated under Section 3.1 of the Participation Agreement.

"Timeshare Contract Payments" means, with respect to any Timeshare Contract or Fairway Contract for Deed (or in the related contract for sale of real estate), all payments of principal, interest and Fees due and owing thereunder.

"Timeshare Documents" means, with respect to any Timeshare Purchaser's purchase of a Timeshare Interest, the Timeshare Contract or Fairway Contract for Deed executed by such Timeshare Purchaser in connection with such purchase and the other documents set forth in Schedule 2 attached to the Participation Agreement executed by or delivered to such Timeshare Purchaser.

"Timeshare Interest" means all of the rights to which a Timeshare Purchaser (or his/her successors or assigns) is entitled under his/her Timeshare Documents to use and occupy a Villa as described in such Timeshare Documents after the date of the acquisition by such Timeshare Purchaser of such use and occupancy rights.

"Timeshare Purchaser" means any Person who purchases a Timeshare Interest in connection with and pursuant to Timeshare Documents executed and delivered by such Person.

"Timeshare Reload" means a new Timeshare Contract or Fairway Contract for Deed that is entered into by an Obligor under a Timeshare Contract or Fairway Contract for Deed to finance the purchase of any new or additional timeshare or vacation products sold or marketed by Holder, its Affiliates, agents or brokers, including but not limited to Timeshare Interest(s), and where such Obligor retains its existing Timeshare Interest and enters into a new Timeshare Contract, Fairway Contract for Deed or other contract of any kind to finance the remaining balance of the Obligor's existing Timeshare Contract or Fairway Contract for Deed, and such Obligor's existing Timeshare Contract or Fairway Contract for Deed is discharged. "To Reload" or "To be Reloaded" means to effect a Timeshare Reload.

9

"Timeshare Resale Assumption" means a sale and assignment of a Timeshare Contract or Fairway Contract for Deed by the Obligor thereunder, with the discretionary written consent of Servicer granted as provided pursuant to the requirements of the Servicing, Collection and Enforcement Policies and Procedures, with respect to which a new Person as "Obligor" is contractually substituted into the place of the existing Obligor and such existing Obligor is discharged from its obligations under such Timeshare Contract or Fairway Contract for Deed. "To Resell" or "To be Resold" means to effect a Timeshare Resale Assumption.

"Timeshare Upgrade" means, with respect to any Timeshare Contract or Fairway Contract for Deed, a new Timeshare Contract or Fairway Contract for Deed that is entered into by the Obligor under such Timeshare Contract or Fairway Contract for Deed to finance the purchase of any new or additional timeshare or vacation products, including but not limited to Timeshare Interest(s), by such Obligor pursuant to the upgrade marketing program of Holder or any of its Affiliates, agents or brokers, and where: such Obligor reconveys or reassigns the Timeshare Interest under such Timeshare Contract or Fairway Contract for Deed for a new Timeshare Interest(s) or other timeshare or vacation products, enters into such new Timeshare Contract, Fairway Contract for Deed or other contract of any kind to finance the purchase of such new Timeshare Interest(s) or other timeshare or vacation products, and such Obligor's existing Timeshare Contract or Fairway Contract for Deed is discharged. "To Upgrade" or "To be Upgraded" means to effect a Timeshare Upgrade.

"Transactions" has the meaning assigned to such term in the Purchase Agreement.

"TTL" means CRE Tree Tops, LLC, a Delaware limited liability company, formerly known as Tree Tops, Inc., a Pennsylvania corporation.

"UCC" means the Uniform Commercial Code of the Commonwealth of Pennsylvania or of any other applicable jurisdiction, in each case, as in effect from time to time.

"Upgrade" is defined in the definition of "Timeshare Upgrade" in this Section 1.1.

"Upgrade/Reload/Resold/Refinance Deemed Prepayment" is defined in the definition of "Permitted Modification" in this Section 1.1.

"Villa" means a residential unit located in a Building.

**1.2**     Construction.

Except as otherwise provided herein or if the context hereof requires otherwise, whenever used in this Agreement (a) any noun or pronoun shall be deemed to include the plural and the singular (including as may apply to any definition contained in this Agreement), (b) the terms "include" and "including" shall be deemed to be followed by the phrase "without limitation", (c) the word "or" shall be inclusive and not exclusive, (d) the word "shall" and "will" are used interchangeably and have the same meaning, (e) all references to "$" or "dollars" mean U.S. dollars, (f) references to any law defined or referred to herein are references to that law or any

DOC ID = 25164159.16

5037022-100403 04/07/2017

successor law, as the same may have been amended or supplemented from time to time, and any rules or regulations promulgated thereunder, as amended from time to time (including any successor rules or regulations) and (g) references to any Person herein includes its permitted successors and assigns.

      **1.3**     Headings and Captions; Exhibits and Schedules.

The headings and captions in this Agreement are included for convenience of reference only and shall be ignored in the construction or interpretation of this Agreement. All Exhibits and Schedules annexed to or referred to in this Agreement are incorporated in and made a part of this Agreement as if set forth in full. Any capitalized terms used in any Schedule or Exhibit but not otherwise defined therein, shall have the meaning as defined in this Agreement. All references to Sections, Articles or Exhibits contained in this Agreement shall be to Sections, Articles or Exhibits of or to this Agreement unless otherwise stated.

**ARTICLE 2.**
**LOCKBOX ACCOUNT; SWEEPS; DISTRIBUTIONS**

      **2.1**    **Obligor Credit Risk.** Servicer does not assume, and shall not have, any liability to RGI for the failure of any Obligor to pay any amount of the Timeshare Contract Payments or otherwise perform its other undertakings under any of the Timeshare Contracts, Fairway Contracts for Deed or related Timeshare Contract Documents. For the avoidance of doubt, nothing in this Section 2.1 shall diminish or relieve Servicer of its obligations, undertakings and duties set forth herein.

      **2.2**    No Exercise of Collection Rights and Remedies by RGI.

      (a)    RGI shall not have any right to exercise, assert or enforce any collection rights or other remedies as "seller" under any of the Timeshare Contracts, Fairway Contracts for Deed or related Timeshare Contract Documents or with respect to any Timeshare Interest in respect thereof other than (a) as provided in Sections 3.2(f) and (g) hereof, (b) as provided in Section 3.10 hereof, to the extent that RGI terminates Servicer in accordance with the terms hereof, (c) as provided in Section 2.3 hereof in terms of effecting the collection of Timeshare Contract Payments thereunder, (d) as provided in Section 2.4 hereof with respect to the RGI's Swept Timeshare Contract Payments, (e) as provided in Section 3.3(c) hereof in terms of changing Lockbox and Payment Procedures to direct Timeshare Contract Payments to be paid to a lockbox and collection account of RGI's choosing and/or (f) in connection with the substitution of a new servicer for "Servicer" pursuant to a mutual agreement among RGI, Holder and Servicer to do so.

      (b)    Anything contained in this Section 2.2 to the contrary notwithstanding, RGI shall have the right to receive the benefits of, and to direct to the extent provided in Article 3 below, Servicer's management, administration, servicing and collecting of the Timeshare Contracts, Fairway Contracts for Deed and Timeshare Contract Payments and Collection Rights under said Article 3.

DOC ID - 25164159.16

5037022-100403 04/07/2017

**2.3     Obligor Notification.** RGI may enforce any Timeshare Contract Payments and Collection Rights (at its own cost and expense) in a manner consistent with the obligations imposed on Servicer hereunder, if but only if a Servicer/Resort Default has occurred and has not been cured, and RGI is exercising its right to appoint a successor Servicer under Section 3.10 hereof. Servicer shall not interfere with the rights of RGI under this Section 2.3 (or with respect to any notice given by RGI under this Section 2.3) and, at the cost and expense of RGI, shall provide such assistance to Holder as it may reasonably request.

**2.4     Lockbox Account; Sweeps; Distributions**.

(a)     Neither Servicer nor RGI shall utilize the Lockbox Account, or permit it to be utilized, for the collecting of payments in respect of any Retail Timeshare Contracts other than the Timeshare Contracts and the Fairway Contracts for Deed.

(b)     On or prior to the Closing Date, RGI shall cause the bank at which the Lockbox Account is maintained to enter into a control and access agreement with RGI, in form and substance satisfactory to Servicer and RGI, pursuant to which RGI shall have the exclusive right to withdraw good, collected funds from the Lockbox Account after the repayment in full of the Hypothecation Loan and the termination and the discharge of all liens and security interests of the Hypothecation Lender in and to the Lockbox Account.

(c)     Servicer agrees not to effect any withdrawals of monies from the Lockbox Account without the prior written consent of RGI.

(d)     From and after the date on which the Hypothecation Loan shall have been repaid in full and all of the liens and security interests of the Hypothecation Lender in and to the Lockbox Account shall have been terminated or discharged, RGI shall withdraw from the Lockbox Account all good, collected funds on deposit therein once a week on a Business Day selected by RGI (or on such other periodic interval as may be elected by RGI), provided that, after such withdrawal, there shall be a balance in the Lockbox Account of not less than $20,000 in good, collected funds (such funds are referred to herein as the "RGI's Swept Timeshare Contract Payments"). RGI shall pay for all costs and expenses charged to it by the bank maintaining the Lockbox Account in effecting any such withdrawal.

(e)     On the last Business Day of each calendar month occurring after the date on which the Hypothecation Loan shall have been repaid in full and the liens and security interests of the Hypothecation Lender in and to the Lockbox Account have been terminated and discharged, RGI shall deliver to Holder Holder's Ownership Percentage of all RGI's Swept Timeshare Contract Payments obtained by RGI from the Lockbox Account during such month (or, in the case of the month in which the aforesaid date on which the Hypothecation Loan shall have been repaid in full and the liens and security interests of the Hypothecation Lender in and to the Lockbox Account terminated and discharged falls, during the portion of such month from and after such date) pursuant to wiring or other payment instructions given to RGI from time to time by Holder not less than ten (10) Business Days prior to any payment date under this Section 2.4. On each date on which RGI effects a withdrawal from the Lockbox Account of RGI's Swept

12

Timeshare Contract Payments, as contemplated under Section 2.4(d) above, RGI shall retain for itself RGI's Retained Ownership Percentage of all such RGI's Swept Timeshare Contract Payments then obtained from the Lockbox Account. RGI shall be responsible for payment of all fees and charges and other costs and expenses related to effecting payments to Holder of Holder's Ownership Percentage of all RGI's Swept Timeshare Contract Payments.

## ARTICLE 3.
## SERVICING

**3.1    Appointment of Servicer**.  RGI hereby appoints the Servicer to manage, administer, service and make collections on the Timeshare Contracts and Fairway Contracts for Deed for the balance of the Servicing Term, and Servicer hereby accepts such appointment. Accordingly, Servicer agrees to, and shall on and after the date hereof for the balance of the Servicing Term act as Servicer and perform the duties and undertakings of Servicer under this Article 3 and otherwise herein (and shall not resign) unless (a) otherwise consented to in writing by RGI or (b) upon determination that its duties hereunder are no longer permissible under Applicable Law.  Any such determination permitting the resignation of the Servicer shall be evidenced by an Opinion of Counsel to such effect delivered and acceptable to RGI (which Opinion of Counsel may be supported as to factual (including financial and capital markets) matters by any relevant certificates and other documents necessary or advisable in the judgment of counsel delivering the opinion).

**3.2    Servicing Policies and Procedures and Standards**.

(a)    The Servicer shall take or cause to be taken all such actions as is reasonably necessary and/or advisable to manage, administer, service and collect the Timeshare Contract Payments in order to maximize the receipt of payments therefrom, in each case, in accordance with the Servicing, Collection and Enforcement Policies and Procedures, attached hereto as Schedule 1.  Notwithstanding anything herein to the contrary, in the event that the Servicer believes in good faith that complying with the Servicing, Collection and Enforcement Policies and Procedures will result in the violation of Applicable Law or otherwise receives notice from a Governmental Authority that such compliance with result in any such violation, then in lieu of such compliance, the Servicer shall use commercially reasonable procedures in performing its undertakings and duties hereunder.

(b)    The Servicer shall perform its undertakings and duties hereunder in good faith and in accordance with (i) Applicable Laws, (ii) the terms and conditions of each Timeshare Contract, Fairway Contract for Deed their respective related Timeshare Documents and (iii) the Servicing, Collection and Enforcement Policies and Procedures, and using the degree of skill, care and diligence required by the Servicing, Collection and Enforcement Policies and Procedures, which shall not be less than the skill, care and diligence that Servicer exercises from time to time with respect to receivables similar to the Timeshare Contracts and the Fairway Contracts for Deed that it services for Purchaser, for itself and others (such standards of skill, care and diligence to be used by Servicer as provided in this Section 3.2(b) are referred to herein as the "Servicing, Collection and Enforcement Standards").

13

(c)     The aforesaid actions shall also include, without limitation, the following: (i) performing standard accounting services and general record keeping services with respect to each Timeshare Contract and Fairway Contract for Deed, including, without limitation, maintaining an installment contract processing database and processing all Timeshare Contract Payments received in accordance with the Servicing, Collection and Enforcement Policies and Procedures, (ii) responding to any telephone and written inquiries of Obligors concerning their respective Timeshare Contracts and Fairway Contracts for Deed, (iii) keeping Obligors informed of the proper place and preferred method or methods of making payments with respect to their respective Timeshare Contracts and Fairway Contracts for Deed, (iv) contacting Obligors to effect collection and to discourage delinquencies in the payment of amounts due with respect to the Timeshare Contracts and Fairway Contract for Deed, including mailing of past due notices, preparing and mailing collection letters, contacting delinquent Obligors by telephone to encourage payment, and mailing reminder notices to delinquent Obligors, (v) initiating and pursuing, in a manner consistent with the Servicing, Collection and Enforcement Standards, other collection remedies available at law or by contract (but excluding forfeitures, foreclosures, commencement of law suits or other formal enforcement procedures, or retaining outside collection agencies), and (vi) reporting tax information to Obligors as required by law.

(d)     In discharging its duties under this Article 3, the Servicer shall appropriately, fairly and in good faith allocate its resources and personnel so that the Timeshare Contracts and Fairway Contracts for Deed are accorded appropriate attention and servicing diligence (consistent with past practices of RGI's Affiliates and sufficient to allow Servicer to meet its Servicing, Collection and Enforcement Standards including, without limitation, allocating to personnel working on the Timeshare Contracts and Fairway Contracts for Deed appropriate personnel incentives, compensation, workloads and training) and are not intentionally disadvantaged for the direct or indirect benefit of Servicer's portfolio of Timeshare Contracts, Fairway Contracts for Deed or similar such timeshare receivables, in each case, originated after the Closing Date.   For the avoidance of doubt, if the standard and/or implementation of management, administration, servicing and collection of Servicer's Timeshare Contracts and Fairway Contracts for Deed originated after the Closing Date or that no longer qualify as Timeshare Contracts (as provided in the definition thereof) or Fairway Contracts for Deed (as provided in the definition thereof) is higher than the standard and implementation of management, administration, servicing and collection required by this Article 3 for the Timeshare Contracts and Fairway Contracts for Deed, Servicer shall promptly inform RGI of the same and Servicer, upon the giving of such written notice or upon receipt of any written demand from RGI regarding this subclause (d), shall promptly adjust its servicing so as to afford to the Timeshare Contracts and Fairway Contracts for Deed such higher standards and implementation of management, administration, servicing and collection.

(e)     The Servicing, Collection and Enforcement Policies and Procedures set forth on Schedule 1 attached hereto and having application to the Timeshare Contracts and Fairway Contracts for Deed, as provided in this Section 3.2, may not be amended or modified without the prior written consent of RGI.   Subject to Section 3.2(d), above,  any change effected by Servicer to the "Servicing, Collection and Enforcement Policies and Procedures" being

14

applied by Servicer or its Affiliates to Servicer's Timeshare Contracts and Fairway Contracts for Deed originated after the Closing Date (as provided in each of the definitions thereof) shall not adversely affect the application of the Servicing, Collection and Enforcement Policies and Procedures to, and the level of management, administration, servicing and collections required by this Agreement in respect of, the Timeshare Contracts and Fairway Contracts for Deed.

(f)       Anything contained herein to the contrary notwithstanding and in addition to any other rights and remedies of RGI, during any period when a Servicer/Resort Default other than or in addition to a Cash Flow Shortfall Default shall exist, the Servicer shall take any reasonable action that it is directed, in writing, to take by RGI which relates to the Servicer's obligations under this Agreement; provided, however, that the Servicer shall not be obligated to take any such action to the extent that the Servicer determines in its reasonable discretion that such action may cause (i) a violation of Applicable Law, (ii) a default under any of the Hypothecation Loan and Security Documents, (iii) a violation of any of the Servicing, Collection or Enforcement Policies and Procedures, (iv) a violation of any of the Lockbox and Payment Procedures, (v) a violation of any term or provision of any applicable Timeshare Contract, Fairway Contracts for Deed or the respective Timeshare Documents related thereto or (vi) that could reasonably be expected to have an adverse effect on Holder's Participation.

(g)       Anything contained herein to the contrary notwithstanding and in addition to any other rights and remedies of RGI hereunder, during any period when a Cash Flow Shortfall Default shall exist but no other Servicer/Resort Default shall exist, the Servicer shall take such reasonable measures to address such Cash Flow Shortfall Default as may be reasonably requested by RGI in writing and agreed to by Holder and RGI.

(h)       In the event there exists a conflict or inconsistency between this Agreement and the Hypothecation Lender Servicing Agreement, the terms of the Hypothecation Lender Servicing Agreement shall control and prevail, provided that, for the avoidance of doubt and without otherwise limiting any other qualification to this subclause (h), to the extent that any provision in this Agreement shall hold the Servicer to a higher standard of performance than in the Hypothecation Lender Servicing Agreement, shall require the Servicer to act in a way that would increase the collections in respect of the Timeshare Contracts and Fairway Contracts for Deed over what would otherwise be collected under the Hypothecation Lender Servicing Agreement, shall require additional reporting from the Servicer than what is provided in the Hypothecation Lender Servicing Agreement and/or shall provide different servicing defaults and related remedies and different indemnification as to what is provided in the Hypothecation Lender Servicing Agreement, such provision shall not be deemed under this subclause (h) to be in conflict or inconsistent with the Hypothecation Lender Servicing Agreement and shall continue to be valid and binding hereunder upon the Servicer.

### 3.3    Lockbox and Payment Procedures.

(a)       The Servicer shall direct or otherwise cause the Obligors of each Timeshare Contract and Fairway Contract for Deed to mail or deposit or pay by electronic means or by means of a credit or debit card all Timeshare Contract Payments due thereunder pursuant to

15

the Lockbox and Payment Procedures or as otherwise agreed in writing between Servicer and RGI and subject to the prior rights of the Hypothecation Lender to such Timeshare Contract Payments, as provided in <u>Section 4.1</u> of the Participation Agreement.   The Servicer acknowledges and agrees that all such Timeshare Contract Payments shall be held for the mutual benefit of Holder and RGI (after giving effect to payments therefrom required under the Hypothecation Loan, as provided in the Participation Agreement) and shall be identifiable at all times (by installment contract number, deposit number or otherwise). To the extent that any Timeshare Contract Payments are not credited to or deposited in the Lockbox Account (including but not limited to certain Timeshare Contract Payments paid by credit card or debit card), the Servicer shall to the extent it is in possession of all necessary information and authorizations, instruct the appropriate bank or agent to transfer said Timeshare Contract Payments not less than weekly and to instruct the appropriate bank or agent to promptly deposit said Timeshare Contract Payments into the Lockbox Account. All electronic payments in respect of Timeshare Contract Payments shall be deposited into the Lockbox Account. Credit card and debit card payments or vouchers shall not be discounted by the Servicer and accordingly the face amount of said credit card payments or vouchers shall be deposited into the Lockbox Account to the extent available. Without limiting the foregoing, any Timeshare Contract Payments received directly by Servicer or any of its Affiliates shall be deposited into the Lockbox Account within two (2) Business Days following the receipt thereof. Servicer shall be responsible for payment of all fees and charges and other costs and expenses related to the Lockbox and Payment Procedures and the Lockbox Account.

(b)    Except as provided in Section 2.3 hereof and this Section 3.3, none of the Lockbox and Payment Procedures shall be changed or modified by Servicer without the prior written consent of RGI, including, without limitation, (i) Servicer executing or otherwise entering into any blocked account agreement, springing depository agreement or control agreement with respect to the Lockbox Account or any Timeshare Contract Payments or (ii) Servicer changing any address and/or the Lockbox Account to which Timeshare Contract Payments are sent and/or deposited.

(c)    Subject to the terms and conditions of the Hypothecation Loan and Security Documents, RGI shall have the right to substitute a new lock box bank and a new lock box account, in each case, reasonably acceptable to Servicer (Servicer's consent with respect thereto not to be unreasonably withheld, delayed or conditioned) if PNC Bank, N.A. or any successor lock box bank no longer is able to perform, in RGI's reasonable determination, all of its duties and obligations as contemplated herein and under its applicable account control agreement or lockbox agreement.  RGI shall reasonably cooperate with Servicer and its Affiliates to ensure that the Timeshare Contract Payments are made to the new lock box account and to take any other commercially reasonable action reasonably requested by Servicer in connection with the appointment of such new lockbox bank.

### 3.4    Servicing Fee.

(a)    As the sole compensation for its undertakings, duties and activities under this Agreement, so long as no Material Servicer/Resort Default shall have occurred and has been

16

continuing, Servicer shall be entitled to receive the Servicing Fee for each calendar month (or portion thereof) occurring after the Closing Date and during the Servicing Term.  Servicer shall prepare an invoice showing all applicable detail in the calculation of the Servicing Fee for each such calendar month and shall deliver the same to RGI not later than the fifth (5th) day (or, if such 5th day is not a Business Day, the next Business Day) of the month following the month for which the Servicing Fee is being calculated, and, absent manifest error in such invoice, such invoice shall be binding. RGI shall pay the Servicing Fee in full, on or prior to the fifth (5th) Business Day after the receipt of the aforesaid invoice in respect thereof, with the understanding that such payment may be made from the Timeshare Contract Payments.

(b)     Except as set forth herein, Servicer shall pay for its own account all costs and expenses incurred by it or otherwise in connection with its management, administration, servicing and collecting activities with respect to the Timeshare Contract Payments and Collection Rights hereunder, including but not limited to any bank fees (including, without limitation, Lockbox Account fees), interchange fees from any credit card services provider, and wire fees.

**3.5     Payment of Free and Clear Net Timeshare contract Payments to Holder and RGI**.

(a)     Until the Hypothecation Loan shall have been repaid in full and the liens and security interests of the Hypothecation Lender in and to the Lockbox Account shall have been terminated and discharged, it is understood that the Hypothecation Lender shall sweep all Timeshare Contract Payments then held in the Lockbox Account for application pursuant to the relevant provisions of the Hypothecation Loan and Security Documents, net of the Servicing Fees which shall be paid to Servicer as provided in Section 3.4.a hereinabove.

(b)     For the avoidance of doubt, the Parties do not expect there to be any Free and Clear Net Timeshare Contract Payments until after the Hypothecation Loan has been paid in full and the liens and security interests of the Hypothecation Lender in and to the Lockbox Account terminated and discharged, and the Parties further agree that any rights of Servicer under this Section 3.5 are subject to RGI's rights to RGI's Swept Timeshare Contract Payments under Section 2.4 hereof.

(c)     Servicer shall be responsible for payment of all fees and charges and other costs and expenses related to effecting payments to Holder of Holder's Ownership Percentage of all Free and Clear Net Timeshare Contract Payments and to RGI of RGI's Retained Ownership Percentage of all Free and Clear Net Timeshare Contract Payments.

**3.6     Standstill on some Remedies Applicable to the Timeshare Contracts and Fairway Contracts for Deed.**  Servicer will not effect a forfeiture of a Timeshare Interest under a Timeshare Contract or a Fairway Contract for Deed, will not commence and/or pursue a Uniform Commercial Code foreclosure against any such Timeshare Interest, will not commence any law suit or other formal enforcement process to enforce the Timeshare Payments and Collection Rights under such Timeshare Contract or Fairway Contract for Deed or retain any

17

outside collection agency to seek collection of the same unless and until all of RGI's right, title and interest in and to the related Timeshare Contract Payments and Collection Rights of such Timeshare Contract or Fairway Contract for Deed are and have been deemed to be conveyed to Holder pursuant to the Participation Agreement.

**3.7    Amendment and Modification of Timeshare Contracts and Fairway Contracts for Deed**.

(a)    The Servicer shall not amend, modify or waive any term or condition of any Timeshare Contract or Fairway Contract for Deed other than with respect to a Permitted Modification.

(b)    In connection with any Permitted Modification involving a Refinanced Timeshare Contract or to avoid a Timeshare Contract or Fairway Contract for Deed becoming a Non-Performing Timeshare Contract, Servicer shall comply at all times with the Servicing, Collection and Enforcement Standards.

**3.8    Back-Up Servicing.**Servicer shall maintain Equiant Financial Services, Inc., as the back-up servicer (the "Back-Up Servicer") pursuant to the current back-up servicing agreement (the "Back-Up Servicing Agreement") to be maintained for the Hypothecation Lender (and, after the payment in full of the Hypothecation Loan, to be maintained for the benefit of RGI) unless otherwise consented to, in writing, by RGI, and shall provide weekly backup data files to RGI for all Timeshare Contracts and Fairway Contracts for Deed as of the last day of such week, for RGI to forward to the Back-Up Servicer.  RGI shall be responsible for payment to the Back-Up Servicer of back-up servicing fees for RGI's Timeshare Contracts and Fairway Contracts for Deed.

**3.9    Maintenance of Errors and Omissions Insurance.**  Servicer shall keep in force throughout the Servicing Term (inclusive of customary tail coverage) fidelity bonds and a policy or policies of insurance covering errors and omissions in the performance of its obligations as Servicer hereunder.  Such bonds and policy or policies shall be in such form and amount as is reasonably acceptable to RGI (it being understood that to the extent any such bonds or policies are generally consistent with the bonds and policies maintained by or on behalf of RGI and its Affiliates prior to the date hereof, then such bonds and policies shall be reasonably acceptable to RGI).  Furthermore, until expiration of the Servicing Term, the Servicer shall cause BGL and its subsidiaries to maintain (or cause to be maintained) all insurance coverage required under the Timeshare Documents and the Hypothecation Lender Servicing Agreement, including but not limited to all perils coverage required under the public offering statements.

**3.10    Servicer/Resort Default**.

(a)    If a Material Servicer/Resort Default shall have occurred and be continuing and RGI, after the giving of all notices with respect thereto and the expiration of all applicable grace and cure periods in respect thereof, shall have given a final written notice thereof to Servicer and such Material Servicer/Resort Default shall have not been cured within

18

45 days of the sending of such final written notice, RGI may terminate the Servicer by providing written notice of such termination to the Servicer and, thereafter, RGI shall appoint a successor Servicer (which may be RGI).  Such terminated Servicer shall continue to serve as Servicer until a successor Servicer is appointed by RGI in accordance with the immediately preceding sentence.  If no successor Servicer is appointed by RGI within 30 days after the Servicer's receipt of the related notice of termination, such terminated Servicer may petition a court of competent jurisdiction to appoint a successor Servicer.

(b)     If the Servicer is terminated pursuant to Section 3.10(a), then Servicer shall fully cooperate with the successor Servicer, and provide such party with all necessary and reasonable assistance and support in connection with its transitioning into, and its performance of, such duties and undertakings, including, without limitation,

(i)              providing on-site and remote computer access to Servicer's electronic books and records and systems,

(ii)             providing physical access to and copies (or PDFs) of all paper records, payment histories and files with respect to the servicing of the Timeshare Contracts,

(iii)            effecting a full, accurate and timely transfer of all necessary electronic data to such successor and its systems in a medium and format mutually agreed upon, and

(iv)            granting full access to such successor to the bank or banks relating to the the Lockbox and Payment Procedures, the Lockbox Account and any post office box or lockbox used to collect Timeshare Contract Payments to which the Servicer has access.

(c)     If the initial Servicer is terminated pursuant to Section 3.10(a), then any costs and expenses incurred by RGI in connection with transferring the obligations of the initial Servicer hereunder to a successor Servicer shall be shared equally between the Servicer and RGI.

**3.11    Servicer Reporting Requirements.**During the Servicing Term, the Servicer will furnish to RGI (and, at the request of RGI, to the Hypothecation Lender) unless RGI shall otherwise consent in writing:

(a)     each of the reports specified in Schedule 4 attached hereto by the dates specified in such schedule.

(b)     to the extent permitted by the terms of the Hypothecation Loan and Security Documents and to the extent not already received by RGI, copies of any reports delivered by the Servicer in connection with the Hypothecation Loan and Security Documents;

(c)     promptly, but in no event later than five (5) Business Days after the earlier of a Responsible Officer having actual notice of, or receiving written notice from RGI of, the

19

occurrence of any Servicer/Resort Default or Potential Servicer/Resort Default, the statement of a Responsible Officer setting forth the details of such Servicer/Resort Default or Potential Servicer/Resort Default and the action which the Servicer proposes to take with respect thereto; and

(d)     as soon as reasonably practicable, from time to time, such other information, documents, records or reports within its possession respecting the Timeshare Contract Payments or the conditions or operations, financial or otherwise, of the Servicer as RGI may from time to time reasonably request in order to protect the interests of RGI in respect of RGI's Retained Participation; RGI will pay all reasonable out-of-pocket expenses of Servicer in connection with its obtaining and delivery to RGI of any such information, documents, records or reports under this Section 3.11(d).

If Servicer shall produce, for its internal management, reports in addition to the reports set forth in Section 3.11(a) hereof that pertain to the Timeshare Contracts and the Fairway Contracts for Deed, such additional reports shall likewise be furnished to RGI.

3.12    **Annual Officer's Certificate.**   On or before one hundred twenty (120) days after the end of the first full fiscal year of the Servicer after the Closing Date and each fiscal year thereafter, the Servicer shall deliver a certificate of a Responsible Officer of the Servicer to RGI to the effect that a review of the activities of the Servicer during the Servicer's preceding fiscal year (or since the Closing Date in the case of the first such officer's certificate required to be delivered) has been made under the supervision of the officer executing such officer's certificate with a view to determining whether during such period the Servicer has performed and observed all of its obligations under this Agreement in all material respects, and either (a) stating that to the best of his or her knowledge no Potential Servicer/Resort Default or Servicer/Resort Default has occurred, or (b) if such a Potential Servicer/Resort Default or Servicer/Resort Default has occurred and has not been cured, specifying the same and the nature and status thereof.

3.13    **Compliance with Applicable Law.** Servicer shall comply in all material respects with Applicable Law, the Servicing, Collection and Enforcement Policies and Procedures and the Servicing, Collection and Enforcement Standards in regard to its managing, administering, servicing and collection of the Timeshare Contracts, Fairway Contracts for Deed and Timeshare Contracts Payments.

3.14    **Servicer Books and Records and Procedures.**   Servicer shall maintain and implement administrative and operating procedures (including an ability to recreate records and electronic data evidencing the Timeshare Contracts and Fairway Contracts for Deed in the event of the destruction of the originals thereof or the records of the Timeshare Contract Payments with respect thereto) and shall keep and maintain, all documents, books, records electronic data and other information reasonably necessary for the servicing and collection of all amounts due with respect to the Timeshare Contract Payments (including records adequate to permit the daily identification of all collections of Timeshare Contract Payments).

DOC ID - 25164159.16

5037022-100403 04/07/2017

### 3.15    Servicer Inspections.

(a)    Upon prior written notice to the Servicer, the Servicer shall permit RGI or its representatives (including, without limitation, the Back-Up Servicer) twice during each twelve-month period, during regular business hours (with not less than three (3) Business Days' prior notification) and at the expense of the Servicer, in an amount not to exceed $50,000 during any such twelve-month period, to have access to all records, files, books of account, data bases, and information in the possession or under the control of the Servicer or stored off-site pertaining to the Timeshare Contracts, the Fairway Contracts for Deed, the Timeshare Contract Payments received during each month of such twelve-month period and the application of the same, the calculation and payment of the Servicing Fee for each month of such twelve-month period, the calculation of Free and Clear Net Timeshare Contract Payments for each month during such twelve-month period and auditing any of the reports provided during such twelve-month period under Section 3.11 hereof, provided, however, that if any Servicer/Resort Default or Potential Servicer/Resort Default shall occur and be continuing hereunder, then the aforesaid limitation on inspections per twelve-month period shall be inapplicable and RGI may effect as many inspections as it may reasonably determine, all at the expense of Servicer.

(b)    RGI (or its representatives or principals) may, once a month during regular business hours, contact (in person, via telephone, e-mail or other electronic communications) Responsible Officers of Servicer or any Affiliate thereof to discuss matters relating to the management, administration, servicing and collection of the Timeshare Contracts and the Fairway Contracts for Deed, the level of collections and application of Timeshare Contract Payments, the determination and payment of Servicing Fees, the Servicer's performance hereunder and the existence or potential existence of any Servicer/Resort Defaults and the curing of the same; provided, however, that if any Servicer/Resort Default or Potential Servicer/Resort Default shall actually exist hereunder, then the aforesaid contacts may be made as frequently as RGI shall determine, in RGI's sole discretion, and at the expense of Servicer, until such Servicer/Resort Default or Potential Servicer/Resort Default shall have been cured, resolved or waived.

### 3.16    RGI's Retained Ownership Percentage.

(a)    Beginning on the last Business Day of the calendar month that is twelve months after the date on which the Hypothecation Loan shall have been repaid in full and the liens and security interests of the Hypothecation Lender in and to the Lockbox Account have been terminated and discharged, and on the last Business Day of each calendar month every twelve (12) months thereafter, the Servicer shall deliver a report, substantially in the form attached hereto as Schedule 8  (the "Projected Portfolio Collection Report") to RGI and Holder, prepared in accordance with the procedures set forth on Schedule 7, which report projects the amounts and dates of the remaining Timeshare Contract Payments until the Timeshare Contracts and the Fairway Contracts for Deed have been paid in full.

(b)    RGI's retained ownership percentage the ("RGI's Retained Ownership Percentage") shall initially be a percentage equal to sixty-six and ninety-four one-hundredths

21

percent (66.94%) and Holder's ownership percentage (the "Holder's Ownership Percentage") shall initially be equal to thirty-three and six one-hundredths percent (33.06%); provided that on the date on which the Hypothecation Loan shall have been repaid in full and the liens and security interests of the Hypothecation Lender in and to the Lockbox Account have been terminated and discharged, RGI's Retained Ownership Percentage and the Holder's Ownership Percentage shall each equal fifty percent (50%). In the event any Projected Portfolio Collection Report projects that Holder's Received Amount will equal or exceed the Participation Limit prior to the final month on which all of the Timeshare Contract Payments are projected to be received, then within ten (10) Business Days after the delivery of such Projected Portfolio Collection Report, the Servicer (in consultation with the Holder and RGI) shall adjust RGI's Retained Ownership Percentage and Holder's Ownership Percentage such that Holder's Received Amount, based on the information set forth in such Project Portfolio Collection Report, will equal the Participation Limit following the final month on which Timeshare Contract Payments are received; provided that RGI's Retained Ownership Percentage shall never be less than fifty percent (50%).

(c)     Notwithstanding the foregoing, if a Material Servicer/Resort Default shall have occurred and be continuing, then (i) RGI's Retained Ownership Percentage shall equal sixty-six and ninety-four one-hundredths percent (66.94%) and (ii) the Servicer shall cease preparing the Projected Portfolio Collection Reports and RGI's Retained Ownership Percentage shall not be further re-adjusted pursuant to subsection (b). Notwithstanding the foregoing, this subsection (c) shall not apply if RGI terminates the Servicer in violation of Section 3.10 hereof.

(d)     Notwithstanding anything to the contrary in this Agreement, from and after such time that Holder's Received Amount equals the Participation Limit, RGI's Retained Ownership Percentage shall equal one hundred percent (100%).

(e)     The sum of RGI's Retained Ownership Percentage and Holder's Ownership Percentage shall always equal one hundred percent (100%).

## ARTICLE 4.
## INDEMNIFICATION FOR BENEFIT OF RGI

**4.1     RGI Indemnitees.** Servicer hereby indemnifies RGI and its Affiliates (collectively, the "RGI Indemnitees") from and against, and agree to hold each of them harmless from, Damages incurred or suffered by the RGI Indemnitees resulting from any breach of Servicer's obligations under this Agreement or resulting from any representation or warranty made by Servicer under this Agreement having been untrue or incorrect when made, excluding in each case, any Damages that were caused by a RGI Indemnitee's gross negligence or willful misconduct, in each case, subject to the following limitations:

(a)     from and after the date that is twenty-four (24) months following the Closing Date, Servicer shall not be under any obligation to indemnify any RGI Indemnitee for any Damages incurred or suffered by the RGI Indemnitees resulting from any representation or warranty made by Servicer under this Agreement (other than those made under Section 6.11(c)

22

hereof) having been untrue or incorrect when made; provided that if at such time, any claims for indemnification under this clause shall be pending, Servicer's obligations hereunder as to such claims shall continue until such claims are satisfied or otherwise disposed of in accordance with the terms hereof;

(b)     from and after the date that is thirty-six (36) months following the Closing Date, Servicer shall not be under any obligation to indemnify any RGI Indemnitee for any Damages incurred or suffered by the RGI Indemnitees resulting from any representation or warranty made by Servicer under Section 6.11(c) hereof having been untrue or incorrect when made; provided that if at such time, any claims for indemnification under this clause shall be pending, Servicer's obligations hereunder as to such claims shall continue until such claims are satisfied or otherwise disposed of in accordance with the terms hereof;

(c)     from and after the date that is twenty-four (24) months following the Closing Date, Servicer shall not be under any obligation to indemnify any RGI Indemnitee for any Damages incurred or suffered by the RGI Indemnitees resulting from any breach of Servicer's obligations under this Agreement that were required to be performed on or prior to the Closing Date; provided that if at such time, any claims for indemnification under this clause shall be pending, Servicer's obligations hereunder as to such claims shall continue until such claims are satisfied or otherwise disposed of in accordance with the terms hereof; and

(d)     from and after the date that is twenty-four (24) months following the date performance was due, said 24-month period to run from the date of each such breach, Servicer shall not be under any obligation to indemnify any RGI Indemnitee for any Damages incurred or suffered by the RGI Indemnitees resulting from any breach of Servicer's obligations under this Agreement that were required to be performed after the Closing Date; provided that if at such time, any claims for indemnification under this clause shall be pending, Servicer's obligations hereunder as to such claims shall continue until such claims are satisfied or otherwise disposed of in accordance with the terms hereof.

**4.2     Direct Claims of RGI**.

(a)     Any claim by any RGI Indemnitee on account of Damages under Section 4.1 hereof shall be asserted by such RGI Indemnitee giving Servicer prompt written notice thereof; provided, however, that no delay on the part of such RGI Indemnitee in notifying Servicer shall relieve Servicer from any obligation hereunder unless (and then solely to the extent) Servicer is prejudiced thereby.  Such notice by such RGI Indemnitee shall describe such claim in reasonable detail, shall include copies of all material written evidence thereof within such RGI Indemnitee's possession, shall indicate the estimated amount, if reasonably practicable, of the Damages that have been or may be sustained by the RGI Indemnitee, and the Section of this Agreement under which the applicable indemnification obligation arises.  Servicer shall have thirty (30) days after its receipt of such notice to respond in writing to such claim. During such 30-day period, Servicer shall make such investigation of such claim as it considers necessary or desirable.  For the purpose of such investigation, such RGI Indemnitee shall make available to Servicer such information as Servicer may reasonably request.  If Servicer does not so respond

23

within such 30-day period or dispute such claim, Servicer shall be deemed to have rejected such claim, in which case the RGI Indemnitees shall be free to pursue such remedies as may be available to the RGI Indemnitees on the terms and subject to the provisions of this Agreement and as available under Applicable Law.

(b)     RGI Indemnitees and Servicer agree that, with respect to any Servicer/Resort Default under Section 4.1(a) hereof that results in a reduction of Timeshare Contract Payments, Damages with respect thereto shall include (but not be limited to) the restoration of RGI's Retained Ownership Percentage of such payments, as and when they were scheduled to have been paid under the applicable Timeshare Contracts and Fairway Contracts for Deed.

## 4.3     Third Party Claims Against Servicer.

(a)     If a Person who is not a Party to this Agreement or an Affiliate of a Party to this Agreement or a representative of the foregoing shall notify any RGI Indemnitee with respect to any matter which may give rise to a claim for indemnification against Servicer under Section 4.1 hereof (a "Third Party Claim Against Servicer"), then the RGI Indemnitees shall promptly notify Servicer thereof in writing; provided, however, that no delay on the part of the RGI Indemnitees in notifying Servicer shall relieve Servicer from any obligation hereunder unless (and then solely to the extent) Servicer is prejudiced thereby.  Such notice will describe the Third Party Claim Against Servicer in reasonable detail, will include copies of all material written evidence thereof and will indicate the estimated amount, if reasonably practicable, of Damages that has been or may be sustained by the RGI Indemnitees.

(b)     The Servicer shall be entitled to participate in the defense of a Third Party Claim Against Servicer and, unless the Servicer is also a party to such Proceeding and the RGI Indemnitee determines that joint representation would be inappropriate and subject to the limitations set forth in this Section 4.3, shall be entitled to control and appoint lead counsel for such defense, which counsel must be reasonably satisfactory to the RGI Indemnitee, in each case at the Servicer's expense.  Within ten (10) days following the receipt of notice by the RGI Indemnitee of any Third Party Claim Against Servicer, the Servicer shall provide notice to the RGI Indemnitee of its election to assume control of the defense of such Third Party Claim Against Servicer in accordance with the provisions of this Section 4.3.

(c)     If the Servicer shall assume the control of the defense of any Third Party Claim Against Servicer in accordance with the provisions of this Section 4.3, (i) it will be conclusively established for purposes of this Agreement that such Third Party Claim Against Servicer is within the scope of and subject to indemnification under this Article 4, (ii) the Servicer shall obtain the prior written consent of the RGI Indemnitee before entering into any settlement of such Third Party Claim Against Servicer, if (A) the settlement does not fully, completely and unconditionally release the RGI Indemnitee from all liabilities and obligations with respect to such Third Party Claim Against Servicer, (B) the settlement contains any admission of liability or wrongdoing on the part of the RGI Indemnitee or (C) the settlement imposes any injunctive or other equitable relief against the RGI Indemnitee and (iii) the RGI

24

Indemnitee shall be entitled to participate in the defense of such Third Party Claim Against Servicer and to employ separate counsel of its choice for such purpose at its own expense; *provided*, *however*, that the RGI Indemnitee shall have the right to employ, at the Servicer's expense, one counsel of its choice in each applicable jurisdiction (if more than one jurisdiction is involved) to represent the RGI Indemnitee if, in the RGI Indemnitee's reasonable judgment, there exists an actual or potential conflict of interest between the RGI Indemnitee and the Servicer or if the Servicer (x) elects not to defend, compromise or settle a Third Party Claim Against Servicer, (y) fails to notify the RGI Indemnitee within the required time period of its election as provided in Section 4.3(b), or (z) having timely elected to defend a Third Party Claim Against Servicer, fails, in the reasonable judgment of the RGI Indemnitee, after at least ten (10) days' notice to the Servicer, to adequately prosecute or pursue such defense, and in each such case the RGI Indemnitee may defend such Third Party Claim Against Servicer on behalf of and for the account and risk of the Servicer, and in each such case, the RGI Indemnitee may settle such Third Party Claim Against Servicer and seek indemnification for the amount of such settlement against the Servicer (including reasonable costs and expenses, including attorneys' fees) in accordance with this Article 4.

(d)     RGI and Servicer shall each cooperate, and cause their respective Affiliates to cooperate, in the defense or prosecution of any Third Party Claim Against Servicer and shall furnish or cause to be furnished such records, information and testimony, and attend such conferences, discovery proceedings, hearings, trials or appeals, as may be reasonably requested in connection therewith.

**4.4     Adjustment of Indemnification Owed to RGI Indemnitees**.

(a)     Subject to Section 6.11(d) hereof in any case, all indemnification payable by Servicer to the RGI Indemnitees shall be reduced by any indemnification payments owing from RGI to Servicer under Section 5 hereof, with such indemnification payments being considered to have been paid by virtue of such reduction).

(b)     Servicer shall not have any obligation to indemnify any RGI Indemnitee for any Damages under this Article 4 unless and until the aggregate amount of Damages suffered or incurred by the RGI Indemnitees exceeds One Hundred Thousand Dollars ($100,000.00) (the "RGI Deductible"), in which event Servicer shall be liable only for such Damages in excess of the RGI Deductible.  The maximum aggregate liability Servicer shall have under this Agreement, including but not limited to Article 4,  together with the aggregate liability the Purchaser shall have under the Purchase Agreement and the Holder shall have under the Participation Agreement with respect to Damages (as defined herein, in the Purchase Agreement and the Participation Agreement, as the case may be), breaches of obligations, undertakings, representations and warranties  hereunder and thereunder and other liabilities or indemnified amounts in respect hereof or thereof (regardless of the theory under which such liabilities arise) including (y) any such liabilities in respect of special, indirect, incidental, consequential, exemplary and punitive damages or (z) any liabilities in respect of the Transactions under this Agreement, the Participation Agreement or the Purchase Agreement arising from a violation of Applicable Law by Servicer, the Purchaser or the Holder, as applicable or any duty imposed on Servicer, the

25

Purchaser or the Holder, as applicable by Applicable Law, as to which, in each such case, Servicer, the Purchaser or the Holder, as applicable has a payment obligation or liability to RGI hereunder or thereunder), and the maximum aggregate amount payable by Servicer (together with Purchaser and Holder) with respect to such Damages, obligations, undertakings, representations, warranties and other liabilities referred to above or otherwise, shall not exceed the Indemnification Cap (excluding any claims arising from willful misconduct, fraud or intentional misrepresentation on the part of Servicer, the Holder or the Purchaser with respect to the Transactions; provided that any claims arising under the Purchase Agreement shall nevertheless be subject to the penultimate sentence of Section 8.5(b) of the Purchase Agreement), it being understood that the Indemnification Cap shall be for the benefit of any direct or indirect permitted successors or assignees of Servicer, the Holder or the Purchaser.  For the avoidance of doubt, any amounts owing by Purchaser under the Purchase Agreement in respect of PMA Liabilities shall not be subject to the Indemnification Cap.  The parties hereto acknowledge and agree that the termination or rescission of the Purchase Agreement, by court order, mutual agreement or otherwise, shall result in the termination or rescission of this Agreement.

(c)     Each RGI Indemnitee shall use commercially reasonable efforts to mitigate any Damages for which such RGI Indemnitee is seeking indemnification hereunder.  The amount of Damages payable by Servicer under this Article 4 shall be reduced by any insurance proceeds or other reimbursement arrangements with any third party, by way of indemnification or otherwise, actually recovered or recoverable by the RGI Indemnitees with respect to the claim for which indemnification is sought (whether or not the RGI Indemnitee chooses to pursue such recovery).  If, following the payment of any indemnification claim hereunder, the amount of Damages is reduced by recovery, settlement or otherwise under or pursuant to any claim, recovery, settlement or payment by or against any other entity, the amount of such reduction will promptly be repaid by the RGI Indemnitees to Servicer.

## ARTICLE 5.
## INDEMNIFICATION FOR BENEFIT OF SERVICER

**5.1     Servicer Indemnitees.**     RGI hereby indemnifies Servicer and its respective Affiliates (collectively, the "Servicer Indemnitees") from and against, and agrees to hold each of them harmless from, Damages incurred or suffered by the Servicer Indemnitees resulting from any breach of RGI's obligations under this Agreement or resulting from any representation or warranty made by RGI under this Agreement having been untrue or incorrect when made, excluding in each case, any Damages that were caused by a Servicer Indemnitee's gross negligence or willful misconduct, in each case, subject to the following limitations:

(a)     from and after the date that is twenty-four (24) months following the Closing Date, RGI shall not be under any obligation to indemnify any Servicer Indemnitee for any Damages incurred or suffered by the Servicer Indemnitees resulting from any representation or warranty made by RGI under this Agreement (other than those made under Section 6.11(c) hereof) having been untrue or incorrect when made; provided that if at such time, any claims for indemnification under this clause shall be pending, RGI's obligations hereunder as to such

26

claims shall continue until such claims are satisfied or otherwise disposed of in accordance with the terms hereof;

(b)      from and after the date that is thirty-six (36) months following the Closing Date, RGI shall not be under any obligation to indemnify any Servicer Indemnitee for any Damages incurred or suffered by the Servicer Indemnitees resulting from any representation or warranty made by RGI under Section 6.11(c) hereof having been untrue or incorrect when made; provided that if at such time, any claims for indemnification under this clause shall be pending, RGI's obligations hereunder as to such claims shall continue until such claims are satisfied or otherwise disposed of in accordance with the terms hereof;

(c)      from and after the date that is twenty-four (24) months following the Closing Date, RGI shall not be under any obligation to indemnify any Servicer Indemnitee for any Damages incurred or suffered by the Servicer Indemnitees resulting from any breach of RGI's obligations under this Agreement that were required to be performed on or prior to the Closing Date; provided that if at such time, any claims for indemnification under this clause shall be pending, RGI's obligations hereunder as to such claims shall continue until such claims are satisfied or otherwise disposed of in accordance with the terms hereof; and

(d)      from and after the date that is twenty-four (24) months following the date performance was due, said 24-month period to run from the date of each such breach, RGI shall not be under any obligation to indemnify any Servicer Indemnitee for any Damages incurred or suffered by the Servicer Indemnitees resulting from any breach of RGI's obligations under this Agreement that were required to be performed after the Closing Date; provided that if at such time, any claims for indemnification under this clause shall be pending, RGI's obligations hereunder as to such claims shall continue until such claims are satisfied or otherwise disposed of in accordance with the terms hereof.

5.2      **Direct Claims of RGI.**  Any claim by a Servicer Indemnitee on account of Damages under Section 5.1 above shall be asserted by such Servicer Indemnitee giving RGI prompt written notice thereof; provided, however, that no delay on the part of such Servicer Indemnitee in notifying RGI shall relieve RGI from any obligation hereunder unless (and then solely to the extent) RGI is prejudiced thereby.  Such notice by such Servicer Indemnitee shall describe such claim in reasonable detail, shall include copies of all material written evidence thereof within such Servicer Indemnitee's possession, shall indicate the estimated amount, if reasonably practicable, of the Damages that have been or may be sustained by such Servicer Indemnitee, and the Section of this Agreement under which the applicable indemnification obligation arises.  RGI shall have thirty (30) days after its receipt of such notice to respond in writing to such claim. During such 30-day period, RGI shall make such investigation of such claim as is considered necessary or desirable.  For the purpose of such investigation, such Servicer Indemnitee shall make available to RGI such information as RGI may reasonably request.  If RGI does not so respond within such 30-day period or dispute such claim, RGI shall be deemed to have rejected such claim, in which case the Servicer Indemnitees shall be free to pursue such remedies as may be available to the Servicer Indemnitees on the terms and subject to the provisions of this Agreement and as available under Applicable Law.

27

**5.3** **Third Party Claims Against RGI**.

(a)    If a Person who is not a Party to this Agreement or an Affiliate of a Party to this Agreement or a representative of the foregoing shall notify any Servicer Indemnitee with respect to any matter which may give rise to a claim for indemnification against RGI under Section 5.1 hereof (a "Third Party Claim Against RGI"), then the Servicer Indemnitees shall promptly notify RGI thereof in writing; provided, however, that no delay on the part of the Servicer Indemnitees in notifying RGI shall relieve RGI from any obligation hereunder unless (and then solely to the extent) RGI is prejudiced thereby.  Such notice will describe the Third Party Claim Against RGI in reasonable detail, will include copies of all material written evidence thereof and will indicate the estimated amount, if reasonably practicable, of Damages that has been or may be sustained by the Servicer Indemnitees, and the Section of this Agreement under which the applicable indemnification obligation arises.

(b)    RGI shall be entitled to participate in the defense of a Third Party Claim Against RGI and, unless RGI is also a party to such Proceeding and the Servicer Indemnitee determines that joint representation would be inappropriate and subject to the limitations set forth in this Section 4.3, shall be entitled to control and appoint lead counsel for such defense, which counsel must be reasonably satisfactory to the Servicer Indemnitee, in each case at RGI's expense.  Within ten (10) days following the receipt of notice by the Servicer Indemnitee of any Third Party Claim Against RGI, RGI shall provide notice to the Servicer Indemnitee of its election to assume control of the defense of such Third Party Claim Against RGI in accordance with the provisions of this Section 4.3.

(c)    If RGI shall assume the control of the defense of any Third Party Claim Against RGI in accordance with the provisions of this Section 5.3, (i) it will be conclusively established for purposes of this Agreement that such Third Party Claim Against RGI is within the scope of and subject to indemnification under this Article 5, (ii) RGI shall obtain the prior written consent of the Servicer Indemnitee before entering into any settlement of such Third Party Claim Against RGI, if (A) the settlement does not fully, completely and unconditionally release the Servicer Indemnitee from all liabilities and obligations with respect to such Third Party Claim Against RGI, (B) the settlement contains any admission of liability or wrongdoing on the part of the Servicer Indemnitee or (C) the settlement imposes any injunctive or other equitable relief against the Servicer Indemnitee and (iii) the Servicer Indemnitee shall be entitled to participate in the defense of such Third Party Claim Against RGI and to employ separate counsel of its choice for such purpose at its own expense; *provided*, *however*, that the Servicer Indemnitee shall have the right to employ, at RGI's expense, one counsel of its choice in each applicable jurisdiction (if more than one jurisdiction is involved) to represent the Servicer Indemnitee if, in the Servicer Indemnitee's reasonable judgment, there exists an actual or potential conflict of interest between the Servicer Indemnitee and RGI or if RGI (x) elects not to defend, compromise or settle a Third Party Claim Against RGI, (y) fails to notify the Servicer Indemnitee within the required time period of its election as provided in Section 5.3(b), or (z) having timely elected to defend a Third Party Claim Against RGI, fails, in the reasonable judgment of the Servicer Indemnitee, after at least ten (10) days' notice to RGI, to adequately

28

prosecute or pursue such defense, and in each such case the Servicer Indemnitee may defend such Third Party Claim Against RGI on behalf of and for the account and risk of RGI, and in each such case, the Servicer Indemnitee may settle such Third Party Claim Against RGI and seek indemnification for the amount of such settlement against RGI (including reasonable costs and expenses, including attorneys' fees) in accordance with this Article 5.

(d)     Each of Servicer and RGI shall cooperate, and cause their respective Affiliates to cooperate, in the defense or prosecution of any Third Party Claim Against RGI and shall furnish or cause to be furnished such records, information and testimony, and attend such conferences, discovery proceedings, hearings, trials or appeals, as may be reasonably requested in connection therewith.

**5.4     Adjustment of Indemnification Owed to Servicer Indemnitees**.

(a)     Subject to Section 6.11(d) hereof in any case, all indemnification payable by RGI to the Servicer Indemnitees shall be reduced by any indemnification payments owing from the Servicer to the RGI Indemnitees under Article 4 hereof, with such indemnification payments being considered to have been paid by virtue of such reduction.

(b)     RGI shall not have any obligation to indemnify any Servicer Indemnitee for any Damages under this Article 5 unless and until the aggregate amount of Damages suffered or incurred by the Servicer Indemnitees exceeds One Hundred Thousand Dollars ($100,000.00) (the "Servicer Deductible"), in which event RGI shall be liable only for such Damages in excess of the Servicer Deductible. The maximum aggregate liability RGI shall have under this Agreement, including but not limited to Article 5, under the Purchase Agreement and under the Participation Agreement with respect to Damages (as defined herein, in the Purchase Agreement and the Participation Agreement, as the case may be), breaches of obligations, undertakings, representations and warranties hereunder and thereunder and other liabilities or indemnified amounts in respect hereof or thereof (regardless of the theory under which such liabilities arise) including (y) any such liabilities in respect of special, indirect, incidental, consequential, exemplary and punitive damages or (z) any liabilities in respect of the Transactions under this Agreement, the Participation Agreement or the Purchase Agreement arising from a violation of Applicable Law by RGI or any duty imposed on RGI by Applicable Law, as to which, in each such case, RGI has a payment obligation or liability to Servicer hereunder or to the Purchaser under the Purchase Agreement or the Holder under the Participation Agreement), and the maximum aggregate amount payable by RGI with respect to such Damages, obligations, undertakings, representations, warranties and other liabilities referred to above or otherwise, shall not exceed the Indemnification Cap (excluding any claims arising from willful misconduct, fraud or intentional misrepresentation on the part of RGI with respect to the Transactions; provided that any claims arising under the Purchase Agreement shall nevertheless be subject to the last sentence of Section 8.5(b) of the Purchase Agreement), it being understood that the Indemnification Cap shall be for the benefit of any direct or indirect permitted successors or assignees of RGI. For the avoidance of doubt, (i) any amounts owing by RGI in respect of the Holder's Participation (including, without limitation amounts in respect of Hypothecation Distribution Advances) and (ii) any amounts due and payable in accordance with Section 3.4(a)

29

hereof by RGI to Servicer in respect of the Servicing Fee, shall not be subject to the Indemnification Cap.  The parties hereto acknowledge and agree that the termination or rescission of the Purchase Agreement, by court order, mutual agreement or otherwise, shall result in the termination or rescission of this Agreement.

(c)     Each Servicer Indemnitee shall use commercially reasonable efforts to mitigate any Damages for which such Servicer Indemnitee is seeking indemnification hereunder.  The amount of Damages payable by RGI under this <u>Article 5</u> shall be reduced by any insurance proceeds or other reimbursement arrangements with any third party, by way of indemnification or otherwise, actually recovered or recoverable by the Servicer Indemnitee with respect to the claim for which indemnification is sought (whether or not the Servicer Indemnitee chooses to pursue such recovery).  If, following the payment of any indemnification claim hereunder, the amount of Damages is reduced by recovery, settlement or otherwise under or pursuant to any claim, recovery, settlement or payment by or against any other entity, the amount of such reduction will promptly be repaid by the Servicer Indemnitees to RGI.

## ARTICLE 6.
## MISCELLANEOUS

6.1     **Notices**.

(a)     All notices, requests, claims, demands and other communications required or permitted to be given under this Agreement shall be in writing and shall be delivered by hand, sent by facsimile or sent, postage prepaid, return receipt requested, by registered, certified or express mail or overnight courier service and shall be deemed given when so delivered by hand or facsimile (if received prior to 5 p.m. in the place of receipt and such day is a Business Day in the place of receipt; otherwise, any such notice, request or communication shall be deemed not to have been received until the next succeeding Business Day in the place of receipt), or if mailed, three (3) days after mailing (one (1) Business Day in the case of express mail or overnight courier service), to the respective Parties at the following addresses (or at such other address for a Party as shall be specified in a notice given in accordance with this <u>Section 6.1</u>):

if to Servicer, to:

CRE Bushkill Group, LLC
1008 Sand Hill Road
East Stroudsburg, PA 18302

with a copy to (which shall not constitute notice):

Schulte Roth & Zabel LLP
919 Third Avenue
New York, New York 10022
Attention:  Boris Ziser

DOC ID - 25164159.16

5037022-100403 04/07/2017

Telephone: (212) 756-2140
Facsimile:  (212) 593-5955

if to RGI, to:

Resorts Group, Inc.
819 Ann Street
Stroudsburg, PA 18360
Attention: W. Andrew Worthington
Telephone:  570-350-2681
Email:  aworthington@resortsgroup.com

*with copies to* (which shall not constitute notice):

Baker Donelson
100 Light Street
Baltimore, MD 21202
Attention: Jeffrey S. Kuperstock
Telephone: 401-347-7375
Email: jkuperstock@bakerdonelson.com

*with copies to* (which shall not constitute notice):

Harry Van Sciver
575 Mistic Drive
P.O. Box 764
Marstons Mills, MA 02648
Telephone:  508-428-3458
Facsimile: 508-428-0607
Email:  hvansciver@resortsgroup.com

and:

Mark S. Turner
261 Young Road
Sciota, PA 18354
Email: mturner@resortsgroup.com


and:

Thomas V. Casale
204 Bellis Court
Stroudsburg, PA 18360
Email: tcasale@resortsgroup.com

31

(b)     RGI shall act as notification agent for the RGI Indemnitees hereunder. Servicer shall act as notification agent for the Servicer Indemnitees hereunder.  Any notice required under Section 4 or Section 5 hereof to be given to the RGI Indemnitees shall be deemed given if given to RGI.  Any notice required under Section 4 or Section 5 hereof to be given to Servicer Indemnitees shall be deemed given if given to Servicer.

**6.2     Amendments and Waivers**.

(a)     Any provision of this Agreement may be amended or waived if, but only if, such amendment or waiver is in writing and is signed, in the case of an amendment, by each Party and consented to in writing by Holder, or in the case of a waiver, by the Party against whom the waiver is to be effective and consented to in writing by Holder.

(b)     Any waiver of any term or condition of this Agreement shall not be construed as a waiver of any subsequent breach, or a subsequent waiver of the same term or condition or a waiver of any other term or condition, of this Agreement.  The failure of any Party to assert any of its rights hereunder shall not constitute a waiver of any of such rights.  No failure or delay by any Party in exercising any right, power or privilege under this Agreement shall operate as a waiver thereof nor shall any single or partial exercise thereof preclude any other or further exercise thereof or the exercise of any other right, power or privilege.  The rights and remedies provided in this Agreement shall be cumulative and not exclusive of any rights or remedies provided by Applicable Law.

**6.3     Expenses.**Except specifically as provided for herein, all costs and expenses (including fees and disbursement of its counsel, accountants and other advisors) incurred in connection with the preparation, negotiation, execution, delivery or performance of this Agreement shall be paid by the Party incurring such cost or expense.

**6.4     Successors and Assigns.**  The provisions of this Agreement shall be binding upon and inure to the benefit of the Parties and their respective successors and assigns; provided that

(a)     Servicer may not sell, assign, delegate or otherwise transfer or dispose of any of its rights or obligations under this Agreement (whether by contract or operation of law or otherwise) unless RGI shall have consented, in writing, to such sale, assignment, delegation, transfer and disposition, which consent shall not be unreasonably withheld, delayed or conditioned; provided that no such consent shall be required if the transferee or assignee is an Affiliate of Servicer providing significant and ongoing receivables servicing and/or collections for Holder or Purchaser;

(b)     RGI may not sell, assign, delegate or otherwise transfer or dispose of any of its rights or obligations under this Agreement (whether by contract or operation of law or otherwise) unless Holder and Servicer shall have consented in writing thereto, which consent

32

shall not be unreasonably withheld, delayed or conditioned (it being understood that it shall be reasonable for the Servicer to withhold, condition or delay its consent if such sale, assignment, delegation or other transfer or disposition is to a Person that is or is an Affiliate of a competitor of the Servicer or any of its Affiliates).

6.5     **Governing Law.**  This Agreement (and any claims or disputes arising out of or related to this Agreement, whether for breach of contract, tortious conduct or otherwise and whether predicated on common law, statute or otherwise) shall in all respects be governed by and construed in accordance with the laws of the State of New York (including Section 5-1401 of the General Obligations Laws of the State of New York but otherwise without regard to conflicts of law principles), including all matters of construction, validity and performance, in each case without reference to any conflict of law rules that might lead to the application of the laws of any other jurisdiction.  Each Party further agrees that the laws of the State of New York bear a reasonable relationship to this Agreement and irrevocably and unconditionally waives any objection to the application of the laws of the State of New York to any action, suit or proceeding arising out of this Agreement and further irrevocably and unconditionally waives and agrees not to plead or claim that any such action, suit or proceeding should not be governed by the laws of the State of New York.

6.6     **Consent to Jurisdiction.**   Each Party hereto hereby irrevocably and unconditionally submits, for itself and its property, to the exclusive jurisdiction of the Supreme Court of the State of New York sitting in New York County and of the United States District Court of the Southern District of New York, and any appellate court from any thereof, in any action or proceeding arising out of or relating to this Agreement, or for recognition or enforcement of any judgment, and each of the parties hereto hereby irrevocably and unconditionally agrees that all claims in respect of any such action or proceeding may be heard and determined in such New York State court (or, to the extent permitted by law, in such Federal court).  Each Party hereto agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law. Each Party hereby waives formal service of process and agrees that service of any process, summons, notice or document by U.S. registered mail to such Party's respective address set forth above shall be effective service of process for any action, suit or proceeding in New York with respect to any matters to which it has submitted to jurisdiction in this Section 6.6.  Each Party irrevocably and unconditionally waives, any objection to the laying of venue of any action, suit or proceeding arising out of this Agreement in such courts and hereby and thereby further irrevocably and unconditionally waives and agrees not to plead or claim in any such court that any such action, suit or proceeding brought in any such court has been brought in an inconvenient forum.

6.7     **WAIVER OF JURY TRIAL.**  EACH PARTY HEREBY EXPRESSLY AND IRREVOCABLY WAIVES TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT TO ANY ACTION, PROCEEDING OR COUNTERCLAIM (WHETHER BASED ON CONTRACT, TORT OR OTHERWISE) DIRECTLY OR INDIRECTLY RELATING TO ANY

33

DISPUTE ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.  Each Party (a) certifies that no representative, agent or attorney of the other Party has represented, expressly or otherwise, that such other Party would not, in the event of litigation, seek to enforce the foregoing waiver and (b) acknowledges that it and the other Party have been induced to enter into this Agreement, by, among other things, the mutual waivers and certifications in this Section 6.7.

6.8     **Counterparts; Third Party Beneficiaries.**  This Agreement may be signed in any number of counterparts (including by facsimile or other electronic signature), each of which shall be an original, with the same effect as if the signatures were upon the same instrument.  This Agreement shall become effective when each Party shall have received a counterpart of this Agreement signed by each other Party.  Each Party hereto acknowledges that the Holder shall be an express third party beneficiary of this Agreement, with the right to enforce any provisions of this Agreement as if it were a direct party hereto.

6.9     **Severability.**  If any provision of this Agreement (or any portion thereof) or the application of any such provision (or any portion thereof) to any Person or circumstance shall be held invalid, illegal or unenforceable in any respect by a court of competent jurisdiction, such invalidity, illegality or unenforceability shall not affect any other provision of this Agreement (or the remaining portion thereof) or the application of such provision to any other Person or circumstances.  Upon such determination that any term or other provision is invalid, illegal or incapable of being enforced, the Parties shall negotiate in good faith to modify this Agreement so as to effect the original intent of the Parties as closely as possible in a mutually acceptable manner in order that the transactions contemplated hereby are completed as originally contemplated to the greatest extent possible.

6.10     **Entire Agreement.**  This Agreement constitutes the entire agreement and understanding among the Parties with respect to the subject matter of this Agreement and supersedes all prior agreements and understandings, both oral and written, among the Parties with respect to the subject matter of this Agreement.

6.11     **Miscellaneous**.

(a)     All payments to be made by one Party to another Party hereunder shall be made by wire transfer (or other means specifically designated by the receiving Party) of immediately available funds pursuant to written payment instructions submitted to the paying Party reasonably in advance of the applicable date for such payments.

(b)     This Agreement is not intended to create or constitute, nor shall it be construed to create or constitute, the formation of a partnership or joint venture between Servicer and RGI.

(c)     Each Party represents and agrees that the making and performance of this Agreement is within the power of such Party and has been duly authorized by all necessary corporate, company and other action by it, that this Agreement is in compliance with all

34

Applicable Laws and regulations promulgated thereunder with respect to such Party and does not conflict with any agreements by which such Party is bound, and that this Agreement has been duly executed by it, and constitutes the legal, valid, and binding obligation of such Party, enforceable in accordance with its terms.  Each Party hereto represents and warrants to the other Parties hereto that the execution, delivery and performance by such Party of this Agreement does not and will not violate any consent, license, or approval of, registration or filing with, or any other action by, any Governmental Authority. Servicer represents and warrants to RGI that Servicer has obtained and will maintain all licenses, registrations, approvals, exemptions, authorization, bonds and permits from, and has made and hereafter will make all filings with, any governmental authority that are required under Applicable Law for Servicer to discharge its undertakings and duties hereunder.  Each Party shall conduct its businesses, and shall perform its material obligations hereunder, in compliance with Applicable Law.

(d)     Subject to the Indemnification Cap and any express provision to the contrary set forth in this Agreement, each Party agrees and acknowledges that any payment owing to any (receiving) Party by another (paying) Party under this Agreement may be reduced by

(i)     any amounts such (receiving) Party owes to such other (paying) Party under this Agreement;

(ii)     if such (receiving) Party is Purchaser, the Holder or an Affiliate of Purchaser or the Holder and the other (paying) Party is RGI or an Affiliate of RGI, any amounts Purchaser, the Holder or such Affiliate of Purchaser or the Holder owes to RGI or such Affiliate of RGI under the Purchase Agreement or the Participation Agreement, as applicable, and

(iii)     if such (receiving) Party is RGI or an Affiliate of RGI and the other (paying) Party is Purchaser, the Holder or an Affiliate of Purchaser or the Holder, any amounts RGI or such Affiliate of RGI owes to Purchaser or the Holder or such Affiliate of Purchaser or the Holder under the Purchase Agreement or the Participation Agreement, as applicable.

Such offsets shall be deemed to satisfy the obligations to which they relate under the applicable documents. No set-off or reduction provided for in this Section 6.11(d) may be effected to the extent of the excess referred to below if such set-off or reduction or reduction is in respect of an indemnification payment or other payment subject to the Indemnification Cap, and the Indemnification Cap applicable to this Agreement, the Purchase Agreement and/or the Servicing Agreement would be exceeded after giving effect to such set-off or reduction.  For the avoidance of doubt, no other set-off or reduction is allowed hereunder.

(e)     [Reserved]

(f)     Notwithstanding prior provisions to the contrary, this Agreement and all rights and obligations of the Parties hereto shall terminate on the Termination Date, provided that Article 4, Article 5 and Article 6 hereof shall remain in effect until the first anniversary of the

DOC ID = 25164159.16

5037022-100403 04/07/2017

Termination Date, provided further that, if at the time of such first anniversary, any claims for indemnification under Article 4 or Article 5 hereof shall be pending, Article 4, Article 5 and Article 6 as to such pending claims, shall continue in full force and effect until such claims are satisfied or otherwise disposed of in accordance with the terms thereof.

(g)     At all times during the performance of Servicer's services under this Agreement, the parties hereto acknowledge and agree that Servicer is acting as, and shall have the status of, an independent contractor.  RGI is relying on the expertise of Servicer in entering into this Agreement. Nothing contained in this Agreement, nor the performance by Servicer of its duties and obligations hereunder shall create or be construed to create a joint venture, partnership, fiduciary or agency relationship between Servicer and RGI.

(h)     The Parties hereto acknowledge and agree that Section 6.10 of the Purchase Agreement is hereby incorporated herein by reference and made a part hereof and shall be applicable to each of the Parties hereto.

[Signatures Page Follows]

36

**IN WITNESS WHEREOF,** the parties have hereunto set their hands and seals to this Agreement as of the date and year first above written.

**RESORTS GROUP, INC.**

By: _____

Name:  W. Andrew Worthington

Title:  President and Chief Executive Officer

**CRE BUSHKILL GROUP LLC**

By: _____

Name:  W. Andrew Worthington

Title:  President and Chief Executive Officer

*[Signature page - Servicing Agreement]*

**Schedule 1**

**Servicing, Collection and Enforcement Policies and  Procedures**

## _SERVICING, COLLECTION AND ENFORCEMENT POLICIES AND PROCEDURES_

**SECTION 1.  Telephone Collections:**

      1.1    Policy. It is Bushkill Financial Services Policy (a) that telephone collections are the primary means of curing delinquent Bushkill timeshare loan and maintenance fee accounts, (b) that a designated Bushkill Financial Services Representative (see Section 4 below) is to make all outbound collection (and related customer service) telephone calls to Bushkill timeshare loan obligors and/or members, who have been assigned to such Bushkill Financial Services Representative, regarding their respective delinquent Bushkill timeshare loan and/or maintenance fee accounts beginning no later than 7 days after any such account shall first become contractually past due, or earlier at the discretion and direction of the Bushkill Director of Financial Services, (c) that such telephone collection calls are to continue until the delinquent amount for the applicable Bushkill timeshare loan and/or maintenance fee account is collected or otherwise dealt with under Sections 8, 9 or 10 below, (d) that outbound collection telephone calls to delinquent Bushkill timeshare loan obligors or members are to be directly dialed by a Bushkill Financial Services Representatives, when available, and otherwise may be made by the use of predictive and other automated dialers, (e) to employ credit tracking and skip-tracing software (such as LexisNexis and Trans Union) to obtain new telephone numbers, whenever needed, with respect to delinquent Bushkill timeshare loan obligors and members, (f) that, subject to Section 2.5 below, no Bushkill Financial Services Representative will disclose or discuss personal, financial, delinquency, credit or Bushkill timeshare loan or maintenance fee account information with a person that is not the Bushkill timeshare obligor or member in respect thereof unless such obligor or member has expressly requested, in writing, that such Bushkill Financial Services Representative do so and then only if the Bushkill Director of Financial Services or a Bushkill in-house attorney has approved the same in writing and (g) to comply with all applicable laws and applicable regulations, including, without limitation, the Fair Credit and Reporting Act, the Credit Card Accountability Responsibility and Disclosure Act of 2009 ("Card Act"), the Equal Credit Opportunity Act, the Payment Card Industry Data Security Standards ("PCI"), and the rules and regulations of Consumer Financial Protection Bureau.

      1.2    Outbound Collection Telephone Call Procedures. Outbound collection telephone calls are to be made via Bushkill telephone landlines and Bushkill internet phone services. All outbound collection telephone calls are to be made from Bushkill's offices on Bushkill's

telephones or Bushkill supplied devices. Bushkill Financial Services Representatives may not use their personal telephones or other devices, nor may they initiate contact with Bushkill timeshare loan obligors or members from anywhere outside of the Bushkill Property.

1.3     <u>Outbound Collection Telephone Call Timing Procedures</u>. Outbound collection telephone calls are to be made between 8AM and 9PM weekdays, between 8AM and 4PM on Saturdays, and between Noon and 4PM on Sundays (in each case Eastern time). The foregoing times should be appropriately adjusted if a delinquent Bushkill timeshare loan obligor or member lives in another time zone. Bushkill Financial Services Representatives will not initiate new outbound collection telephone calls outside these hours. Bushkill Financial Services Representatives may return a telephone call of a delinquent Bushkill timeshare loan obligor or member within the aforesaid times or within one hour of receipt of the customer's call if outside such times.

1.4     <u>"Free Text" Input Procedure</u>. Every outbound collection call is to be entered into the Bushkill Collection System by the Bushkill Financial Services Representative initiating the same through the "Free Text" screen. See <u>Section 4.7</u> below.

1.5     <u>Access Procedure for "Free Text" Comments</u>. Subject to <u>Section 7.1(d)</u> below, "Free Text" comments in the Bushkill Collection System are to be available to any authorized Bushkill employee logging-into the Bushkill Collections System while on the Bushkill Property, so that they may appropriately reference the status of any Bushkill timeshare loan and/or maintenance fee account and understand any financial, travel or service-related issues for that account.

1.6     <u>Telephone Number Input and Update Procedure</u>. Telephone numbers available to be called by Bushkill Financial Services Representatives are to include (and the same are to be entered into the Bushkill Collection System) each contact number provided by a Bushkill timeshare loan obligor or member in any "Installment Contract," "Contract for Deed," "Credit Application," "Credit Report," membership and other timeshare documents, reservation correspondence, other correspondence or otherwise during the course of his/her Bushkill membership. Telephone contact numbers available to be called by Bushkill Financial Services Representatives (and in the Bushkill Collection System) may include listed and unlisted numbers, home phones, cell phones, work phones, and other numbers provided by any Bushkill timeshare loan obligor or member. Bushkill Financial Services Representatives are to periodically supplement and update the aforesaid telephone numbers by utilizing telephone information or listing services (i.e. new or additional numbers listed for members). See also <u>Section 1.1(e)</u> above.

**SECTION 2.  <u>Letter (Postal) Dunning & Collections; Texts, Emails and Social Media:</u>**

2

2.1     _Policy_. It is Bushkill Financial Services Policy (a) to maintain, update as required by applicable law or Bushkill operations, and for Bushkill Financial Services Representatives to utilize in connection with telephone collections under Section 1 above (in order to maximize efficiencies and collections), form delinquency, dunning and other letters for delinquent Bushkill timeshare loan accounts, see Exhibit entitled _Automated Loan Collection Letters,_ and form delinquency, dunning and other letters for delinquent Bushkill timeshare maintenance fee accounts, see Exhibit entitled _Automated Maintenance Fee Collection Letters );_ (b) for Bushkill Financial Services Representatives to utilize customized letters on delinquent Bushkill timeshare loan accounts (see Exhibit entitled _Customized Loan Collection Letters)_ and delinquent maintenance fee accounts (see Exhibit entitled _Customized Maintenance Fee Collection Letters)_, (c) for Bushkill Financial Services Representatives to use individual letters, at the discretion and direction of the Bushkill Director of Financial Services, as needed to maximize the effectiveness and coverage of Bushkill timeshare loan or maintenance fee account collections, (d) for Bushkill Financial Services Representatives to employ e-mail, text messaging, social media (where appropriate) and other electronic means of communication to encourage delinquent Bushkill timeshare loan obligors and members to contact the Bushkill Financial Services Department regarding their Bushkill timeshare loan and maintenance fee accounts, (e) that no personal, financial, delinquency, credit, Bushkill timeshare loan or maintenance fee account information be divulged in any e-mail, text message, social media contact or other electronic communication, even if express disclosure permission has been provided by the applicable Bushkill timeshare loan obligor or member, (f) that, subject to Section 2.5 below, no Bushkill Financial Services Representative is to disclose or discuss personal, financial, delinquency, credit, Bushkill timeshare loan or maintenance fee account information with a person that is not the Bushkill timeshare obligor or member in respect thereof unless such obligor or member has expressly requested, in writing, that such Bushkill Financial Services Representative do so and the Bushkill Director of Financial Services or a Bushkill in-side attorney has approved the same in writing, (g) to "scrub" bad postal mailing address files from the Bushkill Collections System a minimum of once (1X) annually, using third-party vendors to provide corrected addresses for Bushkill timeshare loan obligors and members, (h) to employ credit tracking and skip-tracing software (such as LexisNexis and Trans Union) to obtain new postal mailing addresses, e-mailing addresses, text-messaging addresses, social media addresses and other electronic addresses, whenever needed, with respect to delinquent Bushkill timeshare loan obligors and members and (i) to comply with all applicable laws and applicable regulations, including, without limitation, the Fair Credit and Reporting Act, the Card Act, the Equal Credit Opportunity Act, the PCI, and the rules and regulations of Consumer Financial Protection Bureau.

2.2     _Address Input and Update Procedures_. Postal mailing addresses, e-mail addresses, text messaging addresses, social media addresses and other electronic addresses available to be utilized by Bushkill Financial Services Representatives are to include (and the same are to be entered into the Bushkill Collection System) each postal mailing address, e-mail address, text messaging address, social media address or other electronic address provided by a Bushkill timeshare loan obligor or member in any "Installment Contract," "Contract for Deed," "Credit Application," "Credit Report," membership and other timeshare documents, reservation

3

correspondence, other correspondence or as otherwise updated during the course of his/her Bushkill membership. Every Bushkill Financial Services United States Post Office mailing is to be endorsed for "forwarding postage & forwarding address," and address changes provided by the United States Post Office are to be inputted regularly into the Bushkill Collections System.

2.3     Correspondence and <u>"Free Text" Input Procedures for Electronic Contacts</u>. Every e-mail, text message, social media contact or other electronic message sent or received from or relating to any Bushkill timeshare loan obligor or member is to be entered into the Bushkill Collections System pursuant to the "Free Text" screen, and copies of all correspondence are to be retained and logged-into the Bushkill Collections System, see Exhibit entitled *Tracking System Reports*. See <u>Section 4.7</u> below.

2.4     <u>"Free Text" Input Procedures for In-Person Meetings</u>. A description of all in-person contacts with any delinquent Bushkill timeshare loan obligor or member (including names of persons involved, subject matter and nature of meeting and date of meeting) is to be entered into the Bushkill Collections System through the "Free Text" screen. See <u>Section 4.7</u> below.

2.5     <u>Access Procedure for "Free Text" Comments</u>. Subject to <u>Section 7.1(d)</u> below, "Free Text" comments in the Bushkill Collection System regarding any post mail, e-mail, social media contact or other electronic communication are to be available to any authorized Bushkill employee logging-into the Bushkill Collections System while on the Bushkill Property, so that they may appropriately reference the status of any Bushkill timeshare loan and/or maintenance fee account and understand any financial, travel or service-related issues for that account.

**SECTION 3.  <u>Bushkill Financial Services Collector Training:</u>**

3.1     <u>Policy</u>. It is Bushkill Financial Service Policy that (a) each Bushkill Financial Services Representative be familiar with all of the Bushkill Financial Services Policy Memoranda (see Exhibit entitled *Bushkill Financial Services Policy Memoranda*), (b) each Bushkill Financial Services Representative satisfy all of the following qualifications: (i) he/she qualifies for, and has obtained and maintained, a Pennsylvania State Timeshare License (see Exhibit entitled *Sample Timeshare License*) (this is a Bushkill Financial Services Policy "core" requirement and not a state requirement); (ii) he/she has toured the Resort, and is, in the judgment of the Bushkill Director of Financial Services, well-familiarized with all Bushkill timeshare products, amenities, services, and reservation procedures; (iii) he/she understands, in the judgment of the Bushkill Director of Financial Services, how timeshare intervals and/or RCI points are exchanged, and how RCI and Interval International reservations are made; (iv) he/she has taken a timeshare sales tour, and, in the judgment of the Bushkill Director of Financial Services, understands how Bushkill timeshare interests are sold; and (v) he/she has received not less than 30 days of training on Bushkill Financial Services Policies, including but not limited to:

4

basic PCI and CARD Act compliance; the use of the "Financial Services" computer screens and "Free Text;" basic loan and maintenance fee accruals, billings, and postings; phone collection techniques and strategies to maximize contact and collections while maintaining good customer service; and use of automated letters, account administration, and basic skip-tracing, (c) each Bushkill Financial Services Representative is to be well-trained, is to be able to promote all of the benefits of the Bushkill timeshare products to any delinquent Bushkill timeshare loan obligor or member who may express dissatisfaction with such products, and is to be familiar with all Bushkill policies and procedures to help delinquent Bushkill timeshare loan obligors and members return to being in good-standing and having restored to them all applicable vacation and Resort use rights and privileges, (d) each Bushkill Financial Services Representative is to be trained to avoid complaints from Bushkill timeshare loan obligors and members and to treat each such obligor and member with courtesy, professionalism and hospitality, regardless of the aging of any delinquency or the balance owing on his/her Bushkill timeshare loan or maintenance fee account and (e) BGI and its employees are to remain persons under common ownership and/or affiliated by corporate control with Tree Tops and HRP and consequently not "debt collectors" subject to, and/or as defined in, the FDCPA.

3.2     Training Procedures. The training of Bushkill Financial Services Representatives is to be under the direction of the Bushkill Director of Financial Services, is to be taught primarily by the senior personnel designated as "Lead Collectors" on the Exhibit entitled *Financial Services Position/Responsibility,* which outlines departmental responsibilities and assignments

3.3     Training Update Procedures. Bushkill Financial Services Department is to employ seminars and ad hoc in-house training, re-training and professional development as needed to ensure that the Bushkill Financial Services Representatives fulfill the policy requirements under Section 3.1 above and remain up-to-date on all of the aforesaid information and skills.

3.4     Noncompliance Procedures. Bushkill Financial Services Representatives who fail consistently to provide quality customer service and problem resolution, or who generate Bushkill member complaints, are subject to disciplinary action and dismissal, in accordance with the applicable Bushkill human resource guidelines and policies.

**SECTION 4.  Priority of Collection Effort; Account Assignments:**

4.1     Policy. It is Bushkill Financial Services Policy that (a) the assignment of collection and servicing responsibilities for delinquent Bushkill timeshare loan and maintenance fee accounts is to be to Bushkill Financial Services Representative(s) as selected by the Bushkill Director of Financial Services based on (i) their "Performance Metrics" (with further guidance from senior management as necessary) and (ii) their seniority and general skill level, (b) less experienced Bushkill Financial Services Representatives are to be assigned to delinquent

5

maintenance fee "only" collections and (c) in assigning delinquent Bushkill timeshare loan and/or maintenance fee accounts the following criteria are to be taken into consideration: (i) each Bushkill Financial Services Representative is to have the time, during normal working hours, to contact each delinquent Bushkill timeshare loan obligor or member assigned to him/her a minimum of twice (2X) per week; (ii) no Bushkill Financial Services Representative is to retain any unsuccessful account assignment (failure to collect that particular account) for more than 120 days; (iii) no Bushkill Financial Services Representative is to have the right to earn subsequent "Incentives," "SPIFs," or other special "payroll bonuses" with respect to any delinquent Bushkill timeshare loan or maintenance fee account which such Bushkill Financial Services Representative previously failed to collect (financial incentives should not be awarded for, and the offering of the same as an incentive package are to be avoided in connection with, the early delay or deferral of collecting any delinquent Bushkill timeshare loan or maintenance fee account by any Bushkill Financial Services Representative); (iv) there is to be made available to each Bushkill Financial Services Representative the special skills of other Bushkill Financial Services Representatives not assigned to the particular delinquent Bushkill timeshare loan or maintenance fee account being worked on by such Bushkill Financial Services Representative (e.g., Spanish-speaking, more refinancing experience, "T.O.s", overtime hours/coverage, superior "in-person" skills for delinquent Bushkill timeshare obligors or members who visit Bushkill to pay).

      4.2    <u>Team Assignment Procedure</u>. Delinquent timeshare loan and/or maintenance fee accounts may be assigned by the Bushkill Director of Financial to individual Bushkill Financial Services Representative, as a single "collector," and/or teams of Bushkill Financial Services Representatives, as "collectors."

      4.3    <u>Intercession Procedure</u>. The Bushkill Director of Financial Services may, at any time, intercede in the process of collection or resolution of any delinquent Bushkill timeshare loan or maintenance fee account being conducted by a Bushkill Financial Services Representative for any reason, including, without limitation: (i) participating in any telephone call (including taking the lead on behalf of Bushkill in any such call); (ii) terminating any telephone call; (iii) recording a telephone call; (iv) re-assigning any Bushkill timeshare loan account or maintenance fee account; and (v) using any telephone call for training, audit or research purposes.

      4.4    <u>Monitoring Procedures</u>. The Bushkill Director of Financial Services may audit inbound and outbound telephone calls and computer activity and correspondence ad hoc and at his/her discretion, for the purposes of quality control, ad hoc training and general departmental management. Bushkill Financial Services Representatives are to sign an acknowledgement of Call Monitoring and/or Call Recording upon hiring.

      4.5    <u>Account Priority Procedures</u>. Bushkill Financial Services Representatives assigned to delinquent Bushkill timeshare loan account collections are also responsible for the collection of delinquent Bushkill maintenance fees associated with those delinquent timeshare

6

loan accounts; and, in cases where a Bushkill timeshare obligor is unable to cure the timeshare loan delinquency and the maintenance fee delinquency simultaneously, collection of the delinquent Bushkill timeshare loan account will take priority.

4.6     Lead and Cooperation Procedures. The Bushkill Director of Financial Services may identify and designate certain Bushkill Financial Services Representatives as "Leads" (see Exhibit entitled _Financial Services Position/Responsibility)_, because of their demonstrated special expertise in collections and timeshare loan and maintenance fee customer service. Leads have the responsibility of being a primary source for situations where the assigned Bushkill Financial Services Representative is having difficulty resolving or collecting an account. If Leads are not available and a Bushkill Financial Services Representative has a special need for assistance, the other Bushkill Financial Services Representatives are to cooperatively assist him/her. General cooperation and teamwork among Bushkill Financial Services Representatives is encouraged. Accordingly,  the Exhibit entitled _BGI Financial Services Policy Memoranda_, and the Exhibits entitled BONUSWORKSHEET as well as other Financial Services departmental payroll  plans all encourage and compensate primary account responsibility by the assigned Bushkill Financial Services Representative, but also provide group and departmental incentives and responsibility for shared collections and customer service.

4.7     "Free Text" Procedures. The Bushkill Financial Services Representative making contact with a Bushkill timeshare loan obligor or member has the responsibility to enter into the Bushkill Collections System using "Free Text" information identifying himself/herself, identifying the obligor or member being contacted and detailing the nature and date of the contact.

4.8     Assignment and Responsibility Procedures. Bushkill Financial Services Representative delinquent account assignments and responsibilities as of 9-2016 are outlined on the Exhibit entitled _Financial Services Position/Responsibility_.


**SECTION 5   Financial Services Payroll Incentives and SPIFs; Key Bushkill Metrics; Collections Performance Metrics:**

5.1     Policy. It is Bushkill Financial Services Policy that (a) each Bushkill Financial Services employee be incentivized, via regular recurring "Incentives" and discretionary "SPIF's," to maximize performance measured on three (3) core "metrics:" (i) "Portfolio Cash Collections - % of "Monthly Budget to Actual;" (ii) Portfolio "Roll" - the net change in "Month-over-Month Delinquency;" and (iii) Maintenance Fee Cash Collections - % of "YTD Budget" (see Bushkill Financial Services employee's performance on these key Bushkill metrics in Exhibits entitled _2016 Portfolio Collections Budget_, _2016 Roll Projection Budget_, and _2016 MFee Collections Budget)_; (b) Bushkill Financial Services Representatives who perform collections exclusively or as a significant portion of their job are to earn a significant percentage of their annual

7

compensation in "Incentives" and "SPIF's," (with top performers to earn more than 50% of their annual compensation from performance-based incentive plans); and (c) a significant portion of the compensation of all other Bushkill Financial Service Representatives is to be based on "Incentives," both "individual Incentives" and "department-wide Incentives" (see Exhibit entitled *BONUSWORKSHEETDUESAND LOAN.xls* for regular recurring payroll-based "Incentives" in place as of 9-2016).

5.2    Payment Procedure. "Incentives" and "SPIFs" are to be paid monthly in the regular payroll period during which they are calculated and approved.

5.3    Incentive Procedures. In addition to the regular recurring "Incentives," the Bushkill Director of Financial Services is to be encouraged by Bushkill senior management to approve "SPIFs" and contests (including, without limitation, "SPIF Vacation Contests" that award Resort accommodations or a RCI exchange rather than compensation) that encourage specific Bushkill Financial Services Department goals and objectives, such as maximizing departmental collections, converting accounts without preauthorized credit card charges ("non-PACs") to accounts with payments via preauthorized credit card charges ("PACs"), improving "metrics" on a particular Bushkill timeshare loan or maintenance fee tranche that may be lagging behind budgeted goals, salvaging difficult accounts, special attention on refinances etc.

5.4    Approach/Compensation Procedure. Bushkill Financial Services Department's approach to, and compensation for, collections is a hybridization of "Dunning, Sales, Customer Service and Hospitality." Bushkill Financial Services Representatives, especially those performing collections, are tasked with, and incentivized by compensation for, maximizing the percentage of Bushkill timeshare loan and maintenance fee accounts that remain current, while collecting as much cash as possible. They are also tasked with, and incentivized by compensation for, not losing a Bushkill member who wants Bushkill timesharing, and ensuring that every Bushkill member has a positive experience and enjoys maximum access to and enjoyment of the Resort, amenities, exchange and other timeshare benefits. They are also required to work together within the "Department" to maximize coverage and attention to timeshare loan and maintenance fee accounts, notwithstanding specific account assignments.

5.5    Compensation Reporting Procedures. All "Payroll Incentives" and "SPIFs" are to be reported each month on the Exhibit which is entitled *BONUSREQUEST.xls*; this report is to be prepared each month by the Bushkill Director of Financial Services, and is to be reviewed and approved in writing by Bushkill senior management before being submitted to Bushkill payroll. This report, together with the Exhibits entitled *RefiReport.xls*, *Dashboards.xls*, and *RepAnnualSummary.xls* all provide detailed "Performance Metrics" for each Bushkill Financial Services Representative, which are used for evaluations, promotions, re-assignments, warnings, or dismissals, all in accordance with Bushkill's human resource policies.

8

**SECTION 6.  <u>Reservation and Exchange Blocking and Unblocking:</u>**

6.1     <u>Policy</u>. It is Bushkill Financial Services Policy (a) to block internal reservations (Tree Tops Resort and Fairway Resort) and external exchanges and travel (RCI Points, RCI Weeks, and other exchange networks) with respect to Bushkill timeshare loan obligors and/or members whose Bushkill timeshare loan and/or maintenance fee accounts are delinquent at the following levels: (i) Bushkill timeshare loan accounts over 31 days contractually past due; and (ii) Bushkill maintenance fee accounts over 91 days contractually past due; (b) that Bushkill timeshare loan obligors and members who pay/cure their respective delinquent Bushkill timeshare loan and maintenance fee accounts such that the same are below the aforesaid contractual delinquency levels are unblocked (as provided in <u>Section 6.2</u> below) for purposes of internal reservations and external exchanges; (c) that Bushkill timeshare loan obligors and members with delinquent Bushkill timeshare loan and/or maintenance fee accounts who make firm arrangements to pay such delinquencies or have other extenuating circumstances may be unblocked from making internal reservations and external exchanges (as provided in <u>Section 6.2</u> below) at the discretion of the Bushkill Director of Financial Services or the Bushkill Manager of Reservations, (d) that the Bushkill Director of Financial Services is to unblock (as provided in <u>Section 6.2</u> below) any delinquent Bushkill timeshare loan obligor and/or member from internal reservations and external exchanges where, in the judgment of the Bushkill Director of Financial Services, such obligor/member is making a successful effort to bring his/her Bushkill timeshare loan account(s) and/or maintenance fee account(s) current and where the collectability of such account(s) will be enhanced by facilitating a vacation for such obligor/member and (e) that the Bushkill reservation personnel have real-time computer access (through the Bushkill Reservation Systems) to the Bushkill timeshare loan and/or maintenance fee delinquency status of every inbound telephone caller or on-line customer requesting an internal Resort reservation, (f) to immediately refer any inbound telephone caller or on-line customer requesting an internal Resort reservation, whose Bushkill timeshare loan and/or maintenance fee account is delinquent and who does not make immediate arrangements to bring his/her account current, to a Bushkill Financial Services Representative; and (g) to refer any Bushkill timeshare loan obligor or member who cures a delinquency in his/her Bushkill timeshare loan or maintenance fee account immediately to appropriate Bushkill reservation personnel, so that they may confirm appropriate reservations for the use of their vacation time pursuant to the timing provided in <u>Section 6.2</u> below.

6.2     <u>Access and Unblocking Procedures</u>. Bushkill Reservations personnel are to have computer access to automated Bushkill timeshare loan and/or maintenance fee delinquency information in order that the blocking and unblocking of internal reservations and external exchanges can be effected on a weekly basis. Bushkill timeshare loan obligors and members who pay delinquent amounts may be unblocked immediately and/or on some other ad hoc timing at the discretion of the Bushkill Director of Financial Services or the Bushkill Manager of Reservations. This immediate or ad-hoc unblocking is executed as an override to the blocked status of the Bushkill timeshare loan obligor/member until Bushkill's Reservation Systems, and/or weekly blocking/unblocking reports to RCI, reflect the change in status.

9

**SECTION 7.  Prohibition on Upgrading or Reloading Delinquent Accounts; Prohibition on Interference:**

7.1     Policy. It is Bushkill Financial Services Policy that (a) Bushkill timeshare sales personnel, telemarketers, brokers, agents and their assigns are to be prohibited from contacting any Bushkill member for the purpose of upgrading, reloading, reselling or otherwise selling any additional timeshare or vacation product or service to such member if such member is more than 31 days contractually past due on its Bushkill timeshare loan account, (b) there is to be no prohibition on Bushkill timeshare sales personnel, telemarketers, brokers, agents and their assigns contacting any Bushkill member for the purpose of upgrading, reloading, reselling or otherwise selling any additional timeshare or vacation product or service if such member is delinquent only on his/her Bushkill maintenance fee account, provided that such Bushkill timeshare sales personnel, telemarketers, brokers, agents and their assigns are not to interfere with the collection process of such delinquent maintenance fee account or contradict or contravene any proposals or agreements reached by Bushkill Financial Services Representatives with respect to such delinquent maintenance fee account as reflected in the Bushkill Collection System, (c) that Bushkill Financial Services Representatives and Bushkill timeshare sales personnel cooperate with each other in the interests of customer service, hospitality, accurate record-keeping and ensuring that Bushkill timeshare loan and maintenance fee accounts remain current, (d) that, subclause (c) above notwithstanding, Bushkill Financial Services Representatives are not to disclose to Bushkill timeshare sales personnel any credit information or any personal information about Bushkill members or Bushkill timeshare loan obligors that is obtained in the process of skip-tracing; and (e) that no Bushkill Financial Services Representative, Bushkill timeshare sales personnel, Bushkill reservation personnel or other Bushkill employee, their successors, agents, affiliates or assigns encourage any Bushkill timeshare loan obligor or member, or anyone purporting to represent a Bushkill timeshare loan obligor or member, to (i) withhold payments on his/her Bushkill timeshare loan or maintenance fee account, (ii) become or remain delinquent with respect to such account, (iii) cancel, terminate or surrender his/her Bushkill membership, or (iv) otherwise default on his/her Bushkill timeshare loan or maintenance fee obligations.

**SECTION 8.  Core Collections Methods and Procedures:**

8.1     Policy. It is Bushkill Financial Services Policy (a) that any monies collected or received with respect to a Bushkill timeshare loan or maintenance fee account of a Bushkill timeshare loan obligor or member are applied first to the most delinquent debt of such timeshare loan obligor or member, and, absent a specific designation by such timeshare loan obligor or member, monies are applied to delinquent Bushkill timeshare loans before delinquent Bushkill maintenance fees; and (b) to maximize collections of delinquent Bushkill timeshare loan and maintenance fee accounts by maximizing the efficient use of any one or more of the procedures, methodologies and/or policies set forth in Sections 1, 2, and 6 above and Section 8.2 below.

10

DOC ID - 25164159.16

5037022-100403 04/07/2017

8.2    _Policies, Methodologies and Procedures_.   Bushkill   Financial   Services Representatives may employ any of the following procedures, methodologies and/or policies to facilitate the collection of delinquent Bushkill timeshare loan and/or maintenance fee accounts:

a.    *Certificates and Vouchers Procedures.* Bushkill Financial Services Representatives may offer certain certificates and vouchers to Bushkill timeshare obligors to (i) maximize near-term cash collections and encourage Bushkill timeshare obligors to bring their Bushkill timeshare loan accounts current; and also (ii) to maximize Bushkill member satisfaction and to create incentives for Bushkill members to keep his/her Bushkill timeshare loans and maintenance fees accounts current. Issuance of certificates and vouchers is to be approved by the Bushkill Director of Financial Services, and is to be processed through Bushkill owner services, and coded so that usage (net of breakage) is charged to the Bushkill Financial Services Department. No certificate or voucher is to be issued to a delinquent Bushkill timeshare obligor or member until the applicable delinquency has been cleared in good funds. No Bushkill Financial Services Representative is to have access to or control over any physical certificates, vouchers or e-certificates or e-vouchers. Certificates and vouchers include: complimentary access to Bushkill amenities such as: Golf, TreeVentures, Blue/White Lightning Tubing, and Zipline; or vouchers for food at Wintergreens; or discounted coupons for nearby attractions such as Shawnee Ski Mountain, Horseback Riding, area restaurants and Pocono Raceway. See the _Exhibit_ entitled _Financial Services Certificates_.

b.    *Discounted or Free Resort Accommodations Procedures*. Bushkill Financial Services Representatives may offer certain free Resort accommodations to Bushkill timeshare loan obligors to (i) maximize near-term cash collections and encourage Bushkill timeshare loan obligors to bring their Bushkill timeshare loan accounts current; and also (ii) to maximize Bushkill member satisfaction and to create incentives for Bushkill members to keep his/her Bushkill timeshare loans and maintenance fees accounts current. Issuance of free Resort accommodations is to be approved by the Bushkill Director of Financial Services and any such approval is to be based on a "cost vs. benefit" evaluation, where the "cost" is the direct marginal cost of providing free Resort accommodations (essentially housekeeping) and the "benefit" is the economic impact of bringing a delinquent Bushkill timeshare loan current (e.g., bringing the delinquent Bushkill timeshare loan back into a borrowing base or collecting net cash with respect to it). No free Resort accommodations are to be afforded to a delinquent Bushkill timeshare loan obligor or member until the applicable delinquency has been cleared in good funds. The Bushkill Director of Financial Services is to be responsible for coordinating and confirming the free Resort accommodations with the Bushkill reservation personnel and the Bushkill Reservation Systems. Free Resort accommodations means any period from one (1) to seven (7) consecutive nights at a Tree Tops Building or a Fairway Building. In no case shall an obligor who has received Discounted or Free Resort Accommodations in connection with bringing an account

11

current receive more or additional Discounted or Free Resort Accommodations within the following year (12 months).

c.     *Procedure for Reinstatement to Full Services*. Delinquent Bushkill timeshare loan obligors and members who bring their Bushkill timeshare loan and maintenance fee accounts current may receive expedited re-connection with, and access to, Bushkill Reservation Systems and its timeshare services (travel, reservations, exchange, etc.). Subject to Section 6 below, Bushkill Financial Services Representatives and Bushkill reservation personnel are to cooperate in connection with providing this procedure for the benefit of delinquent Bushkill timeshare loan obligors and members that have brought their Bushkill timeshare loan and maintenance fee accounts current.

d.     *Waiver Policy and Request Procedure.*

(i)     Policy. It is Bushkill Financial Services Policy that no waiver, write-off or refund of any "Late Fee," "NSF Fee," principal payment, interest payment, maintenance fee payment or other similar payment or fee is to be offered to, or effected for the benefit of, a Bushkill timeshare loan obligor or member except by a Bushkill Financial Services Representative pursuant to a Permitted Specific Waiver Request (as defined below) and with the prior written approval of the Bushkill Director of Financial Services.

(ii)     Procedure. Each Permitted Specific Waiver Request must satisfy the criteria of one of the classes of requests set forth below and must have received the prior written approval of the Bushkill Director of Financial Services before being offered by a Bushkill Financial Services Representative to a delinquent Bushkill timeshare loan obligor or member.

(iii)     Procedure. Any Permitted Specific Waiver Request so approved and accepted by a delinquent Bushkill timeshare loan obligor or member is to be implemented only by Bushkill accounts receivable personnel under the supervision of a Bushkill senior controller.

(iv)     Procedure. Within the procedures set forth in this Section 8.2(d), Bushkill Financial Services Representatives may use Permitted Specific Waiver Requests to maximize near-term cash collections and encourage delinquent Bushkill timeshare loan obligors and members to bring their timeshare loan and membership fee accounts current.

(v)     Procedure. "Permitted Specific Waiver Request Policies" consist of each of the following:

aa.     *Waiver of Timeshare Loan Late Fees* - may be utilized by a Bushkill Financial Services Representative in return for a delinquent

12

Bushkill timeshare loan account being brought fully current by the Bushkill timeshare loan obligor in good funds;

bb.     *Waiver of Loan NSF Fees* - may be utilized by a Bushkill Financial Services Representative in return for the collection of a delinquent payment on a Bushkill timeshare loan or maintenance fee account by the applicable Bushkill timeshare loan obligor or member in good funds;

cc.     *Waiver of Loan Late Fees and/or NSF Fees and/or Delinquent Accrued Interest* - any combination of these may be utilized by a Bushkill Financial Services Representative for payment in full of a Bushkill timeshare loan account which is more than 60 days contractually past due when 100% of the principal balance is paid by the Bushkill timeshare loan obligor in good funds;

dd.     *Waiver of Maintenance Late Fees* - may be utilized by a Bushkill Financial Services Representative in return for collection of a delinquent "prior year" Bushkill maintenance fee being paid by the applicable Bushkill timeshare member in good funds;

ee.     *Waiver of Maintenance NSF Fees* - may be utilized by a Bushkill Financial Services Representative in return for collection of any delinquent Bushkill maintenance fee, being paid by the Bushkill member in good funds;

ff.     *Waiver of Prior Year Maintenance Fee(s)* - may be utilized by a Bushkill Financial Services Representative in return for either: (1) a delinquent Bushkill timeshare loan account being brought current AND a current year maintenance fee being paid in good funds by the applicable Bushkill timeshare loan obligor/member ("<u>collect Loan plus Maintenance</u>"); or (ii) two or more years' delinquent Bushkill maintenance fees being collected in good funds from the applicable Bushkill member ("<u>collect two or more years Maintenance</u>");

gg.     *Waiver of Other Fees or Payments or Combinations of Fees and Payments* – to the extent approved by the Bushkill Director of Financial Services, may be utilized by a Bushkill Financial Services Representative to bring current delinquent Bushkill timeshare loan and/or maintenance fee accounts.

e.     *Refinance/Reinstatement Policies and Procedures*.

13

(i)  Policy. It is Bushkill Financial Services Policy that no Bushkill timeshare loan may be amended or modified (including, without limitation, implementing extensions, changing due dates and/or changing maturity dates) except (aa) changes in interest rate and payment amount contractually specified within an existing Bushkill timeshare installment contract due to changing payment methodology (PAC vs. "credit card" vs. "statement or payment stub"), (bb) nominal payment due date changes for purposes of implementing ACH as a payment mechanism, (cc) waivers under Section 8.2(d) above, (dd) "Refinances," as described below in this Section 8.2(e), (ee) reinstatements as described below in this Section 8.2(e) and (ff) settlements, debt forgiveness, compromises or accords under Section 8.2(g) below.

(ii)  Procedure. A "Refinance" is a procedure that relates to a delinquent Bushkill timeshare loan over 90 days contractually past due (or any other Bushkill timeshare loan where a default appears imminent in the sole determination of the Bushkill Director of Financial Services) and consists of: such existing delinquent or other identified Bushkill timeshare loan being reclassified and treated as "closed" under Section 9 below and then replaced with a new Bushkill timeshare loan conforming to the procedural requirements set forth in the Exhibit entitled *Refinance Policy*; together with the execution and delivery of new documentation by the applicable Bushkill timeshare loan obligor, and an additional payment as detailed in the aforesaid Exhibit entitled *Refinance Policy*.

(iii)  Procedure. Within the procedures set forth in this Section 8.2(e) and in the Exhibit entitled *Refinance Policy*, Bushkill Financial Services Representatives may use Refinances to encourage Bushkill timeshare loan obligors to continue to service and make payments to Bushkill with respect to their Bushkill timeshare financings.

(iv)  Procedure. Within the procedures set forth in this Section 8.2(e) and in the Exhibit entitled *Conditions for Accepting 0*%., Bushkill Financial Services Representatives may offer to reinstate Bushkill timeshare loans that have been "closed" under Section 9 below for more than one year (and treat the same as a Refinance) in order to encourage Bushkill timeshare loan obligors to resume servicing of such loans.

(f)  *Policy and Procedures for Attorney Letters.*

(i)  Policy. It is a Bushkill Financial Services Policy that Bushkill Financial Services Representatives and Bushkill in-house attorneys cooperate with each other to ensure the smooth and timely operation of the "Attorney Letter" procedures described in this Section 8.2(f).

14

(ii)     <u>Procedure</u>. Unless the Bushkill Director of Financial Services determines that sending an attorney letter to a Bushkill timeshare loan obligor that is delinquent on his/her Bushkill timeshare loan account could be counter-productive (e.g., a threatened bankruptcy, a consumer complaint, etc.), each Bushkill Financial Services Representative is to cause to be sent to each Bushkill timeshare loan obligor whose Bushkill timeshare loan account is ~160 days contractually past due a letter from a Bushkill in-house attorney, encouraging him/her to make payment arrangements with such Bushkill Financial Services Representative or to contact the attorney directly.

(iii)     <u>Procedure</u>. Unless the Bushkill Director of Financial Services determines that sending a second attorney letter to a Bushkill timeshare loan obligor that is delinquent on his/her Bushkill timeshare loan account could be counter-productive, if the aforesaid first letter is not successful, each Bushkill Financial Services Representative is to cause to be sent a second similar letter at ~190 days contractually past due, which offers the possibility of a Refinance if the obligor can meet criteria.

(g)     *Policy and Procedure for Settlements.*

(i)     <u>Policy</u>. It is Bushkill Financial Services Policy (a) not to enter into, or offer to enter into, settlement agreements, debt forgiveness agreements, debt compromise agreements or accord and satisfactions with respect to delinquent Bushkill timeshare loans except if the Bushkill Director of Financial Services and a Bushkill in-house attorney have authorized the same in writing and, in any case, the applicable delinquent Bushkill timeshare loan is over 90 days contractually past due (or where a default appears imminent in the sole determination of the Bushkill Director of Financial Services) and (b) that the Bushkill Director of Financial Services is to strongly favor collection of delinquent Bushkill timeshare loans (even those in severe delinquency) and, if collection shall not be feasible, then strongly favor a Refinance of the same rather than offering and then entering into a settlement agreement, debt forgiveness agreement, compromise agreement or accord and satisfaction, provided that the Bushkill Director of Financial Services may favor entering into any settlement agreement, debt forgiveness agreement, compromise agreement or accord and satisfaction (i) if he/she shall have received a recommendation from a Bushkill in-house attorney regarding the same.

(ii)     <u>Procedure</u>. There is no minimum settlement, debt forgiveness, compromise or satisfaction amount required to be obtained in any settlement agreement, debt forgiveness agreement, compromise agreement or accord and satisfaction.

15

(iii)    Procedure. Subject to any contrary determination of the Bushkill Director of Financial Services and a Bushkill in-house attorney, the Bushkill guideline for settlement, debt forgiveness, compromises and accord and satisfactions is that at least one-third ( 33$_{1/3}$%_ of the outstanding balance owing on the aggregate amount of delinquent Bushkill timeshare loan and maintenance fee accounts of the applicable Bushkill timeshare loan obligor/member be collected.

## SECTION 9.  Timeshare Loan Account Closings and Write-Offs:

9.1    Policy. It is Bushkill Financial Services Policy that (a) delinquent Bushkill timeshare loan accounts are to be closed (and the timeshare loan balance owing written off) at such time as (i) the Bushkill Director of Financial Services determines that such account is uncollectible, that it cannot be worked-out, refinanced ,settled or compromised, and that the Bushkill membership of the applicable timeshare loan obligor cannot be salvaged and (ii) written approval from the Bushkill chief financial officer has been obtained, (b) the Bushkill Director of Financial Services is not to close a delinquent Bushkill timeshare loan account until he/she has: (i) reviewed the entire payment history of the account (both timeshare loan and maintenance fees), and reviewed the "Free Text" collection comments in the Bushkill Collection System, (ii) reviewed outbound letters and e-communications, plus any inbound correspondence or e-communications, (iii) reviewed the most recent credit report and any skip-tracing data, (iv) verified that such account has been worked by a minimum of three (3) different Bushkill Financial Services Representatives and (v) at his/her discretion, last and final attempt(s) to contact the obligor have been made, (c) the Bushkill chief financial officer is not to approve the closing of a delinquent Bushkill timeshare loan account unless every opportunity to collect such account and preserve the Bushkill membership of the applicable timeshare loan obligor in respect of such account has been exhausted, (d) no delinquent Bushkill timeshare loan account is to be closed in order to expedite access to, or cancellation or forfeiture of, the underlying Bushkill timeshare interest for remarketing purposes (the criteria for closure and write-off are the same whether the underlying Bushkill timeshare interest represents a high or low potential resale value), and (e) when a delinquent Bushkill timeshare loan account is closed and written-off, the related maintenance fee account is closed and written-off at the same time.

9.2    Policy. It is Bushkill Financial Services Policy that the following special cases ("Timeshare Loan Special Dispositions") are to result in an immediate or expedited closing of the affected Bushkill timeshare loan account: (a) any Chapter 7 Bankruptcy of a Bushkill timeshare loan obligor – Bushkill timeshare loan account is closed immediately upon receipt of petition; (b) any attorney complaint or regulatory inquiry – Bushkill timeshare loan account collection activity suspended immediately and Bushkill timeshare loan account closed at the direction of a Bushkill in-house attorney; and (iii) death – Bushkill timeshare loan account closed

16

upon receipt of death certificate of Bushkill timeshare loan obligor, unless surviving co-member continues payments or re-affirms debt.

9.3    <u>Procedure for Closure</u>. There is no bright procedural line based on "days past due" in order to determine when a delinquent Bushkill timeshare loan account is to be closed, nor is there any procedure or policy providing for an allowance or reserve to be established based on "days past due" for a delinquent Bushkill timeshare loan account in anticipation of closure. Timeshare loan accounts deemed uncollectible are closed as soon as that determination is made, in accordance with the Bushkill Financial Services Policy.

9.4    <u>Procedure for Closure</u>. Bushkill general experience reflects closure of delinquent Bushkill timeshare loan accounts at approximately  300 days contractually past due. Even then, however, a Bushkill timeshare loan obligor may be making sporadic payments and, although extremely delinquent on a contractual basis, it is a Bushkill guideline to give strong consideration to treating such situation as still salvageable and to effect collection of all possible cash flow.

**SECTION 10.**        **<u>Maintenance Fee Account Closings and Write-Offs</u>:**

10.1    <u>Policy</u>. It is Bushkill Financial Services Policy that (a) delinquent Bushkill maintenance fee accounts are to be closed (and the balance owing written off) at such time as (i) the Bushkill Director of Financial Services determines that such account is uncollectible, that it cannot be worked-out, refinanced or settled or compromised, and that the Bushkill membership of the Bushkill member cannot be salvaged and (ii) written approval from the Bushkill chief financial officer has been obtained, (b) the Bushkill Director of Financial Services is not to close a delinquent Bushkill maintenance fee account until he/she has: (i) reviewed the entire payment history of the account (both timeshare loan and maintenance fees), and reviewed the "Free Text" collection comments in the Bushkill Collection System, (ii) reviewed outbound letters and e-communications, plus any inbound correspondence or e-communications, (iii) reviewed the most recent credit report and any skip-tracing data, (iv) verified that such account has been worked by a minimum of three (3) different Bushkill Financial Services Representatives and (v) at his/her discretion, last and final attempt(s) to contact the member have been made, (c) the Bushkill chief financial officer is not to approve the closing of a delinquent Bushkill maintenance fee account unless every opportunity to collect such account and preserve the Bushkill membership of the Bushkill member in respect of such account has been exhausted, and (d) no delinquent Bushkill maintenance fee account will be closed in order to expedite access to the underlying Bushkill timeshare interest for remarketing purposes (the criteria for closure and write-off are the same whether the underlying timeshare interest represents a high or low potential resale value).

10.2    <u>Policy</u>. It is Bushkill Financial Services Policy that the following special cases ("<u>Maintenance Fee Special Depositions</u>") shall result in an immediate or expedited closing of a

17

Bushkill maintenance fee account: (a) any Chapter 7 Bankruptcy of a Bushkill member – Bushkill maintenance fee account is closed immediately upon receipt of petition; (b) any attorney complaint or regulatory inquiry – Bushkill maintenance fee account collection activity suspended immediately and Bushkill maintenance fee account closed at the direction of a Bushkill in-house attorney; and (iii) death – Bushkill maintenance fee account closed upon receipt of death certificate of Bushkill member, unless surviving co-member continues payments or re-affirms debt.

10.3    Procedure for Closure. There is no bright procedural line based on "days past due" in order to determine when a delinquent Bushkill maintenance fee account is to be closed, nor is there any procedure or policy providing for an allowance or reserve to be established based on "days past due" for a delinquent Bushkill maintenance fee account in anticipation of closure. Timeshare maintenance fee accounts deemed uncollectible are closed as soon as that determination is made, in accordance with the Bushkill Financial Services Policy.

10.4    Procedure for Closure. Bushkill general experience reflects closure around 540 days contractually past due for delinquent Bushkill maintenance fee accounts.

## SECTION 11.    Director of Financial Services Core Responsibilities:

11.1    Policy. It is Bushkill Financial Services Policy that the primary duties, goals and objectives of the Bushkill Director of Financial Services are: (a) to maximize cash collections of Bushkill timeshare loan and maintenance fee accounts and minimize the closure and write-off of the same; (b) to ensure that the Bushkill timeshare loan accounts are serviced and collected in a manner consistent with these Bushkill Financial Services Policies; (c) to ensure that Bushkill timeshare loans and maintenance fee accounts are not closed and written-off until every opportunity to collect the existing balances and to preserve the existing timeshare membership has been exhausted; (d) to maintain the highest possible level of Bushkill member satisfaction while enforcing each Bushkill member's contractual obligations; (e) to submit the Reports on *Schedule 4* to the Servicing Agreement to the Bushkill chief financial officer; and (f) to maximize performance-based "Incentive" compensation within Bushkill Financial Services Department, while minimizing fixed salary and hourly compensation, so that Bushkill Financial Services Representatives' objectives match Bushkill's goals of maximizing collections and minimizing closings and write-offs.

## SECTION 12.    CFO Core Responsibilities relating to Bushkill Financial Services Department:

12.1    Policy. It is Bushkill Financial Services Policy that the primary responsibility of the Bushkill chief financial officer to the Bushkill Financial Services Department is to ensure

18

that the Bushkill Director of Financial Services and the entire Bushkill Financial Services Department comply with the Bushkill Financial Servicing Policies.

12.2 <u>Review Procedure</u>. The Bushkill CFO is to review the Reports on *Schedule 4* to the Servicing Agreement on a regular and consistent basis, and is to take or authorize whatever actions may be necessary to maximize cash collections while minimizing Bushkill timeshare loan and maintenance fee account closures and write-offs.

## SECTION 13.  <u>Definitions</u>:

"<u>BGI</u>" means CRE Bushkill Group, LLC, a Delaware limited liability company, its successors and assigns.

"<u>Bushkill</u>" (a) with respect to Tree Tops and its employees, BGI and its employees acting on behalf of Tree Tops, and the Tree Tops Resort means and is used herein to refer to or otherwise identify, specify or designate (i) the timeshare loan accounts and/or maintenance fee accounts originated by Tree Tops in respect of the Tree Tops Resort and the memberships, timeshare interests and other timeshare products, amenities, services and reservation procedures with respect thereto, (ii) the obligors and/or members with respect to such accounts together with their respective timeshare interests and memberships, (iii) property of Tree Tops or BGI and/or their supporting operations being used to service such timeshare loan accounts or maintenance fee accounts, (iv) the aforesaid employees of Tree Tops or BGI or any in-house attorney of Tree Tops or BGI working on Tree Tops or Tree Tops Resort matters or issues, (v) management of Tree Tops or BGI (including, without limitation, any controller, senior controller, chief financial officer, director of financial services or other officer or director) ), (vi) the reservation department for reserving of vacation or use periods at Tree Tops Buildings, (vii) the sales and marketing systems and department for making sales of right-to-use timeshare interests at Tree Tops Buildings, and (viii) the accounting, payroll and other support systems and departments for Tree Tops and/or BGI regarding the Tree Tops Resort and (b) with respect to HRP and its employees or BGI and its employees acting on behalf of HRP and the Fairway Resort, means and is used herein to refer to or otherwise identify, specify or designate (i) the timeshare loan accounts and/or maintenance fee accounts originated by HRP in respect of the Fairway Resort and the memberships, timeshare interests and other timeshare products, amenities, services and reservation procedures with respect thereto, (ii) the obligors and/or members with respect to such accounts, (iii) property of HRP or BGI and/or their supporting operations being used to service such timeshare loan accounts or maintenance fee accounts, (iv) the aforesaid employees of HRP or BGI or any in-house attorney of HRP or BGI working on HRP or Fairway Resort matters or issues, (v) management of HRP or BGI (including, without limitation, any controller, senior controller, chief financial officer, director of financial services or other officer or director), (vi) the reservation department for reserving of vacation or use periods at Fairway Buildings, (vii) the sales and marketing systems and department for making sales of deeded timeshare interests at

19

Fairway Buildings, and (viii) the accounting, payroll and other support systems and departments for HRP and/or BGI regarding the Fairway Resort.

"Bushkill Collection System" means, as the case may be, the hardware and software systems and databases of BGI, Tree Tops and HRP for accounting, tracking, billing and otherwise following the accrual and payment of amounts owed or owing from timeshare loan obligors and/or members to Tree Tops or HRP in respect of their timeshare loan accounts and/or maintenance fee accounts.

"Bushkill Director of Financial Services" means the Director Financial Services for Tree Tops, HRP or BGI, as the case may be.

"Bushkill Financial Services Department" means the financial services department, group or section of HRP, Tree Tops or BGI, as the case may be, in which Bushkill Financial Services Representatives work.

"Bushkill Financial Services Policy" means any policy set forth herein (whether or not specifically referred to or labeled as a "policy") and/or any policy set forth in any of the memoranda attached as Exhibit entitled *Financial Services Policy Memoranda* and, in each case, all related procedures. To the extent that a procedure shall contradict or be incompatible with a policy, the policy shall prevail and the procedure adjusted to comply with the policy.

"Bushkill Financial Services Representative" means (a) with respect to timeshare loan accounts (and the related timeshare installment contract) and/or maintenance fee accounts arising from sales of right-to-use timeshare interests by Tree Tops, an employee of Tree Tops or BGI working in the Bushkill Financial Services Department and having the responsibility pursuant to these Bushkill Financial Services Policies to service and collect such accounts or (b) with respect to timeshare loan accounts (and the related timeshare contract for deed) and/or maintenance fee accounts arising from sales of deeded timeshare interests by HRP, an employee of HRP or BGI working in the Bushkill Financial Services Department and having the responsibility pursuant to these Bushkill Financial Services Policies to service and collect such accounts.

"Bushkill Property" means real property (and improvements thereon) owned or leased by Tree Tops, HRP, HaRa or BGI, including, without limitation, the Tree Tops Buildings and the Fairway Buildings.

"Bushkill Reservation Systems" means the hardware and software systems, databases and personnel of BGI, Tree Tops and HRP for accepting, confirming, tracking and otherwise following the making of reservations by Bushkill members for vacation periods and the use of their respective Bushkill timeshare interests in respect of the Resort.

"Card Act" as defined in Section 1.1.

"collect Loan plus Maintenance" as defined in Section 8.2.

20

"collect two or more years Maintenance" as defined in Section 8.2.

"HaRa" means CRE HaR, LLC, a Delaware limited liability company.

"HRP" means CRE HRP, LLC, a Delaware limited liability company.

"Fairway Buildings" means the Fairway buildings in respect of the sale of deeded timeshare interests by HRP.

"Fairway Resort" means the Fairway Buildings and the other amenities related thereto or as to which a deeded timeshare interest member has the right of access and/or use.

"maintenance fee account" means an account maintained by or for Tree Tops or HRP in respect of maintenance fees owing by a member ("Member") with respect to its Bushkill timeshare interest in respect of the Tree Tops Resort or the Fairway Resort, as the case may be.

"Maintenance Fee Special Dispositions" as defined in Section 10.2.

"Member" is defined in "maintenance fee account" and includes co-members.

"non-PAC" as defined in Section 5.3.

"PAC" as defined in Section 5.3.

"PCI" as defined in Section 1.1.

"Permitted Specific Waiver Request Policies" defined in Section 8.2.

"Resort" means Bushkill Property (inclusive of the Tree Tops Resort and Fairway Resort) together with all of the amenities related thereto, including, without limitation, Golf, TreeVentures, Blue/White Lightning Tubing, and Zipline.

"RGI" means Resorts Group, Inc., a Pennsylvania corporation.

"Servicer" means initially CRE Bushkill Group, LLC, and any successor servicer appointed under the Servicing Agreement.

"Servicing Agreement" means the servicing agreement between RGI and Servicer, dated as of May 18, 2017, as amended.

"timeshare loan account" means an account maintained by or for Tree Tops or HRP in respect of credit extended by Tree Tops or HRP to an obligor ("timeshare loan obligor") for the purchase or refinancing of a Bushkill timeshare interest in respect of the Tree Tops Resort or the Fairway Resort, as the case may be.

21

"timeshare loan obligor" has the meaning set forth in the definition of "timeshare loan account."

"Timeshare Loan Special Dispositions" as defined in Section 9.2.

"Tree Tops" means CRE Tree Tops, LLC, a Delaware limited liability company.

"Tree Tops Buildings" means Tree Tops villas used for the sale of right-to-use timeshare interests by Tree Tops.

"Tree Tops Resort" means the Tree Tops Buildings and the other amenities related thereto or as to which a right-to-use timeshare interest member has the right of access and/or use.

DOC ID - 25164159.16

5037022-100403 04/07/2017

**Schedule 2**

**Projected Timeshare Contract Payment Cash Flow**

| Year | Month | (A) (1) Projected Net Cash-Flow-Target | Annual Sub-Total |
|------|-------|----------------------------------------|------------------|
| 1 | 1 | $1,321,134 | |
| 1 | 2 | $1,313,830 | |
| 1 | 3 | $1,306,526 | |
| 1 | 4 | $1,299,222 | |
| 1 | 5 | $1,291,918 | |
| 1 | 6 | $1,284,615 | |
| 1 | 7 | $1,279,311 | |
| 1 | 8 | $1,274,007 | |
| 1 | 9 | $1,268,703 | |
| 1 | 10 | $1,263,399 | |
| 1 | 11 | $1,258,095 | |
| 1 | 12 | $1,254,618 | $15,415,376 |
| 2 | 13 | $1,241,869 | |
| 2 | 14 | $1,228,120 | |
| 2 | 15 | $1,213,371 | |
| 2 | 16 | $1,200,622 | |
| 2 | 17 | $1,184,873 | |
| 2 | 18 | $1,158,550 | |
| 2 | 19 | $1,144,801 | |
| 2 | 20 | $1,132,052 | |
| 2 | 21 | $1,119,303 | |
| 2 | 22 | $1,106,554 | |
| 2 | 23 | $1,093,805 | |
| 2 | 24 | $1,078,683 | $13,902,603 |
| 3 | 25 | $1,074,445 | |
| 3 | 26 | $1,070,207 | |
| 3 | 27 | $1,065,969 | |
| 3 | 28 | $1,061,731 | |
| 3 | 29 | $1,057,493 | |
| 3 | 30 | $1,050,305 | |
| 3 | 31 | $1,046,467 | |
| 3 | 32 | $1,042,629 | |
| 3 | 33 | $1,038,791 | |
| 3 | 34 | $1,035,253 | |
| 3 | 35 | $1,031,715 | |
| 3 | 36 | $1,028,655 | $12,603,662 |
| 4 | 37 | $1,017,388 | |
| 4 | 38 | $1,005,121 | |
| 4 | 39 | $991,854 | |
| 4 | 40 | $977,587 | |
| 4 | 41 | $962,320 | |
| 4 | 42 | $945,989 | |

| | | | |
|---|---|---|---|
| 4 | 43 | $933,722 | |
| 4 | 44 | $923,455 | |
| 4 | 45 | $913,188 | |
| 4 | 46 | $902,921 | |
| 4 | 47 | $892,654 | |
| 4 | 48 | $885,668 | $11,351,868 |
| 5 | 49 | $876,070 | |
| 5 | 50 | $865,472 | |
| 5 | 51 | $853,874 | |
| 5 | 52 | $841,276 | |
| 5 | 53 | $828,678 | |
| 5 | 54 | $819,692 | |
| 5 | 55 | $812,094 | |
| 5 | 56 | $803,496 | |
| 5 | 57 | $795,498 | |
| 5 | 58 | $787,700 | |
| 5 | 59 | $780,102 | |
| 5 | 60 | $772,352 | $9,836,306 |
| 6 | 61 | $760,819 | |
| 6 | 62 | $749,286 | |
| 6 | 63 | $738,353 | |
| 6 | 64 | $727,820 | |
| 6 | 65 | $717,287 | |
| 6 | 66 | $693,021 | |
| 6 | 67 | $682,088 | |
| 6 | 68 | $671,155 | |
| 6 | 69 | $660,222 | |
| 6 | 70 | $649,289 | |
| 6 | 71 | $638,356 | |
| 6 | 72 | $628,557 | $8,316,256 |
| 7 | 73 | $613,694 | |
| 7 | 74 | $598,831 | |
| 7 | 75 | $583,968 | |
| 7 | 76 | $569,105 | |
| 7 | 77 | $554,242 | |
| 7 | 78 | $529,928 | |
| 7 | 79 | $517,065 | |
| 7 | 80 | $504,202 | |
| 7 | 81 | $491,339 | |
| 7 | 82 | $478,476 | |
| 7 | 83 | $465,613 | |
| 7 | 84 | $452,669 | $6,359,130 |
| 8 | 85 | $440,582 | |
| 8 | 86 | $428,495 | |
| 8 | 87 | $416,408 | |
| 8 | 88 | $404,321 | |
| 8 | 89 | $392,234 | |
| 8 | 90 | $371,803 | |
| 8 | 91 | $360,716 | |
| 8 | 92 | $349,629 | |
| 8 | 93 | $339,542 | |
| 8 | 94 | $330,455 | |

2

| | | | |
|---|---|---|---|
| 8 | 95 | $319,368 | |
| 8 | 96 | $308,083 | $4,461,63 |
| 9 | 97 | $304,459 | |
| 9 | 98 | $300,835 | |
| 9 | 99 | $297,211 | |
| 9 | 100 | $293,587 | |
| 9 | 101 | $289,963 | |
| 9 | 102 | $281,851 | |
| 9 | 103 | $278,227 | |
| 9 | 104 | $274,603 | |
| 9 | 105 | $270,979 | |
| 9 | 106 | $267,355 | |
| 9 | 107 | $263,731 | |
| 9 | 108 | $259,412 | $3,382,20 0 |
| 10 | 109 | $249,523 | |
| 10 | 110 | $239,634 | |
| 10 | 111 | $229,745 | |
| 10 | 112 | $219,856 | |
| 10 | 113 | $209,967 | |
| 10 | 114 | $190,516 | |
| 10 | 115 | $180,627 | |
| 10 | 116 | $171,738 | |
| 10 | 117 | $162,849 | |
| 10 | 118 | $153,960 | |
| 10 | 119 | $144,071 | |
| 10 | 120 | $133,709 | $2,286,196 |
| 11 | 121 | $128,991 | |
| 11 | 122 | $124,473 | |
| 11 | 123 | $120,355 | |
| 11 | 124 | $116,237 | |
| 11 | 125 | $112,119 | |
| 11 | 126 | $102,522 | |
| 11 | 127 | $98,304 | |
| 11 | 128 | $94,086 | |
| 11 | 129 | $89,768 | |
| 11 | 130 | $85,550 | |
| 11 | 131 | $81,332 | |
| 11 | 132 | $76,525 | $1,230,263 |
| 12 | 133 | $70,716 | |
| 12 | 134 | $64,907 | |
| 12 | 135 | $59,098 | |
| 12 | 136 | $53,389 | |
| 12 | 137 | $47,680 | |
| 12 | 138 | $38,428 | |
| 12 | 139 | $33,519 | |
| 12 | 140 | $28,610 | |
| 12 | 141 | $23,701 | |
| 12 | 142 | $18,792 | |
| 12 | 143 | $13,883 | |
| 12 | 144 | $8,411 | $461,131 |
| | | **$89,606,629** | **$89,606,629** |

3

**(A)** *Net Collections, including Non-Performance Fees and Before Servicing Fees.*

**(1)** On every Upgrade/Reload/Resold/Refinance or Improperly Interfered-With Deemed Prepayment paid to or for RGI under the <u>Participation Agreement</u>, the full amount thereof will be subtracted from the "Projected Net Cash Flow - Target" in the month prepaid. In each subsequent month, the scheduled payments on each previously-prepaid Upgrade/Reload/Resold/Refinance or Improperly Interfered-With Timeshare Contract will be subtracted from the "Projected Net Cash Flow - Target".

4