# EXHIBIT B

EXECUTION VERSION

**PARTICIPATION AGREEMENT**

**dated as of May 18, 2017**

**between**

**RESORTS GROUP, INC., a Pennsylvania corporation,
with and in favor of
Holder**

# TABLE OF CONTENTS

**Page**

ARTICLE 1 : DEFINITIONS ........................................................................................1
  1.1  Definitions .............................................................................................1
  1.2  Construction ...........................................................................................9
  1.3  Headings and Captions; Exhibits and Schedules ..................................9

ARTICLE 2 : PARTICIPATION INTERESTS. ...........................................................9
  2.1  Creation of Holder's Participation and RGI's Retained Participation ...................9
  2.2  RGI to Maintain Custody of Fairway Contracts for Deed ....................10
  2.3  [Reserved] .............................................................................................11
  2.4  No Joint Venture ...................................................................................11
  2.5  [Reserved] .............................................................................................11
  2.6  [Reserved] .............................................................................................11
  2.7  Obligor Notification .............................................................................11
  2.8  Servicing ...............................................................................................11
  2.9  Registration and Transfer of Participation Certificate ........................11

ARTICLE 3 : Amendment and Modification ..............................................................13
  3.1  Amendment and Modification of Timeshare Contracts and Fairway Contracts for Deed. ..............................................................13

ARTICLE 4 : HYPOTHECATION LENDER AND LOAN. ......................................14
  4.1  Priority Position of Hypothecation Lender and Hypothecation Loan ...................14
  4.2  Confirmation of Obligations to Hypothecation Lender ........................14
  4.3  Obtaining Advances Under Hypothecation Loan ..................................14
  4.4  Amendments, Modifications and Waivers for Hypothecation Loan ...................15
  4.5  Hypothecation Distribution Advances ..................................................15
  4.6  Indemnification for Hypothecation Loan for benefit of Holder ...........16

ARTICLE 5 : MAINTENANCE FEES; PUTS AND CALLS...................................17
  5.1  Level of Residential and Vacation Ownership Services........................17
  5.2  Limitation on Maintenance Fee Increases ............................................17
  5.3  Sale of Assets; Negative Pledge ..........................................................18
  5.4  RGI's Put ...............................................................................................19
  5.5  Holder's Call .........................................................................................21

ARTICLE 6 : INDEMNIFICATION FOR BENEFIT OF HOLDER. .......................22
  6.1  Holder Indemnitees...............................................................................22
  6.2  Direct Claims of Holder ........................................................................23
  6.3  Third Party Claims Against RGI............................................................23
  6.4  Adjustment of Indemnification Owed to Holder Indemnitees...............25

ARTICLE 7 : INDEMNIFICATION FOR BENEFIT OF RGI. ...............................26
  7.1  RGI Indemnitees ...................................................................................26

|  | 7.2 | Direct Claims of RGI | 27 |
|  | 7.3 | Third Party Claims Against Holder | 27 |
|  | 7.4 | Adjustment of Indemnification Owed to RGI Indemnitees | 28 |
| ARTICLE 8 : | MISCELLANEOUS. | | 29 |
|  | 8.1 | Notices | 29 |
|  | 8.2 | Amendments and Waivers | 31 |
|  | 8.3 | Expenses | 31 |
|  | 8.4 | Successors and Assigns | 31 |
|  | 8.5 | Governing Law | 32 |
|  | 8.6 | Consent to Jurisdiction | 32 |
|  | 8.7 | WAIVER OF JURY TRIAL | 32 |
|  | 8.8 | Counterparts; Third Party Beneficiaries | 33 |
|  | 8.9 | Severability | 33 |
|  | 8.10 | Entire Agreement | 33 |
|  | 8.11 | Miscellaneous | 33 |

<u>**PARTICIPATION AGREEMENT**</u>

**THIS PARTICIPATION AGREEMENT** (this **"Agreement"**) made as of the 18th day of May, 2017 by **RESORTS GROUP, INC.,** a Pennsylvania corporation (hereinafter referred to as **"RGI"**), with and in favor of Holder (as such term is defined in <u>Section 1.1</u> hereof).

<u>**WITNESSETH:**</u>

**WHEREAS,** RGI is the owner of certain rights to service, collect and receive collections in respect of certain Timeshare Contracts and Fairway Contracts for Deed (each as such term is defined in <u>Section 1.1</u> hereof);

**WHEREAS**, RGI desires to create and assign to Holder an undivided fractional interest in and to such rights.

**NOW, THEREFORE,** in consideration of the premises and the mutual covenants and promises herein contained, the parties hereto agree as follows:

## ARTICLE 1:  DEFINITIONS

**1.1      Definitions**.  As used in this Agreement, the following terms have the respective meanings specified below:

"<u>Affiliate</u>" means, with respect to any Person, any other Person (a) directly or indirectly Controlling such first Person, (b) directly or indirectly Controlled by such first Person or (c) under common Control with such first Person.

"<u>Agreement</u>" is defined in the first paragraph hereof.

"<u>Applicable Law</u>" means, with reference to any Person, (a) all laws (including common law), statutes, regulations, ordinances, and treaties, (b) all judgments, decrees, injunctions, writs and orders of any Governmental Authority and (c) the rules, regulations, orders, directives, licenses and permits in respect of clauses (a) and (b) above, in each case, applicable to such Person or its property or in respect of its operations.

"<u>Back-Up Servicer</u>" has the meaning assigned to such term in the Servicing Agreement.

"<u>Building</u>" means any residential building that contains accommodations that qualify as Villas and that is located on the property leased or owned by TTL or HRP, as applicable, in Bushkill, Pennsylvania.

"<u>Business Day</u>" means any day except a Saturday, Sunday or any day on which banks are not generally open for business in New York, New York and Philadelphia, Pennsylvania.

"<u>Closing Date</u>" means the date of this Agreement set forth in the introductory paragraph hereof.

"<u>Contract for Deed</u>" means a contract for deed for a purchase of a Fairway Timeshare Interest (as defined in the Purchase Agreement).

"Control" means, when used with respect to a specified Person, the power to direct the management and policies of such Person, directly or indirectly, whether through the ownership of voting securities, by contract or otherwise.

"Damages" means, with respect to any event relating to indemnification hereunder, any and all damage (excluding any special, indirect, incidental, consequential, exemplary, and punitive damage), loss, liability and expense (including reasonable expenses of investigation and attorneys' fees and expenses in connection with any Proceeding) incurred, suffered or relating to the Person being so indemnified.

"Delinquent Timeshare Contract" means a Timeshare Contract or Fairway Contract for Deed as to which, as of the last day of any calendar month falling on and after the Closing Date, any Timeshare Contract Payment which is a scheduled installment payment then due and payable has remained unpaid for more than 180 days from the original due date for such payment.

"Fairway Contract for Deed" means each Contract for Deed in existence as of the date hereof and as listed in Schedule 3 attached hereto, provided that each of such Fairway Contracts for Deed will not be considered a Fairway Contract for Deed if (a) it shall have been declared after the date hereof a Non-Performing Timeshare Contract and for which the applicable Non-Performance Fee has been paid to RGI under Section 5.4(a) hereof, (b) it shall have been declared after the date hereof an Improperly Interfered With Timeshare Contract and for which the applicable consideration has been paid to RGI under Section 5.4(b) hereof, or (c) it shall have been Upgraded, Reloaded, Resold or Refinanced after the date hereof and, with respect thereto, all payments have been made to RGI as contemplated under Section 3.1 hereof.

"Fees" means, with respect to any Timeshare Contract or Fairway Contract for Deed, all fees payable with respect thereto, including, without limitation, all late fees, servicing fees and processing fees (but excluding any fees for returned checks and similar fees owing to any applicable account banks and any prepayment penalties or fees and similar fees owing under the Hypothecation Loan and Security Documents).

"Governmental Authority" means any court, government or political subdivision or department thereof, any governmental or regulatory body, board, bureau, arbitrator or alternative dispute resolution body, administrative agency or commission, securities exchange, or other governmental agency or instrumentality of competent jurisdiction.

"Holder" means the holder of a Participation Certificate as reflected in the books and records of RGI in accordance with the terms hereof, initially CRE Bushkill Group, LLC.

"Holder Deductible" is defined in Section 6.4(b) hereof.

"Holder Indemnitees" is defined in Section 6.1 hereof.

"Holder's Ownership Percentage" means initially thirty-three and six one-hundredths percent (33.06%), as adjusted from time to time pursuant to Section 2.1(c) hereof.

"Holder's Participation" is defined in Section 2.1(a) hereof.

DOC ID - 24901624.15
5037022-100403 04/07/2017

"Holder's Received Amount" has the meaning assigned to such term in the Servicing Agreement.

"HRP" means CRE HRP, LLC, a Delaware limited liability company, formerly known as HRP Corp., a Pennsylvania corporation.

"Hypothecation Distribution Advance" means prior to the date on which the Holder's Received Amount equals the Participation Limit, any advance, or portion thereof, elected to be obtained by RGI in its sole discretion in writing under the Hypothecation Loan and Security Documents after the Closing Date for any purpose (other than for the payment of fees, premiums, penalties, reimbursable expenses and other amounts payable under the Hypothecation Loan (including amounts payable under and Hypothecation Lender Servicing Agreement, Hypothecation Lender Back-up Servicing Agreement and the lockbox and custodial agreements executed in connection with the Hypothecation Loan), interest on the Hypothecation Loan, principal payments in order to cure a borrowing base deficiency under the Hypothecation Loan (i.e., payments to bring the Hypothecation Loan back into "formula") and expenses or fees owing under the Servicing Agreement).

"Hypothecation Distribution Advance Proceeds" means proceeds of any Hypothecation Distribution Advance under the Hypothecation Loan after the Closing Date.

"Hypothecation Lender" means Western Alliance Bank and its successors and assigns.

"Hypothecation Lender Servicing Agreement" means that certain Servicing Agreement dated April 21, 2017 among RGI, the Hypothecation Lender and Bushkill Group, Inc., as servicer, in connection with the Hypothecation Loan.

"Hypothecation Lender Back-up Servicing Agreement" means that certain Back-Up Servicing Agreement dated April 21, 2017 among RGI, Hypothecation  Lender and Equiant Financial Services, Inc.

"Hypothecation Loan" means that certain revolving loan(s) to be made by the Hypothecation Lender on or after April 21, 2017 to RGI secured by RGI's rights in the Timeshare Contracts and the Fairway Contracts for Deed existing as of the date hereof (but not any other Timeshare Contracts or Fairway Contracts for Deed that may arise thereafter) together with all accrued interest and other fees, expenses and other amounts payable under, and as provided for in, the Hypothecation Loan and Security Documents.

"Hypothecation Loan and Security Documents" means that certain Loan and Security Agreement dated April 21, 2017, by and between Hypothecation Lender and RGI as Borrower, as amended from time to time, and all related promissory notes, and other loan or security agreements and other documents with respect thereto.

"Improperly Interfered With Timeshare Contract" means, with respect to any Timeshare Contract or Fairway Contract for Deed, Servicer or any of its Affiliates shall have intentionally interfered with the payment obligations of any Obligor under such Timeshare Contract or Fairway Contract for Deed (other than in connection with any Permitted Modification, in compliance with the Servicing, Collection and Enforcement Policies and Procedures or with the

DOC ID - 24901624.15
5037022-100403 04/07/2017

prior written consent of RGI, but including, without limitation, any intentional directing of such Obligor or any offering to such Obligor of any inducement not to make payments on such Timeshare Contract or Fairway Contract for Deed after the Closing Date) and thereby caused such Timeshare Contract or Fairway Contract for Deed to become a Delinquent Timeshare Contract, in each case, which interference occurred after the Closing Date.

"Indemnification Cap" means, in the aggregate, an amount not to exceed ten percent (10%) of the Purchase Price (as defined and set forth in the Purchase Agreement).

"Lockbox Account" has the meaning assigned to such term in the Servicing Agreement.

"Lockbox and Payment Procedures" has the meaning assigned to such term in the Servicing Agreement.

"Non-Performance Fee" means, with respect to each Non-Performing Timeshare Contract, for so long as the Holder's Ownership Percentage is greater than 0%, $350 and, at any other time, $500.

"Non-Performing Timeshare Contract" means a Delinquent Timeshare Contract: (a) which has been declared (in a written notice from RGI to Holder) uncollectible by RGI in its sole discretion; or (b) which has been declared (in a written notice from Holder to RGI) uncollectible by Holder, in its sole discretion after the date that is nine months following the Closing Date and, in any case, only after the contractual delinquency of such Delinquent Timeshare Contract has exceeded 180 days; or (c) as to which RGI, the Holder and/or the Servicer has received written notice that the Obligor thereof is subject to an Obligor Insolvency Event.

"Obligor(s)" means the obligor or obligors under each Timeshare Contract or Fairway Contract for Deed, as applicable.

"Obligor Insolvency Event" means, with respect to any Obligor under a Timeshare Contract or Fairway Contract for Deed, the occurrence of any of the following events: (a) a receiver, liquidator, custodian or trustee is appointed by court order for such Obligor or for all or substantially all of the property of such Obligor and such court order remains undismissed or unstayed and in effect for 90 consecutive days; or (b) an order for relief is entered with respect to such Obligor or such Obligor is adjudicated a bankrupt or insolvent under any bankruptcy, reorganization, arrangement, insolvency, readjustment of debt, dissolution or liquidation law of any jurisdiction, whether now or hereafter in effect and such order or adjudication remains undismissed or unstayed and in effect for 90 consecutive days; (c) all or substantially all of the property of such Obligor is sequestered by court order or a petition is filed against such Obligor under any bankruptcy, reorganization, arrangement, insolvency, readjustment of debt, dissolution or liquidation law of any jurisdiction, whether now or hereafter in effect and such order or petition remains undismissed or unstayed and in effect for 90 consecutive days; (d) such Obligor files a petition in voluntary bankruptcy or seeking relief under any provision of any bankruptcy, reorganization, arrangement, insolvency, readjustment of debt, dissolution or liquidation law of any jurisdiction, whether now or hereafter in effect, or shall consent to the filing of any petition against it under any such law; or (e) such Obligor makes an assignment for the benefit of its creditors, or admits in writing its inability, or fails, to pay its debts generally as they become due,

DOC ID - 24901624.15
5037022-100403 04/07/2017

or consents to the appointment of a receiver, liquidator or trustee of any one or more of them, or of all or any part of its property.

"Participation Certificate" means a certificate which RGI provides to a Holder substantially in the form attached hereto as Exhibit A.

"Participation Certificate Register" is defined in Section 2.9(a) hereof.

"Participation Limit" means an amount equal to $15,625,000.

"Parties" means (a) the Holder and its successors and assignees permitted under Section 8.4 hereof that have joined and become signatories hereto and (b) RGI and its successors and assignees permitted under Section 8.4 hereof that have joined and become signatories hereto, with each of the foregoing being referred to herein as a "Party."

"Permitted Lien" means, with respect to any asset of RGI, (a) any lien which is permitted under the terms and conditions of the Timeshare Contract, Fairway Contract for Deed and/or the underlying Timeshare Documents, (b) any lien or security interest provided for under the Hypothecation Loan and Security Documents securing the Hypothecation Loan and (c) any lien or security interest in favor of the Holder.

"Permitted Modifications" means with respect to any Timeshare Contract or Fairway Contract for Deed, (a) any Timeshare Upgrade, Timeshare Reload, Timeshare Resale Assumption or Refinance, provided that contemporaneously with the effectiveness thereof, Holder shall have paid to RGI RGI's Retained Ownership Percentage of outstanding principal and accrued and unpaid interest for such Timeshare Contract or Fairway Contract for Deed so Upgraded, Reloaded, Resold or Refinanced (except that, prior to full repayment of the Hypothecation Loan, 100% of the outstanding principal, accrued and unpaid interest and Fees (if any) for such Timeshare Contract or Fairway Contract for Deed so Upgraded Reloaded, Resold or Refinanced will be paid directly by the Holder to the Hypothecation Lender (pursuant to written direction from Hypothecation Lender) and applied to repayment of the Hypothecation Loan pursuant to the relevant provisions of the Hypothecation Loan and Security Documents)(with respect to any such Timeshare Contract or Fairway Contract for Deed, the full amount thereof deemed to have been prepaid is referred to herein as the "Upgrade/Reload/Resold/Refinance Deemed Prepayment"), (b) any modification effected by Servicer, consistent with the Servicing, Collection and Enforcement Standards, effected prior to such Timeshare Contract or Fairway Contract for Deed being declared a Non-Performing Timeshare Contract, which modification cures any default or deficiency regarding such Timeshare Contract or Fairway Contract for Deed (including, without limitation, its status as a Delinquent Timeshare Contract) that would allow it to have been classified as a Non-Performing Timeshare Contract and (c) any other modifications proposed to RGI by Holder or Servicer in writing and approved by RGI in writing.

"Person" means an individual, corporation, partnership, limited liability company, association, trust or other entity or organization, including a Governmental Authority.

"PMA Liabilities" has the meaning assigned to such term in the Purchase Agreement.

5

"Proceedings" means any claim, action, arbitration, audit, hearing, investigation, notice of violation, litigation or suit (whether civil, criminal, administrative, investigative or informal) commenced, brought by a Person or Governmental Authority, or conducted or heard by or before, or otherwise involving, any Governmental Authority or arbitrator.

"Purchase Agreement" means that certain Unit and Asset Purchase Agreement dated on or after May 19, 2017, by and between Purchaser and RGI.

"Purchaser" has the meaning assigned to such term in the Purchase Agreement.

"Refinanced Timeshare Contract" means any refinanced Timeshare Contract or Fairway Contract for Deed (a) which is not a Non-Performing Timeshare Contract, a Timeshare Reload, a Timeshare Upgrade or a Timeshare Resale Assumption and (b) which is in compliance with the Servicing, Collection and Enforcement Policies and Procedures.  For the avoidance of doubt, such Refinanced Timeshare Contract shall not be subject to this Agreement and neither RGI nor any Affiliate thereof shall have any interest in such Refinanced Timeshare Contract.  "To Refinance" or "To be Refinanced" means to refinance a Timeshare Contract in accordance with the requirements of the first sentence of this definition.

"Reload" is defined in the definition of "Timeshare Reload" in this Section 1.1.

"Resale" is defined in the definition of "Timeshare Resale Assumption" in this Section 1.1.

"Retail Timeshare Contract" means a retail installment contract or contract for sale, as applicable, and disclosure statement for a purchase of a Treetops Timeshare Interest (as defined in the Purchase Agreement).

"RGI" means Resorts Group, Inc., a Pennsylvania corporation.

"RGI Deductible" is defined in Section 7.4(b) hereof.

"RGI Indemnitees" is defined in Section 7.1 hereof.

"RGI's Retained Ownership Percentage" means, at any time, one hundred percent (100%), less the Holder's Ownership Percentage at such time.

"RGI's Retained Participation" is defined in Section 2.1 hereof.

"Servicer" means CRE Bushkill Group, LLC, a Delaware limited liability company, and its successors and assigns.

"Servicing Agreement" means that certain Servicing Agreement, dated as of April 27, 2017, by and between the Servicer and RGI.

"Servicing, Collection and Enforcement Policies and Procedures" has the meaning assigned to such term in the Servicing Agreement.

"Servicer/Resort Default" has the meaning assigned to such term in the Servicing Agreement.

DOC ID - 24901624.15
5037022-100403 04/07/2017

"Termination Date" means the date on which all Timeshare Contract Payments have been paid or collected indefeasibly in cash, as jointly certified in a writing exchanged among RGI and Holder. For purposes of determining the "Termination Date," the "Timeshare Contract Payments" of all Retail Timeshare Contracts excluded from the definition of "Timeshare Contract" and Contracts for Deed excluded from the definition of "Fairway Contracts for Deed" shall be excluded from such determination.

"Third Party Claim Against Holder" is defined in Section 7.3(a) hereof.

"Third Party Claim Against RGI" is defined in Section 6.3(a) hereof.

"Timeshare Contract" means each Retail Timeshare Contract in existence as of the date hereof and as listed in Schedule 1 attached hereto, provided that each of such Retail Timeshare Contracts will not be considered a Timeshare Contract if (a) it shall have been declared after the date hereof a Non-Performing Timeshare Contract and for which the applicable Non-Performance Fee has been paid to RGI under Section 5.4(a) hereof, (b) it shall have been declared after the date hereof an Improperly Interfered With Timeshare Contract and for which the applicable consideration has been paid to RGI under Section 5.4(b) hereof, or (c) it shall have been Upgraded, Reloaded, Resold or Refinanced after the date hereof and, with respect thereto, all payments have been made to RGI as contemplated under Section 3.1 hereof.

"Timeshare Contract Payments" means, with respect to any Timeshare Contract or Fairway Contract for Deed (or in the related contract for sale of real estate), all payments of principal, interest and Fees due and owing thereunder.

"Timeshare Contract Payments and Collection Rights" means, collectively, (a) all Timeshare Contract Payments under each Timeshare Contract and Fairway Contract for Deed (i) made by the Obligor(s) thereunder and (ii) collected by the Servicer or by any other servicer from time to time after the date hereof, (b) all Timeshare Contract Payments under each Timeshare Contract and Fairway Contract for Deed recovered by the Servicer or by any other servicer after the date hereof from the exercise of any payment or collection rights or remedies under such Timeshare Contract, Fairway Contract for Deed or Applicable Law other than through an enforcement or arbitration legal proceeding, any forfeiture provision in such Timeshare Contract or Fairway Contract for Deed, or any foreclosure of collateral (or in-lieu-of-foreclosure proceeding) provided for or allowable under such Timeshare Contract, Fairway Contract for Deed or Applicable Law, (c) the contractual payment obligations of the Obligor(s) under each Timeshare Contract and Fairway Contract for Deed to make the Timeshare Contract Payments and the related creditor and collection rights of RGI to collect the same and (d) all of RGI's interest in and to the Fairway Contracts for Deed (which interest does not include the obligation to deliver a deed to any Obligor under a Fairway Contract of Deed, which obligation has been retained by HRP).

"Timeshare Documents" means, with respect to any Timeshare Purchaser's purchase of a Timeshare Interest, the Timeshare Contract or Fairway Contract for Deed executed by such Timeshare Purchaser in connection with such purchase and the other documents set forth in Schedule 2 attached hereto executed by or delivered to such Timeshare Purchaser.

7

"Timeshare Interest" means all of the rights, title and interest to which a Timeshare Purchaser (or his/her successors or assigns) is entitled under his/her Timeshare Documents, including the right to use and occupy a Villa as described in such Timeshare Documents after the date of the acquisition by such Timeshare Purchaser of such use and occupancy rights.

"Timeshare Purchaser" means any Person who purchases a Timeshare Interest in connection with and pursuant to Timeshare Documents executed and delivered by such Person.

"Timeshare Reload" means a new Timeshare Contract or Fairway Contract for Deed that is entered into by an Obligor under a Timeshare Contract or Fairway Contract for Deed to finance the purchase of any new or additional timeshare or vacation products sold or marketed by Holder, its Affiliates, agents or brokers, including but not limited to Timeshare Interest(s), and where such Obligor retains its existing Timeshare Interest and enters into a new Timeshare Contract, Fairway Contract for Deed or other contract of any kind to finance the remaining balance of the Obligor's existing Timeshare Contract or Fairway Contract for Deed, and such Obligor's existing Timeshare Contract or Fairway Contract for Deed is discharged. "To Reload" or "To be Reloaded" means to effect a Timeshare Reload.

"Timeshare Resale Assumption" means a sale and assignment of a Timeshare Contract or Fairway Contract for Deed by the Obligor thereunder, with the discretionary written consent of Servicer granted as provided pursuant to the requirements of the Servicing, Collection and Enforcement Policies and Procedures, with respect to which a new Person as "Obligor" is contractually substituted into the place of the existing Obligor and such existing Obligor is discharged from its obligations under such Timeshare Contract or Fairway Contract for Deed. "To Resell" or "To be Resold" means to effect a Timeshare Resale Assumption.

"Timeshare Upgrade" means, with respect to any Timeshare Contract or Fairway Contract for Deed, a new Timeshare Contract or Fairway Contract for Deed that is entered into by the Obligor under such Timeshare Contract or Fairway Contract for Deed to finance the purchase of any new or additional timeshare or vacation products, including but not limited to Timeshare Interest(s), by such Obligor pursuant to the upgrade marketing program of Holder or any of its Affiliates, agents or brokers, and where: such Obligor reconveys or reassigns the Timeshare Interest under such Timeshare Contract or Fairway Contract for Deed for a new Timeshare Interest(s) or other timeshare or vacation products, enters into such new Timeshare Contract, Fairway Contract for Deed or other contract of any kind to finance the purchase of such new Timeshare Interest(s) or other timeshare or vacation products, and such Obligor's existing Timeshare Contract or Fairway Contract for Deed is discharged. "To Upgrade" or "To be Upgraded" means to effect a Timeshare Upgrade.

"TTL" means CRE Tree Tops, LLC, a Delaware limited liability company, formerly known as Tree Tops, Inc., a Pennsylvania corporation.

"Transactions" has the meaning assigned to such term in the Purchase Agreement.

"UCC" means the Uniform Commercial Code of the Commonwealth of Pennsylvania or of any other applicable jurisdiction, in each case, as in effect from time to time.

"Upgrade" is defined in the definition of "Timeshare Upgrade" in this Section 1.1.

"Upgrade/Reload/Resold/Refinance Deemed Prepayment" is defined in the definition of "Permitted Modification" in this Section 1.1.

"Villa" means a residential unit located in a Building.

      **1.2**     **Construction.**   Except as otherwise provided herein or if the context hereof requires otherwise, whenever used in this Agreement (a) any noun or pronoun shall be deemed to include the plural and the singular (including as may apply to any definition contained in this Agreement), (b) the terms "include" and "including" shall be deemed to be followed by the phrase "without limitation", (c) the word "or" shall be inclusive and not exclusive, (d) the word "shall" and "will" are used interchangeably and have the same meaning, (e) all references to "$" or "dollars" mean U.S. dollars, (f) references to any law defined or referred to herein are references to that law or any successor law, as the same may have been amended or supplemented from time to time, and any rules or regulations promulgated thereunder, as amended from time to time (including any successor rules or regulations) and (g) references to any Person herein includes its permitted successors and assigns.

      **1.3**     **Headings and Captions; Exhibits and Schedules**.  The headings and captions in this Agreement are included for convenience of reference only and shall be ignored in the construction or interpretation of this Agreement.  All Exhibits and Schedules annexed to or referred to in this Agreement are incorporated in and made a part of this Agreement as if set forth in full.  Any capitalized terms used in any Schedule or Exhibit but not otherwise defined therein, shall have the meaning as defined in this Agreement.  All references to Sections, Articles or Exhibits contained in this Agreement shall be to Sections, Articles or Exhibits of or to this Agreement unless otherwise stated.

<b>ARTICLE 2</b>:  <b>PARTICIPATION INTERESTS</b>.

      **2.1**     **Creation of Holder's Participation and RGI's Retained Participation**.

        (a) In consideration of the Holder's becoming bound by its obligations under this Agreement to and for the benefit of RGI and for other valuable consideration, the receipt and sufficiency of which are hereby acknowledged, RGI hereby conveys and assigns to and for the benefit of the Holder an undivided fractional interest ("Holder's Participation") equal to Holder's Ownership Percentage on the date hereof in and to the Timeshare Contract Payments and Collection Rights, provided, however, that the maximum amount payable to the Holder with respect to the Holder's Participation shall in no event exceed the Participation Limit.  Subject to Section 4.1, RGI shall pay, or shall cause the Servicer or any other servicer to pay, Holder's Ownership Percentage of the Timeshare Contract Payments and Collection Rights actually collected by RGI or any of its Affiliates or by the Servicer or any other servicer.

        (b) RGI shall retain an undivided fractional interest ("RGI's Retained Participation") equal to RGI's Retained Ownership Percentage on the date hereof in and to the Timeshare Contract Payments and Collection Rights.

9

(c)  All Timeshare Contract Payments and Collection Rights actually collected by RGI (or by the Servicer or any other servicer) shall first be used and applied to pay and discharge in full the Hypothecation Loan, including all payments of principal, accrued interest and other fees, expenses and other amounts payable under, and as provided for in, the Hypothecation Loan and Security Documents.  Notwithstanding anything to the contrary in this Agreement, (i) on the date on which the Hypothecation Loan shall have been repaid in full and the liens and security interests of the Hypothecation Lender in and to the Lockbox Account have been terminated and discharged, RGI's Retained Ownership Percentage and the Holder's Ownership Percentage shall each equal fifty percent (50%) and (ii) RGI's Retained Ownership Percentage and the Holder's Ownership Percentage shall thereafter be subject to adjustment, on an annual basis, as set forth in Section 3.16 of the Servicing Agreement, which provisions are hereby incorporated by reference into this Agreement.  RGI's Retained Participation and Holder's Participation shall be pari passu with each other in and to the Timeshare Contract Payments and Collection Rights and shall share the Timeshare Contract Payments and Collection Rights received and/or collected in respect thereof after the date hereof (to the extent not applied to under Hypothecation Loan and Security Documents as provided therein and in Section 4.1 hereof) ratably based on RGI's Retained Ownership Percentage and Holder's Ownership Percentage, as determined from time to time; provided, however, that the maximum amount payable to the Holder with respect to the Holder's Participation shall in no event exceed the Participation Limit.

(d)  Except as provided in this Section 2.1 or elsewhere in this Agreement, RGI is not conveying or assigning any other assets (or interests in assets) to Holder, including, without limitation, any Timeshare Contracts or Fairway Contract for Deed acquired or to be acquired by RGI after the Closing Date.

(e)  RGI shall mark its books and records to reflect Holder's Participation and RGI's Retained Participation and shall reflect that that the Hypothecation Lender  has been granted a security interest in the Holder's Participation.

**2.2   RGI to Maintain Custody of Fairway Contracts for Deed**.  RGI will hold and retain, for its own benefit and for the benefit of Holder (to the extent of the Holder's Ownership Percentage in and to the Timeshare Contract Payments and Collection Rights) and the Hypothecation Lender all of the Fairway Contracts for Deed (however physical possession of the Fairway Contracts for Deed that are pledged to Hypothecation Lender will be held by Hypothecation Lender's custodial agent); provided however that, RGI shall not be the record owner of any Villa, Building or underlying Timeshare Interest.  The Servicer will service the Timeshare Contracts and Fairway Contracts for Deed, as provided in the Servicing Agreement and the Hypothecation Lender Servicing Agreement (until such time as the Hypothecation Loan shall be paid in full), and will continue to accept and collect all of the Timeshare Contract Payments through the Lockbox and Payment Procedures (subject to the rights of the Hypothecation Lender to collect such Timeshare Contract Payments or have the same paid to it and applied under the Hypothecation Loan and Security Documents, as provided therein and in Article 4 hereof).

DOC ID - 24901624.15
5037022-100403 04/07/2017

2.3     **[Reserved]**

2.4     **No Joint Venture**.  None of the execution of this Agreement or the Servicing Agreement, the sharing of the Timeshare Contracts Payments and Collection Rights or the arrangements with respect to the Hypothecation Loan under Article 4 hereof is intended to be, nor shall it be construed to be, the formation of a partnership or joint venture between RGI and/or its Affiliates and Holder for purposes of state law (other than for income purposes). Solely for federal, state and local income tax purposes, however, at such time as the Holder ceases to be wholly owned, directly or indirectly, by RGI, the relationship between Holder and RGI shall be treated as if it were a partnership, and the provisions of Exhibit B attached to this Agreement shall apply.

2.5     **[Reserved]**.

2.6     **[Reserved]**

2.7     **Obligor Notification**. Subject to the terms and conditions of the Servicing Agreement, Obligors under the Timeshare Contracts and Fairway Contracts for Deed shall not be put on notice of the creation of the Holder's Participation hereunder by RGI, Holder or any of their respective Affiliates.

2.8     **Servicing**.  The Parties hereto hereby acknowledge and agree that (i) the Timeshare Contracts and Fairway Contracts for Deed shall be serviced, (ii) the Lockbox Account shall be managed and (iii) all Timeshare Contract Payments shall be collected and managed, in each case, in accordance with the terms and conditions of the Servicing Agreement and the Hypothecation Lender Servicing Agreement.

2.9     **Registration and Transfer of Participation Certificate**.

(a) RGI agrees with Holder that RGI shall keep a register (herein sometimes referred to as the "Participation Certificate Register") in which provision shall be made for the registration of each Participation Certificate, its Holder, the principal and interest relating thereto and the registration of transfers thereof to the extent permitted under Section 8.4 hereof.  The Participation Certificate Register shall also reflect the identity of any Persons to whom a security interest has been granted in the Holder's Participation, to the extent so identified by Holder in writing.

(b) RGI and each other Party hereto shall deem and treat the Person in whose name any Participation Certificate is registered on the Participation Certificate Register as the absolute owner of such Participation Certificate for all purposes of this Agreement.

(c) The Participation Certificate Register shall be kept at the Stroudsburg, Pennsylvania office of RGI and RGI is hereby appointed "Participation Certificate Registrar" for the purpose of registering Participation Certificates and transfers of Participation Certificates as herein provided. Subject to Section 8.4 hereof, any holder of a Participation Certificate may transfer any or all of its Participation Certificate to any Person or Persons. Subject to Section 8.4 hereof, upon surrender for registration of transfer of any Participation

DOC ID - 24901624.15
5037022-100403 04/07/2017

Certificate at the Stroudsburg, Pennsylvania office of RGI, RGI shall execute, in the name of the designated transferee or transferees, one or more new Participation Certificates, aggregating the "percentage" of the surrendered Participation Certificate.

(d) At the option of a holder of a Participation Certificate, its Participation Certificate may be exchanged for other Participation Certificates, having an aggregate of "percentages" that equals the "percentage" of the surrendered Participation Certificate upon surrender of the same at the Stroudsburg, Pennsylvania office of RGI.

(e) Each new Participation Certificate issued upon transfer or exchange shall be dated the date of its issuance. All Participation Certificates issued upon any registration of transfer or exchange of a Participation Certificate shall be entitled to the benefits of this Agreement. Every Participation Certificate presented or surrendered for registration of transfer or exchange, shall be duly endorsed, or be accompanied by a written instrument of transfer in form reasonably satisfactory to RGI duly executed by the holder of such Participation Certificate or its attorney duly authorized in writing.

(f) To the extent that there is more than one Person holding Participation Certificates hereunder, the term "Holder" shall mean all of such Persons (each of which shall have a ratable claim for the benefits hereunder, be jointly and severally liable for the obligations hereunder, and be an undivided fractional owner of the Holder's Participation, in each case, equal to the percentage determined by dividing the percentage appearing on its Participation Certificate by the total of such percentages on all Participation Certificates; the total of such percentages shall always equal the Holder's Ownership Percentage; the holders of Participation Certificates shall make decisions hereunder and issue instructions to the Servicer based on a vote of such holders holding a majority of the ownership in the Holder's Participation). RGI and the other Parties hereto shall treat the Person or Persons in whose name or names the Participation Certificates are registered on the Participation Certificate Register, collectively, as the "Holder" hereunder for all purposes hereof.

(g) If any Participation Certificate shall become mutilated, destroyed, lost or stolen, RGI shall, upon the written request of the affected holder thereof, execute and deliver in replacement thereof, a new Participation Certificate, in the same percentage, dated the date of such Participation Certificate. If the Participation Certificate being replaced has become mutilated, such Participation Certificate shall be surrendered to RGI. If the Participation Certificate being replaced has been destroyed, lost or stolen, the affected holder thereof shall furnish to RGI such security or indemnity as may be reasonably required by them to hold RGI harmless and evidence reasonably satisfactory to RGI of the destruction, loss or theft of such Participation Certificate and of the ownership thereof.

(h) For the avoidance of doubt, nothing in this Section 2.9 shall authorize or permit RGI to issue additional Participation Certificates except in connection with a request to transfer or exchange an outstanding Participation Certificate as requested by a registered Holder thereof.

## ARTICLE 3:  Amendment and Modification

**3.1    Amendment and Modification of Timeshare Contracts and Fairway Contracts for Deed.**

(a) RGI shall not amend, modify or waive any term or condition of any Timeshare Contract or Fairway Contract for Deed other than with respect to a Permitted Modification.

(b) To the extent that Holder effects a Timeshare Upgrade, Timeshare Reload, Timeshare Resale Assumption or Refinance with respect to a Timeshare Contract or Fairway Contract for Deed, Holder shall cause a payment to be made to or for the benefit of RGI, immediately after such Timeshare Upgrade, Timeshare Reload, Timeshare Resale Assumption and/or Refinance becoming effective, of RGI's Retained Ownership Percentage of the Upgrade/Reload/Resold/Refinance Deemed Prepayment with respect to such Timeshare Contract or Fairway Contract for Deed (except that, prior to full repayment of the Hypothecation Loan, 100% of the outstanding principal, accrued and unpaid interest and Fees (if applicable) for such Timeshare Contract or Fairway Contract for Deed so Upgraded, Reloaded, Resold, Assumed or Refinanced will be paid directly by the Holder to the Hypothecation Lender (pursuant to written direction from Hypothecation Lender) and applied pursuant to the relevant provisions of the Hypothecation Loan and Security Documents) and upon payment thereof all of RGI's right, title and interest in and to the Timeshare Contract Payments and Collection Rights of such Timeshare Contract or Fairway Contract for Deed are, and shall be deemed to be, conveyed to Holder or its designee (without any representation, warranty or recourse, other than that RGI has good title to such Timeshare Contract Payments and Collection Rights, including, if applicable, the related Fairway Contract for Deed, free and clear of any lien or other adverse claim other than Permitted Liens as described in clause (a) or (c) of the definition thereof), RGI shall cause the Hypothecation Lender to release all liens and security interests created under the Hypothecation Loan and Security Documents on such Timeshare Contract Payments and Collection Rights (including, if applicable, the related Fairway Contract for Deed) in accordance with the relevant provisions governing such release as set forth in the Hypothecation Loan and Security Documents, and all interests of RGI otherwise in and to such Timeshare Contract or Fairway Contract for Deed are, and shall be deemed to be, terminated and released and RGI shall mark its books and records accordingly.  RGI agrees to take such other reasonable action as shall be necessary to properly effect such conveyance and release as may be reasonably requested by Holder, including executing any documentation in order to evidence such conveyance and release and directing the custodian of the related Timeshare Documents and Fairway Contract for Deed to deliver the originals thereof to Holder or its designee, all at the sole cost and expense of Holder.  Notwithstanding the foregoing, to the extent the Hypothecation Lender is entitled to receipt of the aforementioned amount in respect of a Timeshare Upgrade, Timeshare Reload, Timeshare Resale Assumption or Refinance, such amount shall be paid to Hypothecation Lender before Hypothecation Lender will have any obligation to release its lien on the related Timeshare Contract Payments and Collection Rights (including, without limitation, the related Fairway Contract for Deed).

DOC ID - 24901624.15
5037022-100403 04/07/2017

(c) In connection with any Permitted Modification involving a Refinanced Timeshare Contract or to avoid a Timeshare Contract or Fairway Contract for Deed becoming a Non-Performing Timeshare Contract, RGI shall comply at all times with the Servicing, Collection and Enforcement Standards.

(d) For the avoidance of doubt, nothing in this Agreement shall impose any restriction or serve as a limitation on Holder or any Affiliate thereof from consummating any Timeshare Upgrade, Timeshare Reload, Timeshare Resale Assumption or Refinance.

## ARTICLE 4:  HYPOTHECATION LENDER AND LOAN.

**4.1     Priority Position of Hypothecation Lender and Hypothecation Loan**.

(a) RGI and Holder acknowledge and agree that their respective interests in and to (a) the Timeshare Contract Payments and Collection Rights and the Fairway Contracts for Deed and (b) all proceeds in respect thereof are, in each case, junior and subordinate in all respects to the security interests, liens and payment rights of the Hypothecation Lender under the Hypothecation Loan and Security Documents and in respect of the Hypothecation Loan.

(b) RGI and Holder further acknowledge and agree that the Hypothecation Lender has a first claim and right to the Timeshare Contract Payments collected by the Servicer through the Lockbox and Payment Procedures for application to fees and expenses in connection with, and accrued and unpaid interest on, the Hypothecation Loan, for the repayment of the outstanding principal balance of the Hypothecation Loan and for the payment of all other amounts due and owing to Hypothecation Lender under the Hypothecation Loan and Security Documents. No payments will be made to the Holder with respect to Holder's Participation (excluding Hypothecation Distribution Advances) or to RGI with respect to RGI's Retained Participation until the Hypothecation Loan has been paid in full.

(c) Prior to the full repayment of the Hypothecation Loan, Holder hereby agrees that it shall obtain the Hypothecation Lender's approval of the contents of any UCC financing statement filed against RGI in respect of Holder's Participation pursuant to Section 8.11(e), such financing statement shall specifically reflect, in its text, Holder's subordinate interest as described in Section 4.1(a) and Holder will authorize Hypothecation Lender to file the same on behalf of Holder.  Holder hereby agrees not to amend such UCC financing statement prior to the full repayment of the Hypothecation Loan without the prior written consent and approval of the Hypothecation Lender.

**4.2     Confirmation of Obligations to Hypothecation Lender**.  RGI, by its execution of or acknowledgement of this Agreement, confirms its obligations to the Hypothecation Lender in respect of the Hypothecation Loan and under the Hypothecation Loan and Security Documents, and nothing contained in this Agreement shall affect, impair, restrict or prejudice such obligations to or in favor of the Hypothecation Lender.

**4.3     Obtaining Advances Under Hypothecation Loan**.  From and after the Closing Date, only RGI shall make requests to the Hypothecation Lender for advances under the

DOC ID - 24901624.15
5037022-100403 04/07/2017

Hypothecation Loan and, subject to <u>Section 4.5</u> below, only RGI shall receive and obtain the proceeds of any such advances.

      **4.4**    **Amendments, Modifications and Waivers for Hypothecation Loan**.  Holder acknowledges that the Hypothecation Lender and RGI shall have the right to amend the terms of the Hypothecation Loan and the provisions of the Hypothecation Loan and Security Documents in any manner agreeable to them without the need to seek the approval or consent of and without the requirement to give notice to, Holder or any of its Affiliates.  Notwithstanding the foregoing, from and after the Closing Date, without the prior written consent of Holder which will not be unreasonably withheld, delayed or conditioned, RGI shall not propose or enter into or agree to any amendments, modifications or waivers to or in respect of the terms, conditions or provisions of any of the Hypothecation Loan and Security Documents, in each case, which amendment, modification or waiver (i) has the effect of, or could reasonably be expected to have the effect of (a) increasing the rate of interest charged on the Hypothecation Loan or the maximum amount that the Hypothecation Lender may advance under the Hypothecation Loan and Security Documents, (b) extending the maturity date of the Hypothecation Loan, (c) increasing the amount of fees, premiums, penalties, reimbursable expenses or other amounts payable under the Hypothecation Loan, (d) adding additional events of default, termination events or similar events to any of the Hypothecation Loan and Security Documents or (e) delaying the timing of any payments which could constitute part of Holder's Received Amount or reducing any payments in respect thereof or (ii) could otherwise reasonably be expected to have an adverse effect on Holder or any of its rights hereunder or under the Servicing Agreement.

      **4.5**    **Hypothecation Distribution Advances**.

          (a) RGI may, in its sole discretion after the Closing Date, request and obtain one or more advances, including, without limitation, Hypothecation Distribution Advances, advances for Hypothecation Loan interest, advances to cure a borrowing base deficiency under the Hypothecation Loan, advances for the payment of any other amounts due and owing under the Hypothecation Lender Servicing Agreement, Hypothecation Lender Back-up Servicing Agreement and the lockbox and custodial agreements executed in connection with the Hypothecation Loan, advances for the payment of any other amounts due and owing under the Hypothecation Loan and Security Documents, advances for any expenses or fees owing under the Servicing Agreement, advances for any indemnification owing under this Agreement or the Purchase Agreement or the Servicing Agreement,  in each case, under and subject to the terms and conditions of the Hypothecation Loan and Security Documents. Notwithstanding the foregoing, RGI shall not request or obtain any such advances for any indemnification owing under this Agreement or the Purchase Agreement or the Servicing Agreement until such time after the Holder's Received Amount equals the Participation Limit, and any such advance made prior to such time shall be considered a Hypothecation Distribution Advance.

          (b) To the extent that RGI shall have requested and obtained an Hypothecation Distribution Advance and shall have received, or any of its Affiliates or agents shall have received, the Hypothecation Distribution Advance Proceeds in respect thereof, RGI shall give written notice thereof to Holder and shall promptly, and in any case within five (5) Business Days after the receipt thereof, pay and deliver, or cause to be paid

15

and delivered, to Holder fifty percent (50%) of such Hypothecation Distribution Advance Proceeds (it being understood that such proceeds shall not include (i) advances for Hypothecation Loan interest, (ii) advances to cure a borrowing base deficiency under the Hypothecation Loan, (iii) advances for the payment of any other amounts due and owing under the Hypothecation Loan and Security Documents, (iv) advances for the payments of any amounts due and owing under the Hypothecation Lender Servicing Agreement, Hypothecation Lender Back-up Servicing Agreement and the lockbox and custodial agreements executed in connection with the Hypothecation Loan, or (v) advances for the payment of expenses or fees owing by RGI under the Servicing Agreement), and RGI shall retain for itself the remaining amount of such Hypothecation Distribution Advance Proceeds. Such distributions shall have no effect on the outstanding principal and other unpaid amounts on any Timeshare Contract or Fairway Contract for Deed and shall have no effect on the remaining unpaid Timeshare Contract Payments in respect thereof.  For the avoidance of doubt, after the Holder's Received Amount equals the Participation Limit, should RGI obtain an advance under the Hypothecation Loan for the purpose of paying any indemnification owing to Holder or Purchaser or Servicer under this Agreement or the Purchase Agreement or the Servicing Agreement, it is expressly understood by the parties that all (100%) of said advance shall be paid to Holder, Purchaser or Servicer, as applicable. Any Hypothecation Distribution Advance Proceeds paid to Holder will be applied toward the Participation Limit, and the amount of Hypothecation Distribution Advance Proceeds payable to Holder will in no event exceed the Participation Limit.

**4.6**     **Indemnification for Hypothecation Loan for benefit of Holder**.

(a) As between Holder, on the one hand, and RGI and its Affiliates, on the other hand, RGI and its Affiliates, on and after the Closing Date, shall be solely responsible for the repayment in full of the Hypothecation Loan and all amounts owing in respect thereof and/or under the Hypothecation Loan and Security Documents to the extent that the Timeshare Contract Payments shall be insufficient to pay the same in full, as and when such amounts shall become due and payable.  For the avoidance of doubt, neither Holder nor any Affiliate thereof shall have any responsibility for the repayment of the Hypothecation Loan or any amounts owing in respect thereof and/or under the Hypothecation Loan and Security Documents, regardless of any Hypothecation Distribution Advance Proceeds received by the Holder pursuant to Section 4.5 hereof.

(b) To the extent that RGI shall not cause the Hypothecation Loan to be repaid in full in accordance with its terms, as contemplated in Section 4.6(a) hereof, or any other default occurs under the Hypothecation Loan and Security Documents, RGI shall indemnify Holder and its Affiliates from and against, and RGI agrees to hold Holder and its Affiliates harmless from, any and all Damages incurred or suffered by Holder and its Affiliates arising out of such breach, default, action, inaction or event or circumstance; provided that (a) Holder shall reasonably promptly after becoming aware of the breach by RGI of its undertakings in Section 4.6(a) above, take all necessary action to mitigate Damages under this Section 4.6(b) and (b) the Damages payable under this Section 4.6(b) shall be reduced on a dollar-for-dollar basis by any indemnification payments owing from the Holder Indemnitees to the RGI Indemnitees under Article 7 hereof.

16

### ARTICLE 5:  MAINTENANCE FEES; PUTS AND CALLS.

**5.1     Level of Residential and Vacation Ownership Services**.  After the Closing Date, the initial Holder agrees to (i) continue to provide, or cause to be provided, to each Obligor (and their guests and families) under the Timeshare Contracts and Fairway Contracts for Deed all of the rights, title, access, services, reservations, use and enjoyment to which they are entitled under their respective Timeshare Contracts and/or Fairway Contracts for Deed (including but not limited to each Obligor's right to pay-for and receive recorded title deeds for fully-paid Fairway Contracts for Deed consistent with the terms thereof), public offering statement(s), and declaration(s), in each case, in accordance with the terms thereof, (ii) continue to maintain and operate the Villas in a manner that is at a minimum materially equivalent to how the Villas were being maintained and operated by RGI as of the Closing Date and (iii) without limiting the generality of clause (i) or (ii) of this Section 5.1(a), provide, or cause to be provided, to the Obligors (and their guests and families) under the Timeshare Contracts and Fairway Contracts for Deed customer service at an overall level of quality that is, at a minimum, materially equal to that provided by RGI prior to closing.  Any assignment or transfer of the initial Holder's obligations pursuant to Section 8.4(a) shall include the obligations of the initial Holder under this Section 5.1 and shall be binding upon such assignee or transferee, as applicable.

**5.2     Limitation on Maintenance Fee Increases**.

(a) From and after the Closing Date, initial Holder shall not permit, with respect to the Timeshare Contracts and Fairway Contracts for Deed, the aggregate amount of maintenance fees or other similar fees or assessments (including, without limitation, special assessments) with respect to Timeshare Interests, Villas or Buildings (as such fees or assessments are provided for in such Timeshare Contracts or Fairway Contracts for Deed or as may be provided for in any declaration or home-owners-association regimen imposed by the initial Holder or any Affiliate thereof on such Timeshare Interests, Villas or Buildings after the Closing Date):

(i)     payable from and after the Closing Date to December 31, 2017 to increase from the amounts thereof payable immediately prior to the Closing Date or impose any special assessments during such period,

(ii)     payable during the 12-month period commencing January 1, 2018 to be more than 105% of the aggregate maintenance fees or other similar fees or assessments (including, without limitation, special assessments) payable during the 12-month period ending on December 31, 2017,

(iii)     payable during the 12-month period commencing on January 1, 2019 to be more than 105% of the aggregate maintenance fees or other similar fees or assessments (including, without limitation, special assessments) payable during the 12-month period ending on December 31, 2018, and

(iv)     during any subsequent 12-month period commencing on each January 1st falling on or after January 1, 2020 to be more than 110% of the aggregate maintenance fees or other similar fees or assessments (including, without limitation, special

17

assessments) payable during the 12-month period ending on December 31st immediately preceding such January 1st.

(b) In no case from and after the Closing Date shall any percentage increase in the maintenance fees or other similar fees or assessments (including, without limitation, special assessments) with respect to any particular type or classification of Timeshare Interest, Villa or Building in respect of a Timeshare Contract or Fairway Contract for Deed exceed the percentage increase of maintenance fees or other similar fees or assessments with respect to a similar type or classification of Timeshare Interest, Villa or Building with respect to a Timeshare Contract or Fairway Contract for Deed originated after the Closing Date.

(c) From and after the Closing Date, the initial Holder agrees to utilize maintenance fees or other similar fees and assessments (including, without limitation, special assessments) with respect to the Timeshare Contracts and the Fairway Contracts for Deed as provided for or required in the Timeshare Contracts, Fairway Contracts for Deed, any Timeshare Documents, any declaration or home-owners-association regimen imposed by the initial Holder or any Affiliate thereof on the Timeshare Interests, Villas or Buildings after the Closing Date, or Applicable Law.  The initial Holder agrees and acknowledges with RGI that it will use increases in maintenance fees and other similar fees and assessments (including, without limitation, special assessments) to make capital improvements to the "Tree Tops" and/or "Fairway" resorts, to fund "Tree Tops" and/or "Fairway" resort operations and/or replacement reserves and/or to make repairs and effect resort refurbishments with respect to "Tree Tops" and/or "Fairway" facilities and/or for any other permitted purpose as set forth in any Timeshare Documents or in connection with any such declaration or homeowners association regime.

(d) From the Closing Date until the date that is one year after the Closing Date, RGI shall provide to Holder and its Affiliates, at RGI's sole expense, any background, historical or contextual information that Holder or its Affiliates may require if Holder or its Affiliates elect to create a timeshare homeowner association located on the property leased or owned by TTL or HRP, as applicable, in Bushkill, Pennsylvania.

(e) Any assignment or transfer of the initial Holder's obligations pursuant to Section 8.4(a) shall include the obligations of the initial Holder under Section 5.2 and shall be binding upon such assignee or transferee, as applicable.

**5.3    Sale of Assets; Negative Pledge**.

(a) Other than as set forth in Section 5.3(b) below, RGI shall not convey, transfer, lease or otherwise dispose of any the Fairway Contracts for Deed, the Timeshare Contract Payments, the Timeshare Documents or RGI's Retained Participation, or any of its rights and obligations related to any of the foregoing, in each case, whether in one transaction or in a series of transactions.

(b) From and after the Closing Date, RGI shall not create or suffer to exist any lien, security interest, mortgage, pledge or other encumbrance in and to the Fairway Contracts for Deed, the Timeshare Contract Payments, the Timeshare Documents or RGI's

18

Retained Participation except (i) Permitted Liens and (ii) any such liens, security interests, mortgages, pledges or other encumbrances (other than Permitted Liens) that are junior and subordinate to the Holder's Participation (and Holder's rights and benefits hereunder) pursuant to a writing, in form and substance reasonably satisfactory to Holder.

(c) From and after the Closing Date, initial Holder shall neither create nor suffer the Purchaser under the Purchase Agreement or the Servicer under the Servicing Agreement to permit any transfer, lien, security interest, mortgage, pledge or other encumbrance which would prohibit fulfillment of the Purchaser's obligations set forth in Section 6.11 of the Purchase Agreement or the initial Holder's obligations set forth in Section 5.1 hereinabove, including but not limited to each Obligor's right to pay-for and receive a recorded title deed for that Obligor's fully-paid Fairway Contract for Deed. For the avoidance of doubt, nothing in this Section 5.3(c) shall impose any restriction or serve as a limitation on Holder or any Affiliate thereof from entering into any credit facility or obtaining any financing secured by the Participation Certificate, Holder's Participation, any Timeshare Interest, Villa, Building, Timeshare Document (other than a Fairway Contract for Deed), Timeshare Contract, Contract for Deed, any asset acquired by the Purchaser under the Purchase Agreement or any related asset.

### 5.4    RGI's Put.

(a) Holder does hereby grant to RGI, from and after the Closing Date, the right (but not the obligation) to convey to Holder, and Holder agrees to accept from RGI (and pay to RGI the Non-Performance Fee) the conveyance of, all (but not less than all) of RGI's right, title and interest in and to the Timeshare Contract Payments and Collection Rights of each Non-Performing Timeshare Contract if, but only if, (i) RGI has submitted to Holder (in its sole discretion) a written demand for conveyance under this Section 5.4(a) and (ii) the relevant Non-Performing Timeshare Contract qualifies as such under either clause (a) or clause (c) of the definition of "Non-Performing Timeshare Contract".  Upon the receipt by Holder of the aforesaid written demand from RGI and the payment by Holder to RGI of the Non-Performance Fee in respect thereof, and without any further action required by any other party hereto, all of RGI's right, title and interest in and to the Timeshare Contract Payments and Collection Rights of such Non-Performing Timeshare Contract (including, without limitation, the related Fairway Contract for Deed) are, and shall be deemed to be, conveyed to Holder (without any representation, warranty or recourse other than that RGI has good title to such Timeshare Contract Payments and Collection Rights (including, without limitation, the related Fairway Contract for Deed), free and clear of any lien or other adverse claim other than Permitted Liens as described in clause (a) or (c) of the definition thereof), RGI shall cause the Hypothecation Lender to release all liens and security interests created under the Hypothecation Loan and Security Documents on such Timeshare Contract Payments and Collection Rights (including, if applicable, the related Fairway Contract for Deed) in accordance with the relevant provisions governing such release as set forth in the Hypothecation Loan and Security Documents, and all interests of RGI otherwise in and to such Non-Performing Timeshare Contract are, and shall be deemed to be, terminated and released and RGI shall mark its books and records accordingly. RGI agrees to take such other reasonable action as shall be necessary to properly effect such conveyance and release as

19

may be reasonably requested by Holder, including executing any documentation in order to evidence such conveyance and release and directing the custodian of the related Timeshare Documents and Fairway Contract for Deed to deliver the originals thereof to Holder or its designee, all at the sole cost and expense of Holder. Holder agrees to pay RGI any Non-Performance Fee in respect of a Non-Performing Timeshare Contract within thirty (30) days of the receipt of a written demand therefor so long as RGI has taken all such reasonable action. Holder further agrees that it will not undertake the collection, amendment, modification, refinancing or reinstatement of any Non-Performing Timeshare Contract so conveyed to Holder under this Section 5.4(a) but rather Holder shall promptly pursue all termination, forfeiture and foreclosure rights with respect to the Timeshare Interest underlying such Non-Performing Timeshare Contract. To the extent that Holder should recover any payments on any Non-Performing Timeshare Contract so conveyed to it under this Section 5.4(a), RGI's Retained Ownership Percentage of such payments (such payments being net of all costs and expenses of Holder in effecting such recovery) shall be promptly paid by Holder as additional consideration for the conveyance of such Non-Performing Timeshare Contract.

(b) Holder does hereby grant to RGI, from and after the Closing Date, the right (but not the obligation) to convey to Holder, and Holder agrees to accept from RGI (and pay to RGI an amount equal to RGI's Retained Ownership Percentage of the unpaid balance of principal, interest and Fees of the below described Timeshare Contract or Fairway Contract for Deed (except that, prior to full repayment of the Hypothecation Loan, 100% of the outstanding principal and accrued and unpaid interest and Fees (if applicable) for the below described Timeshare Contract or Fairway Contract for Deed will be paid directly by the Holder to the Hypothecation Lender (pursuant to written direction from Hypothecation Lender) and applied pursuant to the relevant provisions of the Hypothecation Loan and Security Documents) the conveyance of, all (but not less than all) of RGI's right, title and interest in and to the Timeshare Contract Payments and Collection Rights of any Improperly Interfered With Timeshare Contract if, but only if, (i) RGI has submitted to Holder (in its sole discretion) a written demand for conveyance under this Section 5.4(b) and (ii) the relevant Timeshare Contract or Fairway Contract for Deed qualifies as an Improperly Interfered With Timeshare Contract. Upon the receipt by Holder of the aforesaid written demand from RGI and the payment by Holder to RGI or Hypothecation Lender prior to the full repayment of the Hypothecation Loan of the aforesaid amount in respect thereof, and without any further action required by any other party hereto, RGI's right, title and interest in and to the Timeshare Contract Payments and Collection Rights of such Improperly Interfered With Timeshare Contract (including, without limitation, the related Fairway Contract for Deed) are, and shall be deemed to be, conveyed to Holder (without any representation, warranty or recourse, other than that RGI has good title to such Timeshare Contract Payments and Collection Rights (including, without limitation, the related Fairway Contract for Deed), free and clear of any lien or other adverse claim), RGI shall cause the Hypothecation Lender to release all liens and security interests created under the Hypothecation Loan and Security Documents on such Timeshare Contract Payments and Collection Rights (including, without limitation, the related Fairway Contract for Deed) in accordance with the relevant provisions governing such release as set forth in the Hypothecation Loan and Security Documents, and all interests of RGI otherwise in and to

DOC ID - 24901624.15
5037022-100403 04/07/2017

such Improperly Interfered With Timeshare Contract are, and shall be deemed to be, terminated and released and RGI shall mark its books and records accordingly. RGI agrees to take such other reasonable action as shall be necessary to properly effect such conveyance and release as may be reasonably requested by Holder, including executing any documentation in order to evidence such conveyance and release and directing the custodian of the related Timeshare Documents and Fairway Contract for Deed to deliver the originals thereof to Holder or its designee, all at the sole cost and expense of Holder. RGI's rights under this Section 5.4(b) shall reduce any indemnification to which RGI would otherwise be entitled under Article 7 hereof in respect of such Improperly Interfered With Timeshare Contract on a dollar-for-dollar basis. Holder agrees to pay to RGI the aforesaid amount in respect of an Improperly Interfered With Timeshare Contract within thirty (30) days of the receipt of a written demand therefor so long as RGI has taken all such reasonable action. Notwithstanding the foregoing, to the extent the Hypothecation Lender is entitled to receipt of the aforementioned amount in respect of an Improperly Interfered With Timeshare Contract, such amount shall be paid to Hypothecation Lender before Hypothecation Lender will have any obligation to release its lien on the related Timeshare Contract Payments and Collection Rights (including, without limitation, the related Fairway Contract for Deed).

5.5    **Holder's Call**.  RGI does hereby grant to Holder, from and after the date that is nine months following the Closing Date, the right (but not the obligation) to require RGI to convey to Holder all (but not less than all) of RGI's right, title and interest in and to the Timeshare Contract Payments and Collection Rights of each Non-Performing Timeshare Contract if, but only if, (i) Holder has submitted (in its sole discretion) to RGI a written demand for conveyance under this Section 5.5 and certifies that it intends to enforce its rights and remedies with respect to the Non-Performing Timeshare Contract, (ii) the relevant Non-Performing Timeshare Contract qualifies as such under either clause (b) or clause (c) of the definition of "Non-Performing Timeshare Contract", and (iii) Holder pays to RGI the Non-Performance Fee in respect of such conveyance.  Upon the receipt by RGI of the aforesaid written request from Holder and the payment by Holder to RGI of the Non-Performance Fee in respect thereof and any other amounts then due and payable under this Agreement in respect of the Timeshare Contract Payments of such Non-Performing Timeshare Contract, and without any further action required by any other party hereto, RGI's right, title and interest in and to the Timeshare Contract Payments and Collection Rights of such Non-Performing Timeshare Contract (including, without limitation, the related Fairway Contract for Deed) are, and shall be deemed, conveyed to Holder (without any representation, warranty or recourse, other than that RGI has good title to such Timeshare Contract Payments and Collection Rights (including, without limitation, the related Fairway Contract for Deed), free and clear of any lien or other adverse claim), RGI shall cause the Hypothecation Lender to release all liens and security interests created under the Hypothecation Loan and Security Documents on such Timeshare Contract Payments and Collection Rights (including, without limitation, the related Fairway Contract for Deed) in accordance with the relevant provisions governing such release as set forth in the Hypothecation Loan and Security Documents, and all interests of RGI otherwise in and to such Non-Performing Timeshare Contract are, and shall be deemed, terminated and released and RGI shall mark its books and records accordingly.  RGI agrees to take such other reasonable action as shall be necessary to properly effect such conveyance and release, including executing any documentation in order to evidence such conveyance and release and directing the custodian

21

of the related Timeshare Documents and Fairway Contract for Deed to deliver the originals thereof to Holder or its designee, all at the sole cost and expense of Holder.  For the avoidance of doubt, Holder will not exercise its rights under this <u>Section 5.5</u> prior to the date that is nine months following the Closing Date.  Holder agrees to pay to RGI any Non-Performance Fee in respect of a Non-Performing Timeshare Contract within thirty (30) days of issuing a written demand therefor.  Holder further agrees that it will not undertake any collection, amendment, modification, refinancing or reinstatement of any Non-Performing Timeshare Contract so conveyed to Holder under this <u>Section 5.5</u> but rather Holder shall promptly pursue all termination, forfeiture and foreclosure rights with respect to the Timeshare Interest underlying such Non-Performing Timeshare Contract.  To the extent that Holder should recover any payments on any Non-Performing Timeshare Contract at any time following the sending of the aforesaid written demand for conveyance, RGI's Retained Ownership Percentage of such payments (such payments being net of all costs and expenses of Holder in effecting such recovery) shall be promptly paid by Holder as additional consideration for the conveyance of such Non-Performing Timeshare Contract under this <u>Section 5.5</u>.

## ARTICLE 6:  INDEMNIFICATION FOR BENEFIT OF HOLDER.

**6.1    Holder Indemnitees.**    RGI hereby indemnifies Holder and its Affiliates (collectively, the "<u>Holder Indemnitees</u>") from and against, and agree to hold each of them harmless from, Damages incurred or suffered by the Holder Indemnitees resulting from any breach of RGI's obligations under this Agreement or resulting from any representation or warranty made by RGI under this Agreement having been untrue or incorrect when made, excluding in each case, any Damages that were caused by a Holder Indemnitee's gross negligence or willful misconduct, in each case, subject to the following limitations:

(a) from and after the date that is twenty-four (24) months following the Closing Date, RGI shall not be under any obligation to indemnify any Holder Indemnitee for any Damages incurred or suffered by the Holder Indemnitees resulting from any representation or warranty made by RGI under this Agreement (other than those made under <u>Section 8.11(c)</u> hereof) having been untrue or incorrect when made; provided that if at such time, any claims for indemnification under this clause shall be pending, RGI's obligations hereunder as to such claims shall continue until such claims are satisfied or otherwise disposed of in accordance with the terms hereof;

(b) from and after the date that is thirty-six (36) months following the Closing Date, RGI shall not be under any obligation to indemnify any Holder Indemnitee for any Damages incurred or suffered by the Holder Indemnitees resulting from any representation or warranty made by RGI under <u>Section 8.11(c)</u> hereof having been untrue or incorrect when made; provided that if at such time, any claims for indemnification under this clause shall be pending, RGI's obligations hereunder as to such claims shall continue until such claims are satisfied or otherwise disposed of in accordance with the terms hereof;

(c) from and after the date that is twenty-four (24) months following the Closing Date, RGI shall not be under any obligation to indemnify any Holder Indemnitee for any Damages incurred or suffered by the Holder Indemnitees resulting from any breach of RGI's obligations under this Agreement that were required to be performed on or prior to the

22

Closing Date; provided that if at such time, any claims for indemnification under this clause shall be pending, RGI's obligations hereunder as to such claims shall continue until such claims are satisfied or otherwise disposed of in accordance with the terms hereof; and

(d) from and after the date that is twenty-four (24) months following the date performance was due, said 24-month period to run from the date of each such breach, RGI shall not be under any obligation to indemnify any Holder Indemnitee for any Damages incurred or suffered by the Holder Indemnitees resulting from any breach of RGI's obligations under this Agreement that were required to be performed after the Closing Date; provided that if at such time, any claims for indemnification under this clause shall be pending, RGI's obligations hereunder as to such claims shall continue until such claims are satisfied or otherwise disposed of in accordance with the terms hereof.

## 6.2    Direct Claims of Holder.

(a) Any claim by any Holder Indemnitee on account of Damages under Section 6.1(a) hereof shall be asserted by such Holder Indemnitee giving RGI prompt written notice thereof; provided, however, that no delay on the part of such Holder Indemnitee in notifying RGI shall relieve RGI from any obligation hereunder unless (and then solely to the extent) RGI is prejudiced thereby.  Such notice by such Holder Indemnitee shall describe such claim in reasonable detail, shall include copies of all material written evidence thereof within such Holder Indemnitee's possession, shall indicate the estimated amount, if reasonably practicable, of the Damages that have been or may be sustained by the Holder Indemnitee, and the Section of this Agreement under which the applicable indemnification obligation arises.  RGI shall have thirty (30) days after its receipt of such notice to respond in writing to such claim. During such 30-day period, RGI shall make such investigation of such claim as it considers necessary or desirable.  For the purpose of such investigation, such Holder Indemnitee shall make available to RGI such information as RGI may reasonably request.  If RGI does not so respond within such 30-day period or dispute such claim, RGI shall be deemed to have rejected such claim, in which case the Holder Indemnitees shall be free to pursue such remedies as may be available to the Holder Indemnitees on the terms and subject to the provisions of this Agreement and as available under Applicable Law.

(b) Holder Indemnitees and RGI agree that, with respect to any breach of RGI's obligations under this Agreement that results in a reduction of Timeshare Contract Payments, Damages with respect thereto shall include (but not be limited to) the restoration of the Holder's Ownership Percentage of such payments, as and when they were scheduled to have been paid under the applicable Timeshare Contracts and Fairway Contracts for Deed.

## 6.3    Third Party Claims Against RGI.

(a) If a Person who is not a Party to this Agreement or an Affiliate of a Party to this Agreement or a representative of the foregoing shall notify any Holder Indemnitee with respect to any matter which may give rise to a claim for indemnification against RGI under Section 6.1 hereof (a "Third Party Claim Against RGI"), then the Holder Indemnitees shall promptly notify RGI thereof in writing; provided, however, that no delay on the part of the Holder Indemnitees in notifying RGI shall relieve RGI from any obligation hereunder

23

unless (and then solely to the extent) RGI is prejudiced thereby.  Such notice will describe the Third Party Claim Against RGI in reasonable detail, will include copies of all material written evidence thereof and will indicate the estimated amount, if reasonably practicable, of Damages that has been or may be sustained by the Holder Indemnitees.

(b) RGI shall be entitled to participate in the defense of a Third Party Claim Against RGI and, unless RGI is also a party to such Proceeding and the Holder Indemnitee determines that joint representation would be inappropriate and subject to the limitations set forth in this Section 6.3, shall be entitled to control and appoint lead counsel for such defense, which counsel must be reasonably satisfactory to the Holder Indemnitee, in each case at RGI's expense.  Within ten (10) days following the receipt of notice by the Holder Indemnitee of any Third Party Claim Against RGI, RGI shall provide notice to the Holder Indemnitee of its election to assume control of the defense of such Third Party Claim Against RGI in accordance with the provisions of this Section 6.3.

(c) If RGI shall assume the control of the defense of any Third Party Claim Against RGI in accordance with the provisions of this Section 6.3, (i) it will be conclusively established for purposes of this Agreement that such Third Party Claim Against RGI is within the scope of and subject to indemnification under this Article 6, (ii) RGI shall obtain the prior written consent of the Holder Indemnitee before entering into any settlement of such Third Party Claim Against RGI, if (A) the settlement does not fully, completely and unconditionally release the Holder Indemnitee from all liabilities and obligations with respect to such Third Party Claim Against RGI, (B) the settlement contains any admission of liability or wrongdoing on the part of the Holder Indemnitee or (C) the settlement imposes any injunctive or other equitable relief against the Holder Indemnitee and (iii) the Holder Indemnitee shall be entitled to participate in the defense of such Third Party Claim Against RGI and to employ separate counsel of its choice for such purpose at its own expense; provided, however, that the Holder Indemnitee shall have the right to employ, at RGI's expense, one counsel of its choice in each applicable jurisdiction (if more than one jurisdiction is involved) to represent the Holder Indemnitee if, in the Holder Indemnitee's reasonable judgment, there exists an actual or potential conflict of interest between the Holder Indemnitee and RGI or if RGI (x) elects not to defend, compromise or settle a Third Party Claim Against RGI, (y) fails to notify the Holder Indemnitee within the required time period of its election as provided in Section 6.3(b), or (z) having timely elected to defend a Third Party Claim Against RGI, fails, in the reasonable judgment of the Holder Indemnitee, after at least ten (10) days' notice to RGI, to adequately prosecute or pursue such defense, and in each such case the Holder Indemnitee may defend such Third Party Claim Against RGI on behalf of and for the account and risk of RGI, and in each such case, the Holder Indemnitee may settle such Third Party Claim Against RGI and seek indemnification for the amount of such settlement against RGI (including reasonable costs and expenses, including attorneys' fees) in accordance with this Article 6.

(d) Holder and RGI shall each cooperate, and cause their respective Affiliates to cooperate, in the defense or prosecution of any Third Party Claim Against RGI and shall furnish or cause to be furnished such records, information and testimony, and attend such

DOC ID - 24901624.15
5037022-100403 04/07/2017

conferences, discovery proceedings, hearings, trials or appeals, as may be reasonably requested in connection therewith.

**6.4    Adjustment of Indemnification Owed to Holder Indemnitees**.

(a)  Subject to Section 8.11(d) hereof in any case, all indemnification payable by RGI to the Holder Indemnitees shall be reduced by any indemnification payments owing from Holder to RGI under Section 7 hereof, with such indemnification payments being considered to have been paid by virtue of such reduction).

(b)  RGI shall not have any obligation to indemnify any Holder Indemnitee for any Damages under this Article 6 unless and until the aggregate amount of Damages suffered or incurred by the Holder Indemnitees exceeds One Hundred Thousand Dollars ($100,000.00) (the "Holder Deductible"), in which event RGI shall be liable only for such Damages in excess of the Holder Deductible.  The maximum aggregate liability RGI shall have under this Agreement, including but not limited to Article 6, the Purchase Agreement and the Servicing Agreement with respect to Damages (as defined herein, in the Purchase Agreement and the Servicing Agreement, as the case may be), breaches of obligations, undertakings, representations and warranties hereunder and thereunder and other liabilities or indemnified amounts in respect hereof or thereof (regardless of the theory under which such liabilities arise) including (y) any such liabilities in respect of special, indirect, incidental, consequential, exemplary and punitive damages or (z) any liabilities in respect of the Transactions under this Agreement, the Servicing Agreement or the Purchase Agreement arising from a violation of Applicable Law by RGI or any duty imposed on RGI by Applicable Law, as to which, in each such case, RGI has a payment obligation or liability to the Holder hereunder or the Purchaser under the Purchase Agreement or the Servicer under the Servicing Agreement), and the maximum aggregate amount payable by RGI with respect to such Damages, obligations, undertakings, representations, warranties and other liabilities referred to above or otherwise, shall not exceed the Indemnification Cap (excluding any claims arising from willful misconduct, fraud or intentional misrepresentation on the part of RGI with respect to the Transactions; provided that any claims arising under the Purchase Agreement shall nevertheless be subject to the last sentence of Section 8.5(b) of the Purchase Agreement), it being understood that the Indemnification Cap shall be for the benefit of any direct or indirect permitted successors or assignees of RGI.  For the avoidance of doubt, any amounts owing by RGI in respect of the Holder's Participation (including, without limitation amounts in respect of Hypothecation Distribution Advances) shall not be subject to the Indemnification Cap.  The parties hereto acknowledge and agree that the termination or rescission of the Purchase Agreement, by court order, mutual agreement or otherwise, shall result in the termination or rescission of this Agreement.

(c)  Each Holder Indemnitee shall use commercially reasonable efforts to mitigate any Damages for which such Holder Indemnitee is seeking indemnification hereunder.  The amount of Damages payable by RGI under this Article 6 shall be reduced by any insurance proceeds or other reimbursement arrangements with any third party, by way of indemnification or otherwise, actually recovered or recoverable by the Holder Indemnitees with respect to the claim for which indemnification is sought (whether or not the Indemnitee chooses to pursue such recovery). If, following the payment of any indemnification claim

25

hereunder, the amount of Damages is reduced by recovery, settlement or otherwise under or pursuant to any claim, recovery, settlement or payment by or against any other entity, the amount of such reduction will promptly be repaid by the Holder Indemnitees to RGI.

### ARTICLE 7:  INDEMNIFICATION FOR BENEFIT OF RGI.

**7.1     RGI Indemnitees**.  Holder hereby indemnifies RGI and its respective Affiliates (collectively, the "RGI Indemnitees") from and against, and agrees to hold each of them harmless from, Damages incurred or suffered by the RGI Indemnitees resulting from any breach of Holder's obligations under this Agreement or resulting from any representation or warranty made by Holder under this Agreement having been untrue or incorrect when made, excluding in each case, any Damages that were caused by a RGI Indemnitee's gross negligence or willful misconduct, in each case, subject to the following limitations:

(a) from and after the date that is twenty-four (24) months following the Closing Date, Holder shall not be under any obligation to indemnify any RGI Indemnitee for any Damages incurred or suffered by the RGI Indemnitees resulting from any representation or warranty made by Holder under this Agreement (other than those made under Section 8.11(c) and Section 5.3(c) hereof) having been untrue or incorrect when made; provided that if at such time, any claims for indemnification under this clause shall be pending, Holder's obligations hereunder as to such claims shall continue until such claims are satisfied or otherwise disposed of in accordance with the terms hereof;

(b) from and after the date that is thirty-six (36) months following the Closing Date, Holder shall not be under any obligation to indemnify any RGI Indemnitee for any Damages incurred or suffered by the RGI Indemnitees resulting from any representation or warranty made by Holder under Section 8.11(c) and Section 5.3(c) hereof having been untrue or incorrect when made; provided that if at such time, any claims for indemnification under this clause shall be pending, Holder's obligations hereunder as to such claims shall continue until such claims are satisfied or otherwise disposed of in accordance with the terms hereof;

(c) from and after the date that is twenty-four (24) months following the Closing Date, Holder shall not be under any obligation to indemnify any RGI Indemnitee for any Damages incurred or suffered by the RGI Indemnitees resulting from any breach of Holder's obligations under this Agreement that were required to be performed on or prior to the Closing Date; provided that if at such time, any claims for indemnification under this clause shall be pending, Holder's obligations hereunder as to such claims shall continue until such claims are satisfied or otherwise disposed of in accordance with the terms hereof; and

(d) from and after the date that is twenty-four (24) months following the date performance was due, said 24-month period to run from the date of each such breach, Holder shall not be under any obligation to indemnify any RGI Indemnitee for any Damages incurred or suffered by the RGI Indemnitees resulting from any breach of Holder's obligations under this Agreement that were required to be performed after the Closing Date; provided that if at such time, any claims for indemnification under this clause shall be pending, Holder's obligations hereunder as to such claims shall continue until such claims are satisfied or otherwise disposed of in accordance with the terms hereof.

26

**7.2     Direct Claims of RGI**.  Any claim by a RGI Indemnitee on account of Damages under <u>Section 7.1</u> above shall be asserted by such RGI Indemnitee giving Holder prompt written notice thereof; provided, however, that no delay on the part of such RGI Indemnitee in notifying Holder shall relieve Holder from any obligation hereunder unless (and then solely to the extent) Holder is prejudiced thereby.  Such notice by such RGI Indemnitee shall describe such claim in reasonable detail, shall include copies of all material written evidence thereof within such RGI Indemnitee's possession, shall indicate the estimated amount, if reasonably practicable, of the Damages that have been or may be sustained by such RGI Indemnitee, and the Section of this Agreement under which the applicable indemnification obligation arises.  Holder shall have thirty (30) days after its receipt of such notice to respond in writing to such claim. During such 30-day period, Holder shall make such investigation of such claim as is considered necessary or desirable.  For the purpose of such investigation, such RGI Indemnitee shall make available to Holder such information as Holder may reasonably request.  If Holder does not so respond within such 30-day period or dispute such claim, Holder shall be deemed to have rejected such claim, in which case the RGI Indemnitees shall be free to pursue such remedies as may be available to the RGI Indemnitees on the terms and subject to the provisions of this Agreement and as available under Applicable Law.

**7.3     Third Party Claims Against Holder**.

(a)  If a Person who is not a Party to this Agreement or an Affiliate of a Party to this Agreement or a representative of the foregoing shall notify any RGI Indemnitee with respect to any matter which may give rise to a claim for indemnification against a Holder under <u>Section 7.1</u> hereof (a "<u>Third Party Claim Against Holder</u>"), then the RGI Indemnitees shall promptly notify Holder thereof in writing; provided, however, that no delay on the part of the RGI Indemnitees in notifying Holder shall relieve Holder from any obligation hereunder unless (and then solely to the extent) Holder is prejudiced thereby.  Such notice will describe the Third Party Claim Against Holder in reasonable detail, will include copies of all material written evidence thereof and will indicate the estimated amount, if reasonably practicable, of Damages that has been or may be sustained by the RGI Indemnitees, and the Section of this Agreement under which the applicable indemnification obligation arises.

(b)  Holder shall be entitled to participate in the defense of a Third Party Claim Against Holder and, unless Holder is also a party to such Proceeding and the RGI Indemnitee determines that joint representation would be inappropriate and subject to the limitations set forth in this <u>Section 7.3</u>, shall be entitled to control and appoint lead counsel for such defense, which counsel must be reasonably satisfactory to the RGI Indemnitee, in each case at Holder's expense.  Within ten (10) days following the receipt of notice by the RGI Indemnitee of any Third Party Claim Against Holder, Holder shall provide notice to the RGI Indemnitee of its election to assume control of the defense of such Third Party Claim Against Holder in accordance with the provisions of this <u>Section 7.3</u>.

(c)  If Holder shall assume the control of the defense of any Third Party Claim Against Holder in accordance with the provisions of this <u>Section 7.3</u>, (i) it will be conclusively established for purposes of this Agreement that such Third Party Claim Against Holder is within the scope of and subject to indemnification under this <u>Article 7</u>, (ii) Holder shall obtain the prior written consent of the RGI Indemnitee before entering into any

27

settlement of such Third Party Claim Against Holder, if (A) the settlement does not fully, completely and unconditionally release the RGI Indemnitee from all liabilities and obligations with respect to such Third Party Claim Against Holder, (B) the settlement contains any admission of liability or wrongdoing on the part of the RGI Indemnitee or (C) the settlement imposes any injunctive or other equitable relief against the RGI Indemnitee and (iii) the RGI Indemnitee shall be entitled to participate in the defense of such Third Party Claim Against Holder and to employ separate counsel of its choice for such purpose at its own expense; *provided*, *however*, that the RGI Indemnitee shall have the right to employ, at Holder's expense, one counsel of its choice in each applicable jurisdiction (if more than one jurisdiction is involved) to represent the RGI Indemnitee if, in the RGI Indemnitee's reasonable judgment, there exists an actual or potential conflict of interest between the RGI Indemnitee and Holder or if Holder (x) elects not to defend, compromise or settle a Third Party Claim Against Holder, (y) fails to notify the RGI Indemnitee within the required time period of its election as provided in Section 7.3(b), or (z) having timely elected to defend a Third Party Claim Against Holder, fails, in the reasonable judgment of the RGI Indemnitee, after at least ten (10) days' notice to Holder, to adequately prosecute or pursue such defense, and in each such case the RGI Indemnitee may defend such Third Party Claim Against Holder on behalf of and for the account and risk of Holder, and in each such case, the RGI Indemnitee may settle such Third Party Claim Against Holder and seek indemnification for the amount of such settlement against Holder (including reasonable costs and expenses, including attorneys' fees) in accordance with this Article 7.

(d) Each of Holder and RGI shall cooperate, and cause their respective Affiliates to cooperate, in the defense or prosecution of any Third Party Claim Against Holder and shall furnish or cause to be furnished such records, information and testimony, and attend such conferences, discovery proceedings, hearings, trials or appeals, as may be reasonably requested in connection therewith.

**7.4     Adjustment of Indemnification Owed to RGI Indemnitees**.

(a) Subject to Section 8.11(e) hereof in any case, all indemnification payable by Holder to the RGI Indemnitees shall be reduced by any indemnification payments owing from the RGI Indemnitors to the Holder Indemnitees under Article 6 hereof, with such indemnification payments being considered to have been paid by virtue of such reduction.

(b) No Holder shall have any obligation to indemnify any RGI Indemnitee for any Damages under this Article 7 unless and until the aggregate amount of Damages suffered or incurred by the RGI Indemnitees exceeds One Hundred Thousand Dollars ($100,000.00) (the "RGI Deductible"), in which event Holder shall be liable only for such Damages in excess of the RGI Deductible. The maximum aggregate liability Holder shall have under this Agreement, including but not limited to Article 7, together with the aggregate liability the Purchaser shall have under the Purchase Agreement and the Servicer shall have under the Servicing Agreement with respect to Damages (as defined herein, in the Purchase Agreement and the Servicing Agreement, as the case may be), breaches of obligations, undertakings, representations and warranties hereunder and thereunder and other liabilities or indemnified amounts in respect hereof or thereof (regardless of the theory under which such liabilities arise) including (y) any such liabilities in respect of special, indirect, incidental,

28

consequential, exemplary and punitive damages or (z) any liabilities in respect of the Transactions under this Agreement, the Servicing Agreement or the Purchase Agreement arising from a violation of Applicable Law by Holder, the Purchaser or the Servicer, as applicable, or any duty imposed on Holder, the Purchaser or the Servicer, as applicable, by Applicable Law, as to which, in each such case, Holder, the Purchaser or the Servicer, as applicable, has a payment obligation or liability to RGI hereunder or thereunder), and the maximum aggregate amount payable by Holder (together with Purchaser and Servicer) with respect to such Damages, obligations, undertakings, representations, warranties and other liabilities referred to above or otherwise, shall not exceed the Indemnification Cap (excluding any claims arising from willful misconduct, fraud or intentional misrepresentation on the part of Holder, the Purchaser or the Servicer with respect to the Transactions; provided that any claims arising under the Purchase Agreement shall nevertheless be subject to the penultimate sentence of Section 8.5(b) of the Purchase Agreement), it being understood that the Indemnification Cap shall be for the benefit of any direct or indirect permitted successors or assignees of Holder, the Purchaser or the Servicer.  For the avoidance of doubt, any amounts owing by Purchaser under the Purchase Agreement in respect of PMA Liabilities shall not be subject to the Indemnification Cap.  The parties hereto acknowledge and agree that the termination or rescission of the Purchase Agreement, by court order, mutual agreement or otherwise, shall result in the termination or rescission of this Agreement.

(c) Each RGI Indemnitee shall use commercially reasonable efforts to mitigate any Damages for which such RGI Indemnitee is seeking indemnification hereunder. The amount of Damages payable by a Holder Indemnitee under this Article 7 shall be reduced by any insurance proceeds or other reimbursement arrangements with any third party, by way of indemnification or otherwise, actually recovered or recoverable by the RGI Indemnitee with respect to the claim for which indemnification is sought (whether or not the RGI Indemnitee chooses to pursue such recovery).  If, following the payment of any indemnification claim hereunder, the amount of Damages is reduced by recovery, settlement or otherwise under or pursuant to any claim, recovery, settlement or payment by or against any other entity, the amount of such reduction will promptly be repaid by the RGI Indemnitees to the applicable Holder.

## ARTICLE 8:  MISCELLANEOUS.

**8.1    Notices**.

(a) All notices, requests, claims, demands and other communications required or permitted to be given under this Agreement shall be in writing and shall be delivered by hand, sent by facsimile or sent, postage prepaid, return receipt requested, by registered, certified or express mail or overnight courier service and shall be deemed given when so delivered by hand or facsimile (if received prior to 5 p.m. in the place of receipt and such day is a Business Day in the place of receipt; otherwise, any such notice, request or communication shall be deemed not to have been received until the next succeeding Business Day in the place of receipt), or if mailed, three (3) days after mailing (one (1) Business Day in the case of express mail or overnight courier service), to the respective Parties at the following addresses (or at such other address for a Party as shall be specified in a notice given in accordance with this Section 8.1):

if to Holder, to:

> CRE Bushkill Group, LLC
> 1008 Sand Hill Road
> East Stroudsburg, PA 18302

> with a copy to (which shall not constitute notice):

> Schulte Roth & Zabel LLP
> 919 Third Avenue
> New York, New York 10022
> Attention:  Boris Ziser
> Telephone: (212) 756-2140
> Facsimile:  (212) 593-5955

if to RGI, to:

> Resorts Group, Inc.
> 819 Ann Street
> Stroudsburg, PA 18360
> Attention: Andy Worthington
> Telephone:  570-350-2681
> Email:  aworthington@resortsgroup.com

*with a copy to* (which shall not constitute notice):

> Harry Van Sciver
> 575 Mistic Drive
> Marstons Mills, Ma. 02648
> Attention:  Harry Van Sciver
> Telephone:  508-428-3458
> Facsimile: 508-428-0607
> Email:  hvansciver@resortsgroup.com

> and:

> Mark S. Turner
> 261 Young Road
> Sciota, PA 18354
> Email: mturner@resortsgroup.com

> and:

> Thomas V. Casale

30

204 Bellis Court
Stroudsburg, PA  18360
Email: tcasale@resortsgroup.com

(b) RGI shall act as notification agent for the RGI Indemnitors and RGI Indemnitees hereunder.  Holder shall act as notification agent for the Holder Indemnitees hereunder.  Any notice required under Section 6 or Section 7 hereof to be given to the RGI Indemnitors or RGI Indemnitees shall be deemed given if given to RGI.  Any notice required under Section 6 or Section 7 hereof to be given to Holder or Holder Indemnitees shall be deemed given if given to Holder.

**8.2     Amendments and Waivers**.

(a) Any provision of this Agreement may be amended or waived if, but only if, such amendment or waiver is in writing and is signed, in the case of an amendment, by each Party, or in the case of a waiver, by the Party against whom the waiver is to be effective.

(b) Any waiver of any term or condition of this Agreement shall not be construed as a waiver of any subsequent breach, or a subsequent waiver of the same term or condition or a waiver of any other term or condition, of this Agreement.  The failure of any Party to assert any of its rights hereunder shall not constitute a waiver of any of such rights.  No failure or delay by any Party in exercising any right, power or privilege under this Agreement shall operate as a waiver thereof nor shall any single or partial exercise thereof preclude any other or further exercise thereof or the exercise of any other right, power or privilege.  The rights and remedies provided in this Agreement shall be cumulative and not exclusive of any rights or remedies provided by Law.

**8.3     Expenses.**  Except specifically as provided for in Articles 6 and 7 hereof, all costs and expenses (including fees and disbursement of its counsel, accountants and other advisors) incurred in connection with the preparation, negotiation, execution, delivery or performance of this Agreement shall be paid by the Party incurring such cost or expense.

**8.4     Successors and Assigns.**  The provisions of this Agreement shall be binding upon and inure to the benefit of the Parties and their respective successors and assigns; provided that

(a) except with respect to the pledge of any Holder's participation interest granted hereunder, which shall not require RGI's consent, no Holder may sell, assign, delegate or otherwise transfer or dispose of any of its rights or obligations under this Agreement (whether by contract or operation of law or otherwise) unless (i) RGI shall have consented, in writing, to such sale, assignment, delegation, transfer and disposition, which consent shall not be unreasonably withheld, delayed or conditioned; provided that no such consent shall be required if the transferee or assignee is an Affiliate of Holder, and (ii) such Holder shall have complied with the requirements of Section 2.9 hereof;

(b) RGI may not sell, assign, delegate or otherwise transfer or dispose of any of its rights or obligations under this Agreement (whether by contract or operation of law or

DOC ID - 24901624.15
5037022-100403 04/07/2017

otherwise) unless Holder shall have consented in writing thereto, which consent shall not unreasonably be withheld (it being understood that it shall be reasonable for the Holder to withhold its consent if such sale, assignment, delegation or other transfer or disposition is to a Person that is or is an Affiliate of a competitor of the Holder or any of its Affiliates).

8.5     **Governing Law**.  This Agreement (and any claims or disputes arising out of or related to this Agreement, whether for breach of contract, tortious conduct or otherwise and whether predicated on common law, statute or otherwise) shall in all respects be governed by and construed in accordance with the laws of the State of New York (including Section 5-1401 of the General Obligations Laws of the State of New York but otherwise without regard to conflicts of law principles), including all matters of construction, validity and performance, in each case without reference to any conflict of law rules that might lead to the application of the laws of any other jurisdiction.  Each Party further agrees that the laws of the State of New York bear a reasonable relationship to this Agreement and irrevocably and unconditionally waives any objection to the application of the laws of the State of New York to any action, suit or proceeding arising out of this Agreement and further irrevocably and unconditionally waives and agrees not to plead or claim that any such action, suit or proceeding should not be governed by the laws of the State of New York.

8.6     **Consent to Jurisdiction**.    Each Party hereto hereby irrevocably and unconditionally submits, for itself and its property, to the exclusive jurisdiction of the Supreme Court of the State of New York sitting in New York County and of the United States District Court of the Southern District of New York, and any appellate court from any thereof, in any action or proceeding arising out of or relating to this Agreement, or for recognition or enforcement of any judgment, and each of the parties hereto hereby irrevocably and unconditionally agrees that all claims in respect of any such action or proceeding may be heard and determined in such New York State court (or, to the extent permitted by law, in such Federal court).  Each Party hereto agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law. Each Party hereby waives formal service of process and agrees that service of any process, summons, notice or document by U.S. registered mail to such Party's respective address set forth above shall be effective service of process for any action, suit or proceeding in New York with respect to any matters to which it has submitted to jurisdiction in this Section 8.6.  Each Party irrevocably and unconditionally waives, any objection to the laying of venue of any action, suit or proceeding arising out of this Agreement in such courts and hereby and thereby further irrevocably and unconditionally waives and agrees not to plead or claim in any such court that any such action, suit or proceeding brought in any such court has been brought in an inconvenient forum.

8.7     **WAIVER OF JURY TRIAL**.  EACH PARTY HEREBY EXPRESSLY AND IRREVOCABLY WAIVES TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT TO ANY ACTION, PROCEEDING OR COUNTERCLAIM (WHETHER BASED ON CONTRACT, TORT OR OTHERWISE) DIRECTLY OR INDIRECTLY RELATING TO ANY DISPUTE ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.    Each Party (a) certifies that no

DOC ID - 24901624.15
5037022-100403 04/07/2017

representative, agent or attorney of the other Party has represented, expressly or otherwise, that such other Party would not, in the event of litigation, seek to enforce the foregoing waiver and (b) acknowledges that it and the other Party have been induced to enter into this Agreement, by, among other things, the mutual waivers and certifications in this <u>Section 8.7</u>.

**8.8    Counterparts; Third Party Beneficiaries**.  This Agreement may be signed in any number of counterparts (including by facsimile or other electronic signature), each of which shall be an original, with the same effect as if the signatures were upon the same instrument. This Agreement shall become effective when each Party shall have received a counterpart of this Agreement signed by each other Party.  Except as specifically provided for in <u>Articles 6 and 7</u> hereof with respect to named third-party indemnitees, this Agreement is for the sole benefit of the Parties and their successors and permitted assigns and nothing express or implied in this Agreement is intended or shall be construed to confer upon any Person other than the Parties any legal or equitable rights or remedies under this Agreement.  Notwithstanding the foregoing, the Hypothecation Lender shall be an express third-party beneficiary of Section 4.1 of this Agreement, with the right to enforce such provision as if it were a direct party hereto.

**8.9    Severability**.  If any provision of this Agreement (or any portion thereof) or the application of any such provision (or any portion thereof) to any Person or circumstance shall be held invalid, illegal or unenforceable in any respect by a court of competent jurisdiction, such invalidity, illegality or unenforceability shall not affect any other provision of this Agreement (or the remaining portion thereof) or the application of such provision to any other Person or circumstances.  Upon such determination that any term or other provision is invalid, illegal or incapable of being enforced, the Parties shall negotiate in good faith to modify this Agreement so as to effect the original intent of the Parties as closely as possible in a mutually acceptable manner in order that the transactions contemplated hereby are completed as originally contemplated to the greatest extent possible.

**8.10    Entire Agreement**.  This Agreement constitutes the entire agreement and understanding among the Parties with respect to the subject matter of this Agreement and supersedes all prior agreements and understandings, both oral and written, among the Parties with respect to the subject matter of this Agreement.

**8.11    Miscellaneous**.

(a) All payments to be made by one Party to another Party hereunder shall be made by wire transfer (or other means specifically designated by the receiving Party) of immediately available funds pursuant to written payment instructions submitted to the paying Party reasonably in advance of the applicable date for such payments.

(b) Holder represents and warrants to the other Parties hereto that it is an "accredited investor" as defined under Rule 501 of Regulation D promulgated under the Securities Act of 1933, as amended.

(c) Each Party represents and agrees that the making and performance of this Agreement is within the power of such Party and has been duly authorized by all necessary corporate, company and other action by it, that this Agreement is in compliance with all

DOC ID - 24901624.15
5037022-100403 04/07/2017

Applicable Laws and regulations promulgated thereunder with respect to such Party and does not conflict with any agreements by which such Party is bound, and that this Agreement has been duly executed by it, and constitutes the legal, valid, and binding obligation of such Party, enforceable in accordance with its terms.  Each Party hereto represents and warrants to the other Parties hereto that the execution, delivery and performance by such Party of this Agreement does not and will not require any consent, license, or approval of, registration or filing with, or any other action by, any Governmental Authority.   RGI represents and warrants to the other Parties hereto that it has good and valid title to the Timeshare Contract Payments and Collection Rights, free and clear of any lien or other adverse claim other than Permitted Liens.  Holder represents and warrants to RGI that Holder has obtained and will maintain all licenses, registrations, approvals, exemptions, authorizations, bonds and permits from, and has made and hereafter will make all filings with, any governmental authority that are required under Applicable Law for Holder to discharge its undertakings and duties hereunder. Each Party shall conduct its businesses, and shall perform its material obligations hereunder, in compliance with Applicable Law.

(d)  Subject to any express provision to the contrary set forth in this Agreement, each Party agrees and acknowledges that any payment owing to any (receiving) Party by another (paying) Party under this Agreement may be reduced by

(i)  any amounts such (receiving) Party owes to such other (paying) Party under this Agreement,

(ii)  if such (receiving) Party is Purchaser, the Servicer or an Affiliate of Purchaser or the Servicer and the other (paying) Party is RGI or an Affiliate of RGI, any amounts Purchaser or the Servicer or such Affiliate of Purchaser or the Servicer owes to RGI or such Affiliate of RGI under the Purchase Agreement or the Servicing Agreement, as applicable, and

(iii)  if such (receiving) Party is RGI or an Affiliate of RGI and the other (paying) Party is Purchaser, the Servicer or an Affiliate of Purchaser or the Servicer, any amounts RGI or such Affiliate of RGI owes to Purchaser or the Servicer or such Affiliate of Purchaser or the Servicer under the Purchase Agreement or the Servicing Agreement, as applicable.

Such offsets shall be deemed to satisfy the obligations to which they relate under the applicable documents.  No set-off or reduction provided for in this Section 8.11(d) may be effected to the extent of the excess referred to below if such set-off or reduction is in respect of an indemnification payment or other payment subject to the Indemnification Cap, and the Indemnification Cap applicable to this Agreement, the Purchase Agreement and/or the Servicing Agreement would be exceeded after giving effect to such set-off or reduction.  For the avoidance of doubt, no other set-off or reduction is allowed hereunder.

(e)  In order to evidence Holder's Participation, RGI hereby agrees, consents to and acknowledges that Holder may file a UCC financing statement against RGI in respect of Holder's Participation.  Such UCC will reflect that it is junior and subordinate to the interest of Hypothecation Lender as set forth in <u>Section 4.1</u> hereof.  RGI shall not and shall not

34

instruct or permit any other Person to file any termination statement or any amendment in respect of such UCC financing statement.

(f) If RGI determines at any time that any amount received by Holder hereunder or under the Servicing Agreement must be returned to the applicable Obligor or paid to any other Person or entity pursuant to any Applicable Law, upon written confirmation from the Servicer that said amount was paid to Holder and such amount must be so returned, Holder will promptly (but in any event on the next Business Day) after written demand by RGI repay Holder's Ownership Percentage of such amounts that were paid to Holder by RGI or the Servicer together with Holder's pro rata share of interest at such rate, if any, as RGI shall be obligated to pay to such Obligor or such other Person or entity with respect thereto.

(g) Notwithstanding prior provisions to the contrary, this Agreement and all rights and obligations of the Parties hereto shall terminate on the Termination Date, provided that Section 2.9(b), Article 6, Article 7 and Article 8 hereof shall remain in effect until the first anniversary of the Termination Date, provided further that, if at the time of such first anniversary, any claims for indemnification under Article 6 or Article 7  hereof shall be pending, Article 6, Article 7 and Article 8 as to such pending claims, shall continue in full force and effect until such claims are satisfied or otherwise disposed of in accordance with the terms thereof.

(h) The Parties hereto acknowledge and agree that Section 6.10 of the Purchase Agreement is hereby incorporated herein by reference and made a part hereof and shall be applicable to each of the Parties hereto.

[Signatures Page Follows]

35

**IN WITNESS WHEREOF,** the parties have hereunto set their hands and seals to this Agreement as of the date and year first above written.

**RESORTS GROUP, INC.**

By: _____
Name:  W. Andrew Worthington
Title:  President and Chief Executive Officer

**CRE BUSHKILL GROUP, LLC**

By: _____
Name:  W. Andrew Worthington
Title:  President and Chief Executive Officer

*[Signature page - Participation Agreement]*